1  Teresa S. Renaker – CA State Bar No. 187800
   Lindsay Nako – CA State Bar No. 239090
2  LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C.
   1330 Broadway, Suite 1800
3  Oakland, CA  94612
   Telephone: (510) 839-6824
4  Facsimile: (510) 839-7839
   trenaker@lewisfeinberg.com
5  lnako@lewisfeinberg.com

6  *Attorneys for Plaintiff*

7

8

9              IN THE UNITED STATES DISTRICT COURT

10         FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                   SAN FRANCISCO DIVISION

12 YVONNE GLOVER,                    )  Case No. 07-02652-CRB
                                     )
13              Plaintiff,           )  **DECLARATION OF LINDSAY NAKO**
                                     )  **IN OPPOSITION TO DEFENDANT'S**
14      vs.                          )  **MOTION TO DISMISS FOR LACK OF**
                                     )  **PERSONAL JURISDICTION**
15 SBC COMMUNICATIONS, INC.,         )
                                     )  Date:       July 27, 2007
16              Defendant.           )  Time:       10:00 a.m.
                                     )  Courtroom:  8
17 _____)  Judge:      Hon. Charles R. Breyer

18

19 I, Lindsay Nako, declare as follows:

20      1.      I am an attorney with Lewis, Feinberg, Lee, Renaker & Jackson, P.C., which is

21 counsel for Plaintiff in this action. I am admitted to practice law in good standing before this

22 Court. All facts stated herein are true and correct within my personal knowledge.

23      2.      On June 26, 2007, Teresa Renaker and I received a telephone call from

24 Defendant's Counsel Forrest E. Fang. Mr. Fang requested that we stipulate to reschedule the

25 hearing on Plaintiff's Motion to Remand to the date of the hearing on Defendant's Motion to

26 Dismiss for Lack of Personal Jurisdiction. We declined to so stipulate and described an

27 alternative proposal. Mr. Fang informed us that he would discuss our proposal with Susan

28 Kumagai of his firm and provide a response. We did not receive a response from Mr. Fang or

1 | Ms. Kumagai.

2 |     3.      In a confirming letter dated June 26, 2007, we described our alternative proposal

3 | as follows: "In response, we proposed a stipulation which would keep the hearing on the Motion

4 | to Remand on Friday, July 20, 2007, and would allow Defendant to respond to the motion and

5 | appear before the Court to oppose the motion without consenting to the Court's jurisdiction or

6 | waiving any defects in personal jurisdiction. In addition, the stipulation would schedule the

7 | hearing on the pending Motion to Dismiss for an appropriate date after the Motion to Remand is

8 | decided. We also offered to stipulate that, if your removal of this action is determined to be

9 | proper, we will dismiss SBC Communications, Inc. as a defendant and amend our complaint to

10 | name the disability benefit plan, the Pacific Telesis Group Comprehensive Disability Benefit

11 | Plan, on a benefits claim under ERISA § 502(a)(1)(B)."

12 |     4.      On June 29, 2007, my office received, by e-filing, Defendant's Motion to

13 | Reschedule Hearings on Plaintiff's Motion to Remand and on Defendant's Motion to Dismiss for

14 | Lack of Personal Jurisdiction to Same Date.

15 |     5.      Attached hereto as Exhibit 1 is a true and correct copy of the Form 10-K filed by

16 | AT&T Inc. with the Securities and Exchange Commission for the fiscal year ending on

17 | December 31, 2006. I printed this document from the SEC website on July 5, 2007.

18 |     6.      Attached hereto as Exhibit 2 is a true and correct copy of the COBRA Enrollment

19 | Notice dated January 13, 2005, sent from SBC to Yvonne Glover.

20 |     7.      Attached hereto as Exhibit 3 is a true and correct copy of the letter dated June 2,

21 | 2005, from Deanna Medina, Human Resources Case Manager, to Yvonne Glover.

22 |     8.      Attached hereto as Exhibit 4 is a true and correct copy of the June 2, 2005, Notice

23 | to Employee as to Change in Relationship prepared for Yvonne Glover. Personal data identifiers

24 | have been redacted, pursuant to General Order No. 53.

25 |     9.      Attached hereto as Exhibit 5 is a true and correct copy of check number

26 | 2007770413, dated June 2, 2005, issued by SBC/Pacific Bell Telephone Company, and payable

27 | to the order of Yvonne D. Glover. Personal data identifiers have been redacted, pursuant to

28 | General Order No. 53.

10.    Attached hereto as Exhibit 6 is a true and correct copy of the letter dated September 21, 2005, from Heidi Lassler, Appeals Specialist, SBC Medical Absence & Accommodations Resource Team, to Teresa Renaker, "Re: Pacific Telesis Group's Comprehensive Disability Benefits Plan (CDPB) [sic], Claim Number: A325033343-0001-07 Yvonne Glover."

11.    Attached hereto as Exhibit 7 is a true and correct copy of the cover and pages 911 and 912 of the "AT&T Yellow Pages: Oakland and Surrounding Area," September 2006.

12.    Attached hereto as Exhibit 8 is a true and correct copy of Exhibit 21 to the Form 10-K filed by AT&T Inc. with the Securities and Exchange Commission for the fiscal year ending on December 31, 2006.  I printed this document from the SEC website on July 5, 2007.

13.    Attached hereto as Exhibit 9 is a true and correct copy of the confirming letter I sent to Mr. Fang on June 26, 2007.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of July, 2007, at Oakland, California.

Lindsay Nako

# EXHIBIT 1

10-K 1 att10_k.htm AT&T INC. 2006 FORM 10-K

## FORM 10-K

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

(Mark One)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**

**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2006**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)**

**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to**

Commission File Number: 1-8610

**AT&T INC.**

Incorporated under the laws of the State of Delaware
I.R.S. Employer Identification Number 43-1301883

175 E. Houston, San Antonio, Texas 78205-2233
Telephone Number 210-821-4105

Securities registered pursuant to Section 12(b) of the Act: (See attached Schedule A)

Securities registered pursuant to Section 12(g) of the Act: None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12-b2 of the Exchange Act. Large accelerated filer ☒ Accelerated filer ☐ Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

Based on the closing price of $27.89 per share on June 30, 2006, the aggregate market value of our voting and non-voting common stock held by non-affiliates was $108.3 billion.

At January 31, 2007, common shares outstanding were 6,244,142,361.

**DOCUMENTS INCORPORATED BY REFERENCE**

(1)  Portions of AT&T Inc.'s Annual Report to Stockholders for the fiscal year ended December 31, 2006 (Parts I and II).

(2)  Portions of AT&T Inc.'s Notice of 2007 Annual Meeting and Proxy Statement dated on or about March 12, 2007 to be filed within the period permitted under General Instruction G(3) (Parts III and IV).

## SCHEDULE A

Securities Registered Pursuant To Section 12(b) Of The Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Shares (Par Value $1.00 Per Share) | New York Stock Exchange |
| 7.00% Forty Year SBC Communications Inc. Notes, Due June 1, 2041 | New York Stock Exchange |
| 6.375% Forty-Nine Year AT&T Inc. Notes, Due February 12, 2056 | New York Stock Exchange |

## TABLE OF CONTENTS

| Item | | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business | 1 |
| 1A. | Risk Factors | 9 |
| 2. | Properties | 10 |
| 3. | Legal Proceedings | 10 |
| 4. | Submission of Matters to a Vote of Security Holders | 10 |
| | Executive Officers of the Registrant | 11 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 12 |
| 6. | Selected Financial Data | 12 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| 7A. | Quantitative and Qualitative Disclosures about Market Risk | 12 |
| 8. | Financial Statements and Supplementary Data | 13 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 13 |
| 9A. | Controls and Procedures | 13 |
| 9B. | Other Information | 13 |
| | **PART III** | |
| 10. | Directors, Executive Officers and Corporate Governance | 14 |
| 11. | Executive Compensation | 14 |
| 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 15 |
| 13. | Certain Relationships and Related Transactions, and Director Independence | 16 |
| 14. | Principal Accountant Fees and Services | 16 |
| | **PART IV** | |
| 15. | Exhibits and Financial Statement Schedules | 16 |

AT&T Inc.

# PART I

## ITEM 1. BUSINESS

### GENERAL

AT&T Inc. ("AT&T," "we" or the "Company") is a holding company incorporated under the laws of the State of Delaware in 1983 and has its principal executive offices at 175 E. Houston, San Antonio, Texas 78205-2233 (telephone number 210-821-4105). We maintain an Internet website at www.att.com. (This website address is for information only and is not intended to be an active link or to incorporate any website information into this document.) We make available, free of charge, on our website our annual report on Form 10-K, our quarterly reports on Form 10-Q, current reports on Form 8-K and all amendments to those reports as soon as reasonably practicable after such reports are electronically filed with the Securities and Exchange Commission (SEC). We also make available on that website, and in print, if any stockholder or other person so requests, our code of business conduct and ethics entitled "Code of Ethics" applicable to all employees and Directors, our "Corporate Governance Guidelines," and the charters for the Audit, Human Resources and Corporate Governance and Nominating Committees of our Board of Directors. Any changes to our Code of Ethics or waiver of our Code of Ethics for senior financial officers, executive officers or Directors will be posted on that website.

### History

AT&T, formerly known as SBC Communications Inc. (SBC), was formed as one of several regional holding companies created to hold AT&T Corp.'s (ATTC) local telephone companies. On January 1, 1984, we were spun-off from ATTC pursuant to an anti-trust consent decree, becoming an independent publicly traded telecommunications services provider. At formation, we primarily operated in five southwestern states. Our subsidiaries merged with Pacific Telesis Group in 1997, Southern New England Telecommunications Corporation in 1998 and Ameritech Corporation in 1999, thereby expanding our wireline operations as the incumbent local exchange carrier (ILEC) into a total of 13 states. In November 2005, one of our subsidiaries merged with ATTC, creating one of the world's largest telecommunications providers. In connection with the merger, we changed the name of our company from "SBC Communications Inc." to "AT&T Inc." On December 29, 2006, one of our subsidiaries merged with BellSouth Corporation (BellSouth) expanding our service offerings to an additional nine states. With the BellSouth acquisition, we thereby acquired BellSouth's 40 percent economic interest in AT&T Mobility LLC (AT&T Mobility), formerly Cingular Wireless LLC, resulting in 100 percent ownership of AT&T Mobility. Our services and products are marketed under the AT&T brand name, including alliances such as AT&T Yahoo! and AT&T | DISH Network. In 2007, we began rebranding our wireless operations from Cingular to AT&T.

### Scope

We rank among the largest providers of telecommunications services in the United States and the world. We offer our services and products to consumers in the U.S. and services and products to businesses and other providers of telecommunications services worldwide.

The services and products that we offer vary by market, and include: local exchange services, wireless communications, long-distance services, data/broadband and Internet services, telecommunications equipment, managed networking, wholesale services and directory advertising and publishing. We group our operating subsidiaries as follows, corresponding to our operating segments for financial reporting purposes:

- AT&T wireline subsidiaries provide primarily landline telecommunications services to residential, business, and governmental customers, both domestically and internationally,
- AT&T Mobility provides both wireless voice and data communications services across the U.S. and, through roaming agreements, in a substantial number of foreign countries and is held by a wireless subsidiary of AT&T,
- directory subsidiaries provide services related to directory advertising and publishing,
- other subsidiaries provide results from Sterling Commerce Inc. (Sterling), all corporate and other operations and results of BellSouth for the two days following the December 29, 2006 acquisition.

We provide telecommunications services throughout the U.S. and internationally. Our traditional wireline subsidiaries operate in thirteen states: Arkansas, California, Connecticut, Illinois, Indiana, Kansas, Michigan, Missouri, Nevada, Ohio, Oklahoma, Texas and Wisconsin (13-state area). The BellSouth wireline subsidiaries operate in nine states: Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina and Tennessee (BellSouth region). Wireline local exchange services offered in our 13-state area and the BellSouth region are provided through regulated subsidiaries which operate within authorized regions subject to regulation by each state in which they operate and by the Federal Communications Commission (FCC). Additional information relating to regulation is contained under the heading "Government Regulation" below

and in the 2006 AT&T Annual Report to Stockholders under the heading "Operating Environment and Trends of the Business," and is incorporated herein by reference pursuant to General Instruction G(2).

Our acquisitions of BellSouth and ATTC will help change the focus of our company towards business and broadband/data revenues and wireless product integration with AT&T Mobility. Discussed below are the factors upon which we are focusing in 2007.

**Business Markets**
With the acquisitions of BellSouth and ATTC, we expect to strengthen the reach and sophistication of our network facilities and our ability to offer a variety of global communications services, both wireless and wireline, to large businesses and wholesale customers worldwide. We expect significant opportunity in the small- and medium-business markets and to increase our governmental and large-business (referred to as "enterprise") customer base. We also expect to extend our wholesale business to other service products and systems integration services.

**Data/Broadband**
**U-verse Services (Project Lightspeed)** In June 2004, we announced key advances in developing a network capable of delivering a new generation of integrated digital television, high-speed broadband and Voice over Internet Protocol (VoIP) services to our residential and small-business customers. We have been building out this network in numerous locations and are now providing AT&T U-verse$^{SM}$ services, including U-verse TV (IPTV) video, in limited parts of 11 markets as of year-end 2006 and expect to launch additional markets during 2007. Our deployment strategy is to enter each market on a limited basis in order to ensure that all operating and back-office systems are functioning successfully and then expand within each market as we continue to monitor these systems to ensure customer satisfaction with our services. In these market expansions, we expect to continue to use contracted outside labor in addition to our employees as installers; our rate of expansion will be slowed if we cannot hire and train an adequate number of technicians to keep pace with customer demand. During our launch into these additional markets, we also expect to add additional features to our IP video service offering. We expect to have the capability to offer service to approximately 19 million living units by the end of 2008, as part of our initial deployment, and expect to spend approximately $4,600 in network-related deployment costs and capital expenditures from 2006 through 2008, as well as additional customer activation capital expenditures. We remain on budget for this overall target and expect to spend approximately $3,100 during 2007 and 2008. These expenditures may increase slightly if the programming and features of the video offering expand or if additional network conditioning is required.

With respect to our IP video service, we continue to work with our vendors to continue to improve, in a timely manner, the requisite hardware and software technology. Our deployment plans could be delayed if we do not receive required equipment and software on schedule. We have completed most negotiations, and consistent with our profitability assumptions, with programming owners (e.g., movie studios and cable networks) to offer existing television programs and movies and, if applicable, other new interactive services. Also, as discussed in the "Regulatory Developments" section, we are supporting legislation at the state level that would streamline the regulatory process for new video competitors to enter the market.

We believe that IPTV is subject to federal oversight as a "video service" under the Federal Communications Act. However, some cable providers and municipalities have claimed that certain IP services should be treated as a traditional cable service and therefore subject to the applicable state and local regulation, which could include the requirement to pay fees to obtain local franchises for our IP video service. Certain municipalities have refused us permission to use our existing right-of-ways to deploy or activate our U-verse-related services and products, resulting in litigation. Pending negotiations and current or threatened litigation involving municipalities could delay our deployment plans in those areas for 2007 and future years. If the courts were to decide that state and local regulation were applicable to our U-verse services, it could have a material adverse effect on the cost, timing and extent of our deployment plans.

Additional information about Project Lightspeed is included in our "Operating Environment and Trends of the Business" section under the heading "Expected Growth Areas" on page 31 of the 2006 AT&T Annual Report to Stockholders and is incorporated herein by reference pursuant to General Instruction G(2).

**Voice over Internet Protocol** VoIP is generally used to describe the transmission of voice using Internet-Protocol-based technology rather than a traditional wire and switch-based telephone network. A company using this technology often can provide voice services at a lower cost because this technology uses bandwidth more efficiently than a traditional network and because this technology has not been subject to traditional telephone industry regulation. But, depending on the bandwidth allocated, VoIP services may not necessarily be of the same quality as traditional telephone service. The FCC has ongoing proceedings that will address various regulatory issues, including universal service, intercarrier compensation, numbering, disability access and consumer protection.

2

Notwithstanding the unresolved regulatory questions before the FCC and various state public utility commissions, numerous communications providers have begun providing various forms of VoIP or announced their intentions to do so in the near future. These providers include both established companies as well as new entrants. Thus, while the deployment of VoIP will result in increased competition for our voice services, it also presents growth opportunities for us to develop new products for our customers. Additional information relating to VoIP is contained in the 2006 AT&T Annual Report to Stockholders in our "Regulatory Developments" section under the heading "Voice over Internet Protocol," and is incorporated herein by reference pursuant to General Instruction G(2).

**Wireless**
AT&T Mobility began operations in October 2000 as a joint venture between us and BellSouth. Upon our acquisition of BellSouth, AT&T Mobility became a wholly-owned subsidiary. In 2004, AT&T Mobility acquired AT&T Wireless Services, Inc.

Prior to the BellSouth merger, revenues from AT&T Mobility were recognized as equity in net income of affiliates in our Consolidated Statements of Income and were recorded in our wireless segment for segment reporting. Following the December 29, 2006 acquisition, we now record wireless revenues and expenses in our operating income and will continue to present wireless results in our wireless segment. As of December 31, 2006, we served approximately 61 million customers and are the largest provider of mobile wireless voice and data communications services in the U.S in terms of customer base.

Our wireless networks contain digital transmission technologies known as Global System for Mobile Communication (GSM), Time Division Multiple Access (TDMA), General Packet Radio Services (GPRS) and Enhanced Data Rates for GSM Evolution (EDGE) for data communications. We have substantially completed deploying Universal Mobile Telecommunications System/ High-Speed Downlink Packet Access (UMTS/HSPDA) third generation (3G) network technology in our network covering most major metropolitan areas of the U.S. UMTS/HSDPA provides superior speeds for data and video services, as well as operating efficiencies, using the same spectrum and infrastructure for voice and data on an IP-based platform.

3

AT&T Inc.

## BUSINESS OPERATIONS

**Operating Segments**
Our segments are strategic business units that offer different products and services and are managed accordingly. We analyze our various operating segments based on segment income. Interest expense, interest income and other income (expense) – net, are managed only on a total company basis and are, accordingly, reflected only in consolidated results. Therefore, these items are not included in the calculation of each segment's percentage of our total segment income. As a result of our November 2005 acquisition of ATTC, we have revised our segment reporting to represent how we now manage our business, restating prior periods to conform to the current segments. Due to the proximity of our acquisition of BellSouth to year-end, we have reported those results from the time of closing through year-end in the other segment even though there may be some overlap in the products and service provided by that segment and our wireline and/or directory segments. We have four reportable segments: (1) wireline; (2) wireless; (3) directory; and (4) other.

Additional information about our segments, including financial information, is included under the heading "Segment Results" on pages 20 through 29 and in Note 4 of the 2006 AT&T Annual Report to Stockholders and is incorporated herein by reference pursuant to General Instruction G(2).

**Wireline**
Wireline is our largest operating segment, providing approximately 58% of 2006 segment operating revenues and 54% of our 2006 total segment income. Our wireline segment consists of our subsidiaries that operate as both retail and wholesale sellers of communication services domestically and internationally. At December 31, 2006, our wireline subsidiaries were serving approximately 25 million retail consumer lines, 17 million retail business lines and 4 million wholesale lines (including approximately 1 million lines sold through ATTC), for a total of 46 million access lines.

*Services and Products*
We divide our wireline services into three product-based categories: voice, data and other.

**Voice** – Voice includes traditional local and long-distance service provided to retail customers and wholesale access to our network and individual network elements provided to competitors. Voice also includes calling features, fees to maintain wire located inside customer premises, pay telephones, customer premise equipment and other equipment sales and other miscellaneous voice products. We also have a number of integrated voice and data services, such as integrated network connections, that provide customers the ability to integrate access for their voice and data services, the data component of which is included in the data category. Additionally, voice revenues do not include any of our VoIP revenues, which are included in data revenues.

Long distance consists of traditional long distance and international long distance for customers that select us as their primary long-distance carrier. Long distance also includes services provided by calling card, 1-800 services and conference calling. These services are used in a wide variety of business applications, including sales, reservation centers or customer service centers. Other long-distance services offered include call routing by origination point, time-of-day routing and virtual private network applications, including dedicated outbound facilities. We also provide wholesale switched access service to other service providers.

Calling features are enhanced telephone services available to retail customers such as Caller ID, Call Waiting and voice mail. Customers that subscribe to these services can have the number and/or name of callers displayed on their phone, be signaled that additional calls are incoming, and send and receive voice messages. These services are not regulated by the FCC and are generally more profitable than basic local phone service.

**Data** – Data includes traditional products, such as switched and dedicated transport, Internet access and network integration, and data equipment sales. Additionally, data products include high-speed connections such as private lines, packet, dedicated Internet and enterprise networking services, as well as products such as DSL/broadband, dial-up Internet access and WiFi (local radio frequency commonly known as wireless fidelity). We also provide businesses voice applications over IP-based networks (i.e., Enhanced Virtual Private Networks or "EVPN"). Over the past several years, we have built out our new multi protocol label switching/asynchronous transfer mode, or MPLS/ATM network, to supplement, and eventually replace, our other extensive global data networks. These products allow us to provide highly complex global data networks.

Private line uses high-capacity digital circuits to transmit from point-to-point in multiple configurations and allows customers to create internal data networks and to access external data networks.

4

Switched Transport services transmit data using switching equipment to transfer the data between multiple lines before reaching its destination. Dedicated Transport services use a single direct line to transmit data between destinations. Integrated Services Digital Network (ISDN), Dedicated Frame Relay, broadband digital subscriber lines (DSL), Digital Services and Synchronous Optical Network (SONET) are examples of Dedicated Transport services. ISDN transmits voice, video and data over a single line in support of a wide range of applications, including Internet access. Frame Relay is a routing technology that breaks a data signal into individual pieces of data to travel at high speeds and then recombines the data prior to arriving at its destination. DSL is a digital modem technology that converts existing twisted-pair telephone lines into access paths for multimedia and high-speed data communications to the Internet or private networks. DSL allows customers to simultaneously make a phone call and access information via the Internet or an office local area network. Digital Services use dedicated digital circuits to transmit digital data at various high rates of speed. SONET provides customer access to our backbone network at various high speeds.

Network integration services include installation of business data systems, local area networking and other data networking offerings. Internet access services include a wide range of products for residences and businesses, varying by market. Internet services offered include basic dial-up access service, dedicated access, web hosting, e-mail and high-speed access services.

Packet services consist of data networks using packet switching and transmission technologies, including Frame Relay, asynchronous transfer mode (ATM) and IP connectivity services. Packet services enable customers to transmit large volumes of data economically and securely and are used for local area network interconnection, remote site, point of sale and branch office communications. Frame relay, including IP-enabled frame relay and ATM Services are widely deployed as private data networks. High speed packet services, including IP-enabled frame relay service, are used extensively by enterprise (large business) customers.

Dedicated Internet services are designed to meet the needs of all types of commercial and governmental enterprises, including small and medium sized businesses. Our managed Internet services provide customers with dedicated high speed access to the Internet managed by us.

Enterprise networking services provide comprehensive support from network design, implementation and installation to ongoing network operations and management for networks of varying scales, including local area networks, wide area networks, and virtual private networks. These services include applications such as e-mail, order entry systems, employee directories, human resource transactions and other database applications.

We also provide local, interstate and international wholesale networking capacity to other service providers. We offer a combination of high volume transmission capacity and conventional dedicated line services on a regional, national and international basis to wireless carriers, interchange carriers, Internet service providers (ISPs) and facility-based and switchless resellers. Our wholesale customers are primarily large ISPs, wireless carriers, competitive local exchange carriers, regional phone companies, interexchange carriers, cable companies and systems integrators. We also have sold dedicated network capacity through indefeasible rights-of-use agreements under which capacity is furnished for contract terms as long as 25 years.

**Other** – Other includes managed web hosting, application management, security service, integration services, customer premises equipment, outsourcing, directory and operator assistance services, government-related services and AT&T | DISH Network video services.

Our managed web-hosting services for businesses provide network, server and security infrastructure as well as built-in data storage and include application performance management, database management, hardware and operating system management. Our hosting services also provide customers with secure access to detailed reporting information about their infrastructure and applications. Security services include business continuity and disaster recovery services as well as premise and network based security products.

Customer premises equipment and other equipment sales range from single-line and cordless telephones to sophisticated digital PBX systems. PBX is a private telephone switching system, typically used by businesses and usually located on a customer's premises, which provides intra-premise telephone services as well as access to our network.

5

AT&T Inc.

**Wireless**
Our wireless segment reflects 100 percent of the results reported by AT&T Mobility. Prior to our December 29, 2006 acquisition of BellSouth, our consolidated financial statements reported our 60 percent proportionate share of AT&T Mobility's results as equity in net income of affiliates. For segment reporting, we reported this equity in net income of affiliates in our other segment. Following the BellSouth acquisition, as AT&T Mobility is now a wholly-owned subsidiary, we include 100 percent of our wireless results in our operating revenues and expenses under the appropriate line items of our Consolidated Statements of Income.

When analyzing our segment results, we evaluate wireless results on a stand-alone basis using information provided by AT&T Mobility during the year. Prior to the BellSouth acquisition, our consolidated operating revenues did not include AT&T Mobility's results. However, we did include 100 percent of wireless revenues and expenses excluding this adjustment when we analyzed our operating segment results. On that segment basis, the wireless segment provided approximately 37% of total segment operating revenues and 21% of our 2006 total segment income.

*Services and Products*
We offer a comprehensive range of high-quality nationwide wireless voice communications services in a variety of pricing plans, including postpaid and prepaid service plans. Our voice offerings are tailored to meet the communications needs of targeted customer segments, including youth, family, active professionals, small businesses government and major national corporate accounts.

**Service** – Our voice service is generally offered on a contract basis for one or two year periods, referred to as postpaid. Under the terms of these contracts, service is billed and provided on a monthly basis according to the applicable rate plan chosen. Our wireless services include basic local wireless communications service, long-distance service and roaming services. Roaming services enable our subscribers to utilize other carriers' networks when they are "roaming" outside our network footprint. We also charge fees to other carriers for providing roaming services to their customers when their customers utilize our network. We had approximately 50 million postpaid subscribers (excluding reseller subscribers) at December 31, 2006. Additionally, we offer prepaid service to meet the demands of distinct consumer segments, such as the youth market, families and small business customers, who prefer to control usage or pay in advance.

Wireless data continues to be a growing area of our business, with its revenue representing an increasing share of our overall subscriber revenue. We are experiencing solid growth from both consumer and enterprise wireless data services. We continue to upgrade our network and coordinate with equipment manufacturers and applications developers in order to further capitalize on the continued growth in the demand for wireless data services. We believe we are the largest provider of wireless data in the U.S. wireless industry based on subscribers.

**Equipment** – We sell a wide variety of handsets and personal computer wireless data cards manufactured by various suppliers for use with our voice and data services. We also sell accessories, such as carrying cases, hands-free devices, batteries, battery chargers and other items, to consumers, as well as to agents and other third-party distributors for resale. Like other wireless service providers, we provide postpaid contract subscribers substantial equipment subsidies to initiate or upgrade service.

Prior to our BellSouth acquisition, AT&T Mobility was an SEC registrant by virtue of its publicly traded debt securities and filed separate Forms 10-K, 10-Q and other reports with the SEC. Additional information on our wireless segment is contained in the 2006 AT&T Annual Report to Stockholders in the "Operating Environment and Trends of Business" section under the heading "Expected Growth Areas," "Wireless" beginning on page 31 and is incorporated herein by reference pursuant to General Instruction G(2).

**Directory**
Our directory segment includes our directory operations, which publish Yellow and White Pages directories and sell directory and Internet-based advertising. The directory segment provided approximately 4% of total segment operating revenues and 12% of our 2006 total segment income. Our directory subsidiaries operate primarily in our 13-state area. In November 2004, a subsidiary in our directory segment entered into a joint venture agreement with BellSouth and purchased the online directory publisher YELLOWPAGES.COM (YPC). Prior to our December 2006 acquisition of BellSouth, in our consolidated financial statements, we reported our proportionate share of YPC's results as equity in net income of affiliates. For segment reporting, we reported this equity in net income of affiliates in our directory segment. As of December 29, 2006, YPC is a wholly-owned subsidiary and we now include those results in our operating revenues and expenses under the appropriate line items of our Consolidated Statements of Income.

AT&T Inc.

**Other**
Our other segment includes operations from Sterling, our business integration software and services subsidiary, corporate and other operations. The other segment provided approximately 1% of total segment operating revenues and 13% of our 2006 total segment income.

Sterling provides "multi-enterprise collaboration" services to businesses in various industries, including retail, financial services, manufacturing, healthcare and telecom. In recent years, Sterling has completed a number of acquisitions in order to provide end-to-end order fulfillment for customers.

Due to proximity of the BellSouth acquisition to year-end, we have included those operations for the two days of 2006 following the acquisition. BellSouth provides voice, data/broadband and video services, similar to those provided in our 13-state area by our wireline segment, in the southeastern U.S. BellSouth also provides print and online directory services.

**MAJOR CLASSES OF SERVICE**

The following table sets forth the percentage of consolidated total reported operating revenues by any class of service that accounted for 10% or more of our consolidated total operating revenues in any of the last three fiscal years.

|  | Percentage of Total Consolidated Operating Revenues | | |
|---|---|---|---|
|  | **2006** | 2005 | 2004 |
| **Wireline Segment** | | | |
| Voice | **54%** | 56% | 58% |
| Data | **29%** | 25% | 22% |
| Other | **10%** | 10% | 9% |
| **Other Segment** | | | |
| Other | **2%** | 2% | 2% |

Prior to our December 2006 acquisition of BellSouth, our wireless segment revenues were reported in equity in net income of affiliates in our consolidated financial statements due to our equity accounting for the joint venture. We accounted for our 60 percent economic interest in AT&T Mobility under the equity method of accounting since we shared control equally with our 40 percent economic partner in the joint venture. We held equal voting rights and representation on the board of directors that controlled AT&T Mobility. Accordingly, our consolidated results included wireless results in the "Equity in Net Income of Affiliates" line. We did not report wireless revenues in our consolidated financial statements. However, when analyzing our segment results, we evaluated wireless results on a stand-alone basis. The table below shows the effect on our other classes of services (shown in the above table) if we include 100% of AT&T Mobility's revenues added to our total segment operating revenues.

|  | Percentage of Total Segment Operating Revenues (including 100% of AT&T Mobility) | | |
|---|---|---|---|
|  | **2006** | 2005 | 2004 |
| **Wireline Segment** | | | |
| Voice | **34%** | 31% | 39% |
| Data | **18%** | 14% | 15% |
| Other | **6%** | 5% | 6% |
| **Wireless Segment** | | | |
| Wireless subscriber | **34%** | 39% | 29% |
| Other | **4%** | 5% | 3% |
| **Other Segment** | | | |
| Other | **1%** | 1% | 1% |

7

AT&T Inc.

## GOVERNMENT REGULATION

Our wireline and BellSouth subsidiaries are subject to regulation by state commissions which have the power to regulate intrastate rates and services, including local, long-distance and network access services. These subsidiaries are also subject to the jurisdiction of the FCC with respect to interstate and international rates and services, including interstate access charges. Access charges are designed to compensate our wireline subsidiaries for the use of their networks by other carriers.

Wireless communications providers must be licensed by the FCC to provide communications services at specified spectrum frequencies within specified geographic areas and must comply with the rules and policies governing the use of the spectrum as adopted by the FCC. Additionally, while wireless communications providers' prices and service offerings are generally not subject to state regulation, an increasing number of states are attempting to regulate or legislate various aspects of wireless services.

Our subsidiaries operating outside the U.S. are subject to the jurisdiction of national regulatory authorities in the market where service is provided. Regulation is generally limited to operational licensing authority for the provision of enterprise services.

Additional information relating to federal and state regulation of our subsidiaries is contained in the 2006 AT&T Annual Report to Stockholders under the heading "Operating Environment and Trends of the Business" beginning on page 30, and is incorporated herein by reference pursuant to General Instruction G(2).

## IMPORTANCE, DURATION AND EFFECT OF LICENSES

Certain of our subsidiaries own or have licenses to various patents, copyrights, trademarks and other intellectual property necessary to conduct business. We actively pursue patents, trademarks and service marks to protect our intellectual property within the U.S. and abroad. We maintain a global portfolio of more than 5,000 trademark and service mark registrations. We have also entered into agreements that permit other companies, in exchange for fees and subject to appropriate safeguards and restrictions, to utilize certain of our trademarks and service marks. We periodically receive offers from third parties to obtain licenses for patent and other intellectual rights in exchange for royalties or other payments as well as notices asserting that our products or services infringe on their patents and other intellectual property rights. While the outcome of any litigation is uncertain, we do not believe that the resolution of any of these infringement claims or the expiration or non-renewal of any of our intellectual property rights would have a material adverse affect on our results of operations.

## MAJOR CUSTOMER

No customer accounted for 10% or more of our consolidated revenues in 2006, 2005 or 2004.

## COMPETITION

Information relating to competition in each of our operating segments is contained in the 2006 AT&T Annual Report to Stockholders under the heading "Competition" beginning on page 33, and is incorporated herein by reference pursuant to General Instruction G(2).

## RESEARCH AND DEVELOPMENT

The majority of our research and development activities are related to our wireline segment, performed at our subsidiary AT&T Labs. AT&T Labs' scientists and engineers conduct research in a variety of areas, including IP; advanced network design and architecture; network operations support systems; data mining technologies and advanced speech technologies. AT&T Labs works with our business units to create new services and invent tools and systems to manage secure and reliable networks for us and our customers. In addition to AT&T Labs, applied research, technology planning and evaluation services are also conducted at our wireline subsidiary, SBC Laboratories, Inc. We also have a research agreement with Telcordia Technologies, formerly Bell Communications Research, Inc. Research and development expenses were $223 in 2006, $130 million in 2005 and $86 million in 2004.

## EMPLOYEES

As of January 31, 2007, we employed approximately 302,000 persons. Approximately 60 percent of our employees are represented by the Communications Workers of America (CWA), the International Brotherhood of Electrical Workers (IBEW) or other unions.

8

AT&T Inc.

## ITEM 1A. RISK FACTORS

Information required by this Item is included in the 2006 AT&T Annual Report to Stockholders under the heading "Risk Factors" on page 43 through page 45 which is incorporated herein by reference pursuant to General Instruction G(2).

## CAUTIONARY LANGUAGE CONCERNING FORWARD-LOOKING STATEMENTS

The following factors could cause our future results to differ materially from those expressed in the forward-looking statements:

- Adverse economic changes in the markets served by us or in countries in which we have significant investments.
- Changes in available technology and the effects of such changes including product substitutions and deployment costs.
- Increases in our benefit plans' costs including increases due to adverse changes in the U.S. and foreign securities markets, resulting in worse-than-assumed investment returns and discount rates, and adverse medical cost trends.
- The final outcome of Federal Communications Commission proceedings and reopenings of such proceedings and judicial review, if any, of such proceedings, including issues relating to access charges, broadband deployment, unbundled loop and transport elements and wireless services.
- The final outcome of regulatory proceedings in the states in which we operate and reopenings of such proceedings, and judicial review, if any, of such proceedings, including proceedings relating to interconnection terms, access charges, universal service, UNE-Ps and resale and wholesale rates, broadband deployment including Project Lightspeed, performance measurement plans, service standards and traffic compensation.
- Enactment of additional state, federal and/or foreign regulatory and tax laws and regulations pertaining to our subsidiaries and foreign investments.
- Our ability to absorb revenue losses caused by increasing competition, including offerings using alternative technologies (e.g., cable, wireless and VoIP), and our ability to maintain capital expenditures.
- The extent of competition and the resulting pressure on access line totals and wireline and wireless operating margins.
- Our ability to develop attractive and profitable product/service offerings to offset increasing competition in our wireline and wireless markets.
- The ability of our competitors to offer product/service offerings at lower prices due to lower cost structures and regulatory and legislative actions adverse to us, including state regulatory proceedings relating to UNE-Ps and nonregulation of comparable alternative technologies (e.g., VoIP).
- The timing, extent and cost of deployment of our Project Lightspeed initiative; the development of attractive and profitable service offerings; the extent to which regulatory, franchise fees and build-out requirements apply to this initiative, and; the availability, cost and/or reliability of the various technologies and/or content required to provide such offerings.
- The outcome of pending or threatened litigation including patent claims against third parties doing business with us.
- The impact on our networks and business of major equipment failures, severe weather conditions, natural disasters or terrorist attacks.
- The issuance by the Financial Accounting Standards Board or other accounting oversight bodies of new accounting standards or changes to existing standards.
- The issuance by the Internal Revenue Service and/or state tax authorities of new tax regulations or changes to existing standards and actions by federal, state or local tax agencies and judicial authorities with respect to applying applicable tax laws and regulations; and the resolution of disputes with any taxing jurisdictions.
- Our ability to adequately fund our wireless operations, including access to additional spectrum; network upgrades and technological advancements.
- The impact of our acquisition of BellSouth, including the risk that the businesses will not be integrated successfully; the risk that the cost savings and any other synergies from the acquisition may take longer to realize than expected or may not be fully realized; and the disruption from the acquisition may make it more difficult to maintain relationships with customers, employees or suppliers.
- The impact of our acquisition of ATTC, including the risk that the businesses will not be integrated successfully; the risk that the cost savings and any other synergies from the acquisition may not be fully realized or may take longer to realize than expected; disruption from the integration process making it more difficult to maintain relationships with customers, employees or suppliers; and competition and its effect on pricing, spending, third-party relationships and revenues.
- Changes in our corporate strategies, such as changing network requirements or acquisitions and dispositions, to respond to competition and regulatory, legislative and technological developments.

Readers are cautioned that other factors discussed in this report, although not enumerated here, also could materially affect our future earnings.

AT&T Inc.

## ITEM 2. PROPERTIES

Our properties do not lend themselves to description by character and location of principal units. At December 31, 2006, approximately 75% of our property, plant and equipment was owned by our wireline subsidiaries and 15% was owned by our wireless subsidiaries. Network access lines represented approximately 32% of our telephone plant; central office equipment represented 32%; land and buildings represented 13%; other equipment, comprised principally of furniture and office equipment and vehicles and other work equipment, represented 17%; and other miscellaneous property represented 7%.

Substantially all of the installations of central office equipment are located in buildings and on land we own. Many garages, administrative and business offices and telephone centers are in leased quarters.

## ITEM 3. LEGAL PROCEEDINGS

We are a party to numerous lawsuits, regulatory proceedings and other matters arising in the ordinary course of business. Additional information regarding litigation is included in the 2006 AT&T Annual Report to Stockholders under the headings "Antitrust Litigation," "Retiree Phone Concession Litigation, " "NSA Litigation" and "AT&T Wireless Litigation" on page 37, which is incorporated herein by reference pursuant to General Instruction G(2). With respect to NSA Litigation, in late February 2007, the U.S. District Court in the Northern District of California ordered a limited stay on activity in the consolidated case while the Hepting appeal before the U.S. Court of Appeals for the Ninth Circuit is pending. As of the date of this report, we do not believe any pending legal proceedings to which we or our subsidiaries are subject are required to be disclosed as material legal proceedings pursuant to this item.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matter was submitted to a vote of stockholders in the fourth quarter of the fiscal year covered by this report.

10

AT&T Inc.

**EXECUTIVE OFFICERS OF THE REGISTRANT**
**(As of February 20, 2007)**

| Name | Age | Position | Held Since |
|------|-----|----------|------------|
| Edward E. Whitacre Jr. | 65 | Chairman and Chief Executive Officer | 1/1990 |
| James W. Callaway | 60 | Senior Executive Vice President – Business Development | 1/2006 |
| James W. Cicconi | 54 | Senior Executive Vice President - External and Legislative Affairs | 11/2005 |
| James D. Ellis | 63 | Senior Executive Vice President and General Counsel | 3/1989 |
| Karen E. Jennings | 56 | Senior Executive Vice President - Advertising and Corporate Communications | 12/2006 |
| James S. Kahan | 59 | Senior Executive Vice President - Corporate Development | 7/1993 |
| Richard G. Lindner | 52 | Senior Executive Vice President and Chief Financial Officer | 5/2004 |
| Forrest E. Miller | 54 | Group President - Strategic Initiatives and Human Resources | 1/2007 |
| Stanley T. Sigman | 59 | President and Chief Executive Officer – Wireless | 12/2006 |
| John T. Stankey | 44 | Group President – Operations Support | 1/2007 |
| Randall L. Stephenson | 46 | Chief Operating Officer | 5/2004 |
| Rayford Wilkins, Jr. | 55 | Group President | 2/2005 |

All of the above executive officers have held high-level managerial positions with AT&T or its subsidiaries for more than the past five years. Executive officers are not appointed to a fixed term of office.

11

AT&T Inc.

## PART II

### ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED
### STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

Our common stock is listed on the New York Stock Exchange. The number of stockholders of record as of December 31, 2006 and 2005 was 1,766,266 and 1,516,977. The number of stockholders of record as of February 20, 2007 was 1,792,173. We declared dividends, on a quarterly basis, totaling $1.35 per share in 2006 and $1.30 per share in 2005.

During 2006, non-employee directors acquired shares of common stock pursuant to the Non-Employee Director Stock and Deferral Plan. Under the plan, a director may make an annual election to receive all or part of his or her annual retainer or fees in the form of shares or deferred stock units (DSUs) that are convertible into shares. Each director also receives an annual grant of DSUs. During 2006, an aggregate of 109,188 shares and DSUs were acquired by non-employee directors at prices ranging from $25.95 to $35.75, in each case the fair market value of the shares on the date of acquisition. The issuances of shares and DSUs were exempt from registration pursuant to Section 4(2) of the Securities Act. During the fourth quarter of 2005, two non-employee directors acquired a total of 8,140 restricted stock units in connection with our acquisition of ATTC, under ATTC's AT&T 2004 Long Term Incentive Program. Under the program, units are convertible into shares of common stock. The issuance of restricted stock units was exempt from registration pursuant to Section 4(2) of the Securities Act.

On November 18, 2005, in connection with the completion of our acquisition of ATTC, we issued 768,391.4 shares of AT&T Perpetual Cumulative Preferred Stock, par value $1 per share (the "Subsidiary Preferred Shares"), with an aggregate liquidation preference of $768,391,400, to certain wholly owned subsidiaries of AT&T. The Subsidiary Preferred Shares were issued in connection with the merger in exchange for shares of preferred stock of ATTC that were formerly owned exclusively by wholly owned subsidiaries of ATTC. We received no cash proceeds as a result of the issuance of the Subsidiary Preferred Shares. The exchange of Subsidiary Preferred Shares was exempt from registration pursuant to Section 4(2) of the Securities Act.

Other information required by this Item is included in the 2006 AT&T Annual Report to Stockholders under the headings "Quarterly Financial Information" on page 79, "Selected Financial and Operating Data" on page 18, "Issuer Equity Repurchases" on page 43, and "Stock Trading Information" on the back cover, which are incorporated herein by reference pursuant to General Instruction G(2).

### ITEM 6. SELECTED FINANCIAL DATA

Information required by this Item is included in the 2006 AT&T Annual Report to Stockholders under the heading "Selected Financial and Operating Data" on page 18, which is incorporated herein by reference pursuant to General Instruction G(2).

### ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
### RESULTS OF OPERATION

Information required by this Item is included in the 2006 AT&T Annual Report to Stockholders on page 18 through page 46, which is incorporated herein by reference pursuant to General Instruction G(2).

### ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

Information required by this Item is included in the 2006 AT&T Annual Report to Stockholders under the heading "Market Risk" on page 41 through page 43, which is incorporated herein by reference pursuant to General Instruction G(2).

AT&T Inc.

## ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

Information required by this Item is included in the 2006 AT&T Annual Report to Stockholders on page 47 through page 79, which is incorporated herein by reference pursuant to General Instruction G(2).

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

During our two most recent fiscal years, there has been no change in the independent accountant engaged as the principal accountant to audit our financial statements and the independent accountant has not expressed reliance on other independent accountants in its reports during such time period.

## ITEM 9A. CONTROLS AND PROCEDURES

### Disclosure Controls and Procedures

The registrant maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed by the registrant is recorded, processed, summarized, accumulated and communicated to its management, including its principal executive and principal financial officers, to allow timely decisions regarding required disclosure, and reported within the time periods specified in the SEC's rules and forms. The Chief Executive Officer and Chief Financial Officer have performed an evaluation of the effectiveness of the design and operation of the registrant's disclosure controls and procedures as of December 31, 2006. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the registrant's disclosure controls and procedures were effective as of December 31, 2006.

### Internal Control Over Financial Reporting

(a) Management's Annual Report on Internal Control over Financial Reporting
The management of AT&T is responsible for establishing and maintaining adequate internal control over financial reporting. AT&T's internal control system was designed to provide reasonable assurance as to the integrity and reliability of the published financial statements. AT&T management assessed the effectiveness of the company's internal control over financial reporting as of December 31, 2006. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control – Integrated Framework.* We have excluded from the scope of our assessment of internal control over financial reporting the operations and related assets of BellSouth and AT&T Mobility, which we acquired on December 29, 2006. At December 31, 2006 and for the period from December 29 through December 31, 2006, total assets and total revenues subject to BellSouth's internal control over financial reporting represented 27% and 0.2% of AT&T's consolidated total assets and total revenues as of and for the year ended December 31, 2006 and total assets and total revenues subject to AT&T Mobility's internal control over financial reporting represented 36% and 0.3% of AT&T's consolidated total assets and total revenues as of and for the year ended December 31, 2006. Based on its assessment, AT&T management believes that, as of December 31, 2006, the Company's internal control over financial reporting is effective based on those criteria.

(b) Attestation Report of the Registered Public Accounting Firm
AT&T's independent registered public accounting firm, Ernst & Young LLP, has issued an attestation report on management's assessment of the company's internal control over financial reporting. The attestation report is included in the 2006 AT&T Annual Report to Stockholders on page 82, which is incorporated herein by reference pursuant to General Instruction G(2).

## ITEM 9B. OTHER INFORMATION

There is no information that was required to be disclosed in a report on Form 8-K during the fourth quarter of 2006 but was not reported.

AT&T Inc.

## PART III

### ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE

Information regarding executive officers required by Item 401 of Regulation S-K is furnished in a separate disclosure at the end of Part I of this report since the registrant did not furnish such information in its definitive proxy statement prepared in accordance with Schedule 14A. Information regarding directors required by Item 401 of Regulation S-K is incorporated herein by reference pursuant to General Instruction G(3) from the registrant's definitive proxy statement, dated on or about March 12, 2007 (Proxy Statement) under the heading "Election of Directors."

Information required by Item 405 of Regulation S-K is incorporated herein by reference pursuant to General Instruction G(3) from the registrant's Proxy Statement under the heading "Section 16(a) Beneficial Ownership Reporting Compliance."

The registrant has a separately-designated standing audit committee established in accordance with Section 3(a) (58)(A) of the Exchange Act of 1934. The members of the committee are Messrs. Aldinger, Amelio, Eby, Kelly, Madonna and Ritchey. The additional information required by Item 407(d)(5) of Regulation S-K is incorporated herein by reference pursuant to General Instruction G(3) from the registrant's Proxy Statement under the heading "Audit Committee."

The registrant has adopted a code of ethics entitled "Code of Ethics" that applies to the registrant's principal executive officer, principal financial officer and principal accounting officer or controller or persons performing similar functions. The additional information required by Item 406 of Regulation S-K is provided in this report under the heading "General" under Part I, Item 1. Business.

### ITEM 11. EXECUTIVE COMPENSATION

Information required by Item 402(k) of Regulation S-K is incorporated herein by reference pursuant to General Instruction G(3) from the registrant's Proxy Statement under the heading "Compensation of Directors." Information regarding officers is included in the registrant's Proxy Statement on the pages beginning with the heading "Compensation Committee" and ending with, and including, the last page under the heading "Potential Payments upon termination or Change in Control" which are incorporated herein by reference pursuant to General Instruction G(3).

14

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

Information required by Item 403 of Regulation S-K is included in the registrant's Proxy Statement under the heading "Common Stock Ownership," which is incorporated herein by reference pursuant to General Instruction G(3).

Information required by Item 201(d) of Regulation S-K is provided below:

**Equity Compensation Plan Information**

The following table provides information as of December 31, 2006, concerning shares of AT&T common stock authorized for issuance under AT&T's existing equity compensation plans.

**Equity Compensation Plan Information (1)**

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) | |
|---|---|---|---|---|
| Equity compensation plans approved by security holders | 55,225,674 | $36.34 | 142,952,015 | (2) |
| Equity compensation plans not approved by security holders (3) | 93,553,058 | $39.48 | 200,679 | |
| Total | 148,778,732 | $38.32 | 143,152,694 | |

(1) In addition to the shares shown in the table, certain stock options issued by companies acquired by AT&T were converted into options to acquire AT&T stock. As of December 31, 2006, there were 160,486,819 shares of AT&T common stock subject to the converted options, having a weighted-average exercise price of $37.80. No further grants may be issued under the assumed plans.

(2) Of the shares reported, 18,415,973 shares may be issued under the Stock Purchase and Deferral Plan, and 89,980,798 shares may be issued under the 2006 Incentive Plan.

(3) Plans that have not been approved by stockholders include the 1995 Management Stock Option Plan ("1995 Plan") and the Non-Employee Director Stock and Deferral Plan ("Non-Employee Director Plan"). The 1995 Plan provides for grants of stock options to management employees (10-year terms) subject to vesting requirements and shortened exercise terms upon termination of employment. No further options may be issued under this plan. Under the Non-Employee Director Plan, participants may elect to receive stock units in lieu of retainers and fees. In addition, each non-employee Director receives an annual award of stock units equal in value to one and one-half times the annual retainer. Directors who became board members after November 21, 1997, but before September 24, 2004, also receive up to 10 annual grants of stock units equal to $13,000 each. The stock units are paid out in the form of AT&T stock only after the termination of their service as a Director. Under the plan, 200,679 shares remain available for future issuance and are included in the table.

Also included in column (c) are up to 4,292,876 shares that may be purchased under the Stock Savings Plan with reinvested dividend equivalents on deferred share units purchased by mid-level and above managers and limited company partial matching contributions. No new contributions may be made to the plan. The shares purchased are not delivered to the employee until after termination of employment, subject to certain accelerated delivery provisions. In addition, participants receive 2 options for each share purchased with employee payroll deductions. The options have a 10-year term and a strike price equal to the fair market value of the stock on the date of grant. The Stock Savings Plan was last approved by stockholders in 1994. The plan was amended by the Board of Directors in 2000 to increase the number of shares available for purchase under the plan (including shares from the company match and reinvested dividend equivalents) and shares subject to options. Stockholder approval was not required for the amendment. To the extent applicable, the amount shown for non-approved plans in column (a) includes these additional shares. Shares subject to outstanding options issued under the plan prior to amendment are included under approved plans.

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

Information required by Item 404 of Regulation S-K is included in the registrant's Proxy Statement under the heading "Related Party Transactions," which is incorporated herein by reference pursuant to General Instruction G(3). Information required by Item 407(a) of Regulation S-K is included in the registrant's Proxy Statement under the heading "Independence of Directors."

**ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES**

Information required by this Item is included in the registrant's Proxy Statement under the heading "Principal Accountant Fees and Services," which is incorporated herein by reference pursuant to General Instruction G(3).

**Part IV**

**ITEM 15. EXHIBITS and FINANCIAL STATEMENT SCHEDULES**

(a) Documents filed as a part of the report:

|  | Page |
|---|---|
| (1) Report of Independent Registered Public Accounting Firm | * |
| Financial Statements covered by Report of | |
| Independent Registered Public Accounting Firm: | |
| Consolidated Statements of Income | * |
| Consolidated Balance Sheets | * |
| Consolidated Statements of Cash Flows | * |
| Consolidated Statements of Stockholders' Equity | * |
| Notes to Consolidated Financial Statements | * |

* Incorporated herein by reference to the appropriate portions of the registrant's annual report to stockholders for the fiscal year ended December 31, 2006. (See Part II.)

|  | Page |
|---|---|
| (2) Financial Statement Schedules: | |
| II - Valuation and Qualifying Accounts | 21 |

Financial statement schedules other than those listed above have been omitted because the required information is contained in the financial statements and notes thereto, or because such schedules are not required or applicable.

(3) Exhibits:

Exhibits identified in parentheses below, on file with the SEC, are incorporated herein by reference as exhibits hereto. Unless otherwise indicated, all exhibits so incorporated are from File No. 1-8610.

Exhibit
Number

2-a    Agreement and Plan of Merger, dated as of January 30, 2005, among AT&T Corp., SBC Communications Inc. and Tau Merger Sub Corporation (Exhibit 2.1 to Form 8-K dated January 31, 2005.)

2-b    Agreement and Plan of Merger, dated as of March 4, 2006, among BellSouth Corporation, AT&T Inc. and ABC Consolidation Corp. (Exhibit 2.1 to Form 8-K dated March 4, 2006.)

3-a    Restated Certificate of Incorporation, filed with the Secretary of State of Delaware on July 28, 2006. (Exhibit 3 to Form 10-Q filed for June 30, 2006.)

3-b    Bylaws amended November 17, 2006. (Exhibit 3-a to Form 8-K dated November 17, 2006.)

4-a    Certificate of Designations for Perpetual Cumulative Preferred Stock of SBC Communications Inc., filed with the Secretary of State of the State of Delaware on November 18, 2005. (Contained in Restated Certificate of Incorporation filed as Exhibit 3-a.)

16

AT&T Inc.

4-b    No instrument which defines the rights of holders of long-term debt of the registrant and all of its consolidated subsidiaries is filed herewith pursuant to Regulation S-K, Item 601b)(4)(iii)(A), except for the instruments referred to in 4-c, 4-d, 4-e, 4-f, and 4-g below. Pursuant to this regulation, the registrant hereby aggress to furnish a copy of any such instrument not filed herewith to the SEC upon request.

4-c    Guaranty of certain obligations of Pacific Bell Telephone Co. and Southwestern Bell Telephone Co. (Exhibit 4-d to Form 10-K for 1999.)

4-d    Guaranty of certain obligations of Ameritech Capital Funding Corp., Illinois Bell Telephone Co., Indiana Bell Telephone Co. Inc., Michigan Bell Telephone Co., The Ohio Bell Telephone Co., Pacific Bell Telephone Co., Southern New England Telecommunications Corp., The Southern New England Telephone Co., Southwestern Bell Telephone Co., Wisconsin Bell, Inc. (Exhibit 4-c to Form 10-Q for September 30, 2005.)

4-e    Guarantee of certain obligations of AT&T Corp. (Exhibit 4-e to Form 8-K dated December 16, 2005.)

4-f    Guarantee of certain obligations of BellSouth. (Exhibit 4.3 to Form 8-K dated December 29, 2006.)

4-g    Cingular Third Supplemental Indenture. (Exhibit 4.1 to Form 8-K dated December 29, 2006.)

10-a    Short Term Incentive Plan, dated September 1, 2005. (Exhibit 10-a to Form 10-K for 2005.)

10-b    Supplemental Life Insurance Plan, dated September 1, 2005. (Exhibit 10-b to Form 10-K for 2005.)

10-c    Supplemental Retirement Income Plan, dated December 31, 2004. (Exhibit 10-c to Form 10-K for 2004.)

10-d    Senior Management Deferred Compensation Plan (effective for Units of Participation Having a Unit Start Date Prior to January 1, 1988). (Exhibit 10-d to Form 10-K for 2002.)

10-e    Senior Management Deferred Compensation Program of 1988 (effective for Units of Participation Having a Unit Start Date of January 1, 1988 or later). (Exhibit 10-e to Form 10-K for 2002.)

10-f    Officer Disability Plan, formerly the Senior Management Long Term Disability Plan, amended and restated January 1, 2007.

10-g    Salary and Incentive Award Deferral Plan, dated December 31, 2004.

10-h    AT&T Inc. Health Plan, formerly the Executive Health Plan, amended and restated April 13, 2006.

10-i    Retirement Plan for Non-Employee Directors. (Exhibit 10-k to Form 10-K for 1997.)

10-j    Form of Indemnity Agreement, effective July 1, 1986, between SBC (now AT&T Inc.) and its directors and officers. (Appendix 1 to Definitive Proxy Statement dated March 18, 1987.)

10-k    Administrative Plan. (Exhibit 10-ee to Form 10-K for 2004.)

10-l    Stock Savings Plan, dated December 31, 2004.

10-m    1992 Stock Option Plan, dated June 19, 2001. (Exhibit 10-n to Form 10-K for 2001.)

10-n    1996 Stock and Incentive Plan, dated November 2, 2002. (Exhibit 10-o to Form 10-K for 2002.)

10-o    Non-Employee Director Stock and Deferral Plan. (Exhibit 10 to Form 8-K dated June 30, 2006.)

10-p    Pacific Telesis Group Deferred Compensation Plan for Nonemployee Directors. (Exhibit 10gg to Form 10-K for 1996 of Pacific Telesis Group (File No. 1-8609).)

17

10-p(i) Resolutions amending the Plan, effective November 21, 1997. (Exhibit 10-v(i) to Form 10-K for 1997.)

10-q    Pacific Telesis Group Outside Directors' Deferred Stock Unit Plan. (Exhibit 10oo to Form 10-K for 1995 of Pacific Telesis Group (File No. 1-8609).)

10-r    Pacific Telesis Group 1996 Directors' Deferred Compensation Plan. (Exhibit 10qq to Form 10-K for 1996 of Pacific Telesis Group (File No. 1-8609).)

10-r(i) Resolutions amending the Plan, effective November 21, 1997. (Exhibit 10-v(i) to Form 10-K for 1997.)

10-s    Pacific Telesis Group 1994 Stock Incentive Plan. (Attachment A to Pacific Telesis Group's 1994 Proxy Statement filed March 11, 1994, and amended March 14 and March 25, 1994 (File No. 1-8609).)

10-s(i) Resolutions amending the Plan, effective January 1, 1995. (Attachment A to Pacific Telesis Group's 1995 Proxy Statement, filed March 13, 1995 (File No. 1-8609).)

10-t    2001 Incentive Plan, dated January 31, 2003. (Exhibit 10-u to Form 10-K for 2002.)

10-u    Employment Agreement between SBC and Edward E. Whitacre Jr. (Exhibit 10-y to Form 10-K for 2001.)

10-u(i) Amendment to Employment Agreement (Exhibit 10.1 to Form 8-K dated March 4, 2006.)

10-v    AT&T Inc. Change in Control Severance Plan, effective January 1, 2007.

10-w    1995 Management Stock Option Plan, dated November 16, 2001. (Exhibit 10-y to Form 10-K for 2002.)

10-x    Investment and Reorganization Agreement dated October 25, 2004, by and among BellSouth Corporation, SBC Communications Inc., Cingular Wireless Corporation, Cingular Wireless LLC, Links I Corporation, Cingular Wireless II, Inc., BLS Cingular Holdings, LLC, SBC Alloy Holdings, Inc., BellSouth Enterprises, Inc., BellSouth Mobile Systems, Inc., BellSouth Mobile Data, Inc. and SBC Long Distance, Inc. (Exhibit 99.01 to Cingular Wireless LLC's Form 8-K dated October 25, 2004.)

10-y    Concession Program for Directors, dated July 1, 2004. (Exhibit 10-bb to Form 10-Q for March 31, 2004.)

10-z    Amended and Restated Revolving Credit Agreement with Cingular Wireless LLC. (Exhibit 10-bb to Form 10-Q for June 30, 2005.)

10-aa   Five Year Credit Agreement. (Exhibit 10 to Form 8-K dated July 12, 2006.)

10-bb   Stock Purchase and Deferral Plan, amended and restated March 30, 2006. (Exhibit 10-cc to Form 10-Q for March 31, 2006.)

10-cc   Cash Deferral Plan, amended and restated March 30, 2006. (Exhibit 10-dd to Form 10-Q for March 31, 2006.)

10-dd   Master Trust Agreement for AT&T Inc. Deferred Compensation Plans and Other Executive Benefit Plans and subsequent amendments dated August 1, 1995 and November 1, 1999. (Exhibits 99.1-a, 99.1-b and 99.1-c to Schedule 13-D/A filed on December 28, 2004.)

10-ee   2005 Supplemental Employee Retirement Plan, amended and restated November 17, 2006.

10-ff   AT&T Corp. 1997 Long Term Incentive Program, dated March 14, 2000. (Exhibit 10-gg to Form 10-K for 2005.)

10-gg   AT&T Corp. 2004 Long Term Incentive Program. (Exhibit 10-hh to Form 10-K for 2005.)

18

10-hh    AT&T Corp. Senior Management Incentive Award Deferral Plan amended and restated September 18, 2006.

10-ii    2006 Incentive Plan, dated May 1, 2006. (Exhibit 10.2 to Form 8-K dated January 26, 2006.)

10-jj    Retention Agreement for James W. Cicconi dated January 26, 2006. (Exhibit 10.1 to Form 8-K dated January 26, 2006.)

10-kk    BellSouth Corporation Executive Incentive Award Deferral Plan, dated September 23, 1996.

10-ll    BellSouth Corporation Nonqualified Deferred Compensation Plan, dated January 1, 2005.

10-mm    BellSouth Officer Compensation Deferral Plan. (Exhibit 10q to Form 10-K for 2004 of BellSouth Corporation (File No. 1-8607).)

10-nn    BellSouth Corporation Deferred Compensation Plan for Non-Employee Directors, dated March 9, 1984.

10-oo    BellSouth Corporation Director's Compensation Deferral Plan, dated March 1, 2001.

    10-oo(i) First Amendment to BellSouth Corporation Director's Compensation Deferral Plan, dated February 6, 2004.

10-pp    BellSouth Corporation Stock Plan, dated April 24, 1995.

10-qq    BellSouth Corporation Stock and Incentive Compensation Plan. (Exhibit 10v-3 to Form 10-Q for June 30, 2004 of BellSouth Corporation (File No. 1-8607).)

    10-qq(i) First Amendment to BellSouth Corporation Stock and Incentive Compensation Plan. (Exhibit 10ii to Form 10-Q for September 30, 2005 of BellSouth Corporation (File No. 1-8607).)

10-rr    Cingular Wireless Long Term Compensation Plan (Exhibit 99.1 to Form 8-K dated February 17, 2005 of AT&T Mobility LLC, formerly Cingular Wireless LLC (File No. 1-31673).)

10-ss    Master Trust Agreement for AT&T Corp. Deferred Compensation Plans and Other Executive Benefit Plans, effective January 13, 1994.

    10-ss(i) First Amendment to Master Trust Agreement, effective December 23, 1997.

10-tt    Non-Employee Director Non-Qualified Stock Option Terms and Conditions. (Exhibit 10-qq to Form 8-K dated September 30, 2004 of BellSouth Corporation (File No. 1-8607).)

10-uu    BellSouth Corporation Amended And Restated Trust Under Board Of Directors Benefit Plan(s), effective October 11, 2006.

10-vv    BellSouth Non-Employee Directors Charitable Contribution Program, effective February 29, 1992.

    10-vv(i) First Amendment to the Non-Employee Directors Charitable Contribution Program, effective January 27, 1997.

    10-vv(ii)Second Amendment to the Non-Employee Directors Charitable Contribution Program, effective February 25, 2002.

12    Computation of Ratios of Earnings to Fixed Charges.

13    Portions of AT&T's Annual Report to Stockholders for the fiscal year ended December 31, 2006. Only the information incorporated by reference into this Form 10-K is included in the exhibit.

21    Subsidiaries of AT&T Inc.

19

AT&T Inc.

| | |
|---|---|
| 23 | Consent of Ernst & Young LLP, independent registered public accounting firm for AT&T. |
| 24 | Powers of Attorney. |
| 31 | Rule 13a-14(a)/15d-14(a) Certifications |
| | 31.1 Certification of Principal Executive Officer |
| | 31.2 Certification of Principal Financial Officer |
| 32 | Section 1350 Certifications |

We will furnish to stockholders upon request, and without charge, a copy of the annual report to stockholders and the proxy statement, portions of which are incorporated by reference in the Form 10-K. We will furnish any other exhibit at cost.

20

**AT&T INC.**
**SCHEDULE II - VALUATION AND QUALIFYING ACCOUNTS**
**Allowance for Uncollectibles**
Dollars in Millions

| COL. A | COL. B | COL. C | | | COL. D | COL. E |
|---|---|---|---|---|---|---|
| | | Additions | | | | |
| | | (1) | (2) | (3) | | |
| | Balance at Beginning of Period | Charged to Costs and Expenses (a) | Charged to Other Accounts (b) | Acquisitions (e) | Deductions (c) | Balance at End of Period |
| **Year 2006** | $ 1,176 | 586 | 101 | 410 | 997 | $ 1,276 |
| Year 2005 | $ 1,001 | 744 | 184 | 356 | 1,109 | $ 1,176 |
| Year 2004 (d) | $ 1,058 | 761 | 447 | - | 1,265 | $ 1,001 |

(a) Excludes direct charges and credits to expense on the statements of income and reinvested earnings related to interexchange carrier receivables.

(b) Includes amounts previously written off which were credited directly to this account when recovered and amounts related to long-distance carrier receivables which were billed by AT&T.

(c) Amounts written off as uncollectible.

(d) Amounts reflect the classification of balances related to a change in the way we report accounts receivable for our directory segment, which increased our Allowance for Uncollectibles. Additional information relating to this change is contained in the 2006 AT&T Annual Report to Stockholders in Note 1, and is incorporated herein by reference pursuant to General Instruction G(2).

(e) Acquisition of BellSouth in December 2006 and ATTC in November 2005.

21

**AT&T INC.**
**SCHEDULE II - VALUATION AND QUALIFYING ACCOUNTS**
**Accumulated Amortization of Intangibles**
Dollars in Millions

| COL. A | COL. B | COL. C | | | COL. D | COL. E |
|---|---|---|---|---|---|---|
| | | Additions | | | | |
| | | (1) | (2) | (3) | | |
| | Balance at Beginning of Period | Charged to Costs and Expenses | Charged to Other Accounts | Acquisitions (b) | Deductions | Balance at End of Period |
| **Year 2006** | $   986 | 1,033 | - | 1,978 | - | $   3,997 |
| **Year 2005** | $   719 | 271 | - | - | 4 | $   986 |
| **Year 2004** | $   691 | 117 | - | - | 89 | $   719 |
| | | | | | (a) | |

(a) Includes $85 reversal of amount that was fully amortized.
(b) Consolidation of AT&T Mobility due to the December 2006 acquisition of BellSouth.

22

# EXHIBIT 2



# COBRA Enrollment Notice

Statement Date  01-13-2005
Company Code:  F924

000023
YVONNE D. GLOVER AND FAMILY
1211 RUSSELL STREET
BERKELEY CA  94702-0000

**This notice contains important information about your right to continue your SBC Communications Inc. group health plans (the Plans) coverage.** Please read the information contained in this notice as well as the enclosed COBRA Information Notice very carefully and keep these documents for your records.

As a result of your leave of absence on December 1, 2004, your current group health Plan coverage ends as listed in the following table. You may choose to remain covered under your current group health Plan for up to **18** months (excluding a Medical Care Reimbursement Account (MCRA) under the SBC Flexible Spending Account (FSA) Plan, in which case COBRA continuation coverage would expire at the end of the current plan year). This coverage is provided through the *Consolidated Omnibus Budget Reconciliation Act* and is often referred to as "COBRA" coverage.

If elected, COBRA continuation coverage will begin as listed below.

| Group Health Plan | Coverage End Date | COBRA Coverage Begin Date |
|---|---|---|
| Medical | 11-30-2004 | 12-01-2004 |
| Dental | 11-30-2004 | 12-01-2004 |
| Vision | 11-30-2004 | 12-01-2004 |

The cost of COBRA continuation coverage depends on the coverage you select and who you cover. Detailed cost information is provided in the Group Health Coverage section of this notice.



# Group Health Coverage

Below are the coverage options available to you and the monthly cost of each option for the remainder of the current plan year. Once your COBRA continuation coverage begins, you may be able to change your COBRA continuation coverage elections based on Plan rules, for example at annual enrollment. You, your covered spouse/RDP, or your covered dependents will have the same opportunity to make changes to coverage as other Plan participants who are similarly situated but not enrolled in COBRA. If your coverage changes, you will be sent a new confirmation statement with revised coverage and contribution information. If applicable, the Family Information section of this notice lists your dependents currently on file. Only those dependents who were covered prior to the qualifying event may continue coverage under a particular group health Plan.

**Note:** Under certain circumstances, other dependents can be added later. See the enclosed COBRA Information Notice, the initial COBRA Rights Notice, the Plan's Summary Plan Description, or contact SBC Connect for additional information.

## Medical

| Option | Coverage Category | | |
|---|---|---|---|
| | 1<br>Individual | 2<br>Individual +<br>1 | 3<br>Individual +<br>2 or More |
| 0 No Coverage | $0.00 | $0.00 | $0.00 |
| 102 Kaiser North HMO | $272.06 | $489.72 | $707.38 |

**Current Coverage Category** Individual

## Dental

| Option | Coverage Category | | |
|---|---|---|---|
| | 1<br>Individual | 2<br>Individual +<br>1 | 3<br>Individual +<br>2 or More |
| 0 No Coverage | $0.00 | $0.00 | $0.00 |
| 2 DEP–PPO | $46.76 | $86.50 | $126.25 |

**Current Coverage Category** Individual



# EXHIBIT 3

**SBC**

**Via Certified and Regular U. S. Mail**

San Ramon, June 02, 2005

*copy of certified letter*

Yvonne Glover
1211 Russell Street
Berkeley, CA 94702

Dear Yvonne Glover,

This letter is to inform you of your current employment status with SBC West (Pacific Bell).

On May 17, 2005, you were sent a letter which advised that if your doctor continued to disable you and you remained unable to perform the essential functions of your job, your Company Initiated Leave (CIL) would not be extended beyond May 31, 2005.

The letter requested that you discuss this matter with your treating physician. The letter also stated that if your return to work prognosis changed, you must return to work ready, willing and able to perform the essential functions of your job as a Staff Associate on or before May 31, 2005.

Due to the fact that you did not return to work on May 31, 2005, ready, willing and able to perform your job as a Staff Associate, your employment with has been terminated effective May 31, 2005.

Enclosed you will find the following items:

- Notice to Employee document
- California State Unemployment pamphlet
- California State Disability Insurance pamphlet
- Final check for all monies owed

You will also find enclosed a self-addressed stamped envelope so that you can return your SBC Identification Card.

*Deanna Medina*

Deanna Medina, Human Resources Case Manager

Enclosures

CC:  S. Alvera, Helmsman, CWA Local #9400

# EXHIBIT 4

# NOTICE TO EMPLOYEE AS TO CHANGE IN RELATIONSHIP

### Issued pursuant to provisions of Section 1089 of the California Unemployment Insurance Code

**Name:** Yvonne Glover

**Social Security #:**     REDACTED

Your employment with SBC West (Pacific Bell) is terminated on May 31, 2005.

If you choose to file for Unemployment Insurance, please use the information below as your employer address (do not use your former work address):

HR Operations, SBC Services, Inc.
2410 Camino Ramon Suite 100
San Ramon, CA 94583
925-901-8788

Karen Cryan, DIRECTOR-SALES OPERATIONS

**Date Mailed:**

6|02|05

*Redacted Pursuant to General Order No. 53*

# EXHIBIT 5

**Statement of Earnings, Taxes and Allotments**

YVONNE D GLOVER
1211 RUSSELL STREET
BERKELEY CA 94702

PERS NO. 00098677    SOC SEC NO.

| W-4 MS EXP | ADDL | CHECK DATE 06/02/2005 | |
|---|---|---|---|
| FED  S 06 | 0.00 | PAY   FROM 05/29/2005 | |
| CA   S 06 | 0.00 | PERIOD TO  06/11/2005 | |
| | | F9 EIN = 94-0745535 | |

PACIFIC BELL
TELEPHONE COMPANY
ONE SBC CENTER, 28TH FLR
ST. LOUIS, MO  63101

| | | THIS PERIOD | YTD |
|---|---|---|---|
| CURRENT RATE  20.7375 | | | |
| TOTAL COMPENSATION | | 1,493.10 | 3,482.44 |
| WAGES NOT SUBJECT TO INCOME TAX | 401K | | 19.39 |
| INCOME TAX WITHHELD | FED CA | - 373.28  - 138.86 | 855.82  318.36 |
| SOC SEC  06.20% MEDICARE  01.45% CA SDI | | - 92.57  - 21.65 | 210.16  49.15  20.48 |
| | | 2005 LIMITS  SOC SEC  TX 5,580.00  WGS  90,000  CA SDI  TX   857.71  WGS  79,418 | |
| NET PAY | | 866.74 | |

**REFUNDS AND DEDUCTIONS THIS PERIOD**

**MISCELLANEOUS PAYMENT INFORMATION**

PAY IN LIEU CALIFORNIA     1,493.10

| W-2 WAGES | CURRENT | YTD | W-2 WAGES | CURRENT | YTD | OTHER YEAR-TO-DATE INFORMATION |
|---|---|---|---|---|---|---|
| FED | 1,493.10 | 3,370.35 | CA | 1,493.10 | 3,370.35 | |
| SOCIAL SECURITY | 1,493.10 | 3,389.74 | CA SDI | | 1,896.64 | |
| MEDICARE | 1,493.10 | 3,389.74 | | | | |

### Non-Negotiable Check Stub - Detach and Retain for Your Records
← DETACH CHECK ALONG THIS PERFORATION →

**THIS DOCUMENT IS PRINTED IN TWO COLORS. DO NOT ACCEPT UNLESS BLUE AND VIOLET ARE PRESENT.**

**SBC**

Controlled Disbursement
Bank of America, N.A.
Atlanta, Dekalb County, Georgia

84-1278
611  GA

Date     06/02/2005

Check Number     2007770413

Pay this amount
$***********866.74*

PAY
EIGHT HUNDRED SIXTY-SIX and 74/100*****

To the order of

YVONNE D GLOVER
1211 RUSSELL STREET

BERKELEY      CA   94702

VOID

Void 180 days from check date

*Redacted Pursuant to General Order No. 53*

# EXHIBIT 6

SMAART
P.O. Box 61568
King Of Prussia, PA 19406
Telephone 1-866-BSMAART (1-866-276-2278)
Facsimile 1-866-224-4627

**RECEIVED**

**SEP 2 6 2005**

**LEWIS, FEINBERG,
RENAKER & JACKSON**

September 21, 2005

Lewis, Feinberg, Renaker & Jackson, P.C.
Attorneys at Law
1330 Broadway, Suite 1800
Oakland, CA 94612-2509
Attention: Teresa S. Renaker

Re:    Pacific Telesis Group's Comprehensive Disability Benefits Plan (CDPB)
       Claim Number:  A325033343-0001-07 Yvonne Glover

Dear Ms. Renaker:

The SMAART Quality Review Unit reviewed submitted material and information
regarding the denial of short-term disability benefits by the SBC Medical Absence
Accommodations and Resource Team (SMAART), for your client's claim with a first
date absent of October 27, 2004.  After this review, the Unit determined to uphold the
denial of benefits based on the following:

The Short Term Disability Plan provides in Section 2 Paragraph 2.1 that "Short Term
Disability" shall mean a sickness, injury or other medical, psychiatric, or psychological
condition, which prevents an Employee from engaging in his or her normal occupation or
employment with the Participating Company, or such other occupation or employment as
he or she is assigned in accordance with the Participating Company's normal practices."

The Unit and the independent physician advisors, specialists in orthopedic surgery,
speech pathology and neurology reviewed all of the medical information contained in
your client's file and submitted during the appeal. The medical information included
documentation for the period of September 7, 1990 through November 9, 2004 from
Kaiser Permanente outpatient speech pathology services, Robert Leiberson, M.D., Robert
Wagner, M.D., Jill Harrell, M.D., John Warbritton III, M.D., K Izdebski, Ph.D. and
Summit Medical Centers

The medical information provided for the denial/ appeal period did not contain sufficient
clinical findings to substantiate a disabling condition.

**SBC Medical Absence & Accommodations Resource Team**
As Administered by Sedgwick Claims Management Services Inc.

SMAART
P.O. Box 61568
King Of Prussia, PA 19406
Telephone 1-866-BSMAART (1-866-276-2278)
Facsimile 1-866-224-4627

The medical information indicated that Ms. Glover reported feeling a pop in her wrist in July 2002 when she emptied a box of paper; she was treated conservatively for a wrist ganglion cyst. In November 2002 she reported a sudden onset of neck pain after picking up her chair at work; later that month she indicated that she was ejected from her new chair and onto the floor. Ms. Glover continued to have symptoms in her right hand, arm and neck throughout the years 2003 and 2004; she went to the emergency room on July 1, 2004 for pain relief. She has reported that her symptoms worsen with work activities such as validating calendars, paperwork and computer work. Dr. Harrell concluded in her report dated October 28, 2005 that Ms. Glover is precluded from heavy lifting, forceful pushing and pulling and repetitive work at or above shoulder level. She is also precluded from prolonged forward flexion of the neck and prolonged keyboarding.

Additionally, her past medical history indicates that she reported having a sudden onset of dystonia in the year 1990 and as such she has difficulty pronouncing certain words. Her speech however is documented as being understandable.

The orthopedic independent physician advisor noted that her magnetic resonance image (MRI) findings indicated cervical spondylosis with multilevel degenerative disc disease at C3 through C6 with mild disc protrusions and reversal of cervical lordosis of the spine. Physical examination findings indicated slight restrictions in range of motion of the cervical spine and paraspinal and trapezius muscle tenderness. The electromyography report is reported to be normal except in the neurological review in February 2003 which states that she has a C6 radiculopathy. A C6 radiculopathy, if present, would be inconsistent with numbness in the long, ring and small fingers. The independent physician advisor also noted that she has failed to improve from conservative treatment and has a need for chronic pain medication. The opinion of the independent physician advisor was that she would be considered disabled from her regular job and would be unable to work an eight hour day. However there is no documented loss of functionality of the upper extremities with regards to strength and there is no clear radiculopathy pattern consistent with MRI or EMG findings. It is unclear why Ms. Glover was able to withstand a four hour work day for five months prior to her pain being deemed totally disabling. There is no significant change in her functional status from a physical exam standpoint.

The speech pathology independent physician advisor noted that the first reference to Ms. Glover's voice disorder was from 1990. She received voice treatment and as of September 14, 1990 she had made some minor improvements. Office notes from Dr. Leiberson and Dr. Harrell note that she has a dystonic speech pattern and difficulty annunciating words. The opinion of the independent physician advisor was that the documentation did not support disability from her job as of November 3, 2004 based on speech and voice difficulties. There was no documentation from a physician or speech pathologist concerning dystonia or speech therapy other than what was provided by Dr. Izdebski in the year 1990, who indicated at that time her dysphonia appeared to be a conversion non-organic dysphonia. Ms. Glover's job changed from a primarily oral

SMAART
P.O. Box 61568
King Of Prussia, PA 19406
Telephone 1-866-BSMAART (1-866-276-2278)
Facsimile 1-866-224-4627

based communication job to a Staff Associate which requires 30 minutes of oral communication on the phone and perhaps more communication with other colleagues.

The Neurology independent physician advisor noted that Ms. Glover's physical examinations were abnormal per Dr. Harrell and Dr. Lieberson. Clinical data indicated reduced range of motion of her neck and sensory disturbance involving her right upper extremity. She had an abnormal MRI study which showed progressive cervical disc herniation at C5-6 with cord compression and motor deficits involving her upper extremity. There was insufficient evidence of cervical myelopathy. The opinion of the independent physician advisor was that Ms. Glover would be unable to perform her normal job duties however the clinical findings supported transitional work of four hour days.

According to our records, four hour work days were consistently available to your client. Therefore, although some findings are referenced, none are documented to be so severe as to prevent Ms. Glover from performing the job duties of Staff Associate with or without reasonable accommodations from November 3, 2004 to her return to work.

Under the terms of the Pacific Telesis Group's Comprehensive Disability Benefits Plan, the decision of the Unit is final. Your client has the right to bring suit under Section 502(a) of the Employee Retirement Income Security Act of 1974 after there has been full exhaustion of her appeal rights as enumerated in your plan's claim procedures and those rights have been exercised and the Plan benefit requested by said claimant in such appeal have been denied in whole or in part by her employer. You shall be provided, upon written request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to your client's claim benefits.

If you have any questions regarding the information contained in this letter, you may contact the SMAART Quality Review Unit at 1-866-276-2278

Sincerely,


Heidi Y. Lasser
Appeals Specialist
SMAART Quality Review Unit




**SBC Medical Absence & Accommodations Resource Team**
As Administered by Sedgwick Claims Management Services Inc.

# EXHIBIT 7



SBC. Now joined
with AT&T.
New name.
Same great book.

# at&t

# AT&T
# Yellow Pages

### Oakland
and Surrounding Area

AT&T California

**September 2006**
**Area Code 510**



Most seen,
most used,
most trusted
directory.

**YELLOWPAGES.COM™**
We wrote the book on local search.™

**PLUMBING
& DRAIN
SERVICE**
SEE OUR AD ON
THE INSIDE
BACK COVER
510-895-1234
EXPRESS ROOTER



**BERKELEY
CITY COLLEGE**
1974
Transforming Lives

# LOCKSMITH
**24 / 7 MOBILE
EMERGENCY SERVICE**  510 **251-0225**



ALL AMERICAN
LOCKSMITH
CA State Lic. #LC03867



# PLUMBING
## 24 Hr Emergency - 7 Days
**LOW COST
SEWER & DRAIN**  510 **433-0233**
# PLUMBING

**BELL PLUMBING NORTH, INC.**
LIC# 823991 • Insured

©AT&T Advertising L.P. 2006                    To recycle this directory, call 1-800-953-4400.



at&t
Your world. Delivered.

# For all your
# telecommunications needs

## Residence Services

| | |
|---|---|
| Residence | 1-800-ATT-2020 |
| Centro Hispano para Residencias | 1-800-870-5855 |
| Basic and Additional Lines | Personal ISDN |
| Caller ID | *66 (Repeat Dialing) |
| *69 (Call Return) | Three-Way Calling |
| Discount Calling Plans | Call Forwarding |
| Voice Mail (The Message CenterSM) | Call Waiting |
| WireProSM and WirePro PlusSM | Worldwide Calling Card |

## Business Services

| | |
|---|---|
| Business | 1-800-750-2355 |
| Centro Hispano para Negocios | 1-800-300-2733 |
| Access Lines and Centrex Systems | Paperless Billing |
| Custom Calling Services | Toll-Free Services |
| Data Products and Services | Videoconferencing |
| Discount Calling Plans | Voice Mail |

## AT&T Long Distance

| | | |
|---|---|---|
| Residence Customer Ordering | | 1-800-ATT-2020 |
| Centro Hispano | | 1-800-870-5855 |
| Billing Questions | (English) | 1-800-280-1996 |
| | (Spanish) | 1-800-795-1116 |
| Residential Customer Calling Card | | 1-800-221-2212 |
| Business Customer Ordering | | 1-800-750-2355 |
| Business Customer Calling Card | | 1-877-722-2251 |

## AT&T Yellow Pages

| | |
|---|---|
| To Advertise or Customer Service | 1-800-248-2800 |
| YellowPages.com™ | 1-877-647-6278 |
| Your online Yellow Pages – and more!SM | |

## Voice Mail (The Message CenterSM)

| | |
|---|---|
| Residence Customers | 1-800-273-7000 |
| Business Customers | 1-800-540-8020 |
| Unified Communications | 1-888-300-6500 |

## Video Conferencing Solutions

Reservation Services and Information 1-800-266-3373

## Internet Services

| | |
|---|---|
| AT&T Yahoo!® High Speed Internet and AT&T Yahoo!® Dial Sales | 1-866-722-9246 |
| AT&T Yahoo!® High Speed Internet Customer Service | 1-877-722-3755 |
| AT&T Yahoo!® Dial Customer Service | 1-866-722-3425 |

## AT&T I DISH Network

| | |
|---|---|
| Satellite Television | 1-866-722-7500 |

## Hearing and Speech Impaired Services-Accessibility Resources

| | |
|---|---|
| Customer Service–TTY | 1-800-651-5111 |
| Customer Service–Voice | 1-800-772-3140 |
| Directory Assistance–TTY | 1-800-735-2929 |

## Visit us at TheNewATT.com For more information, see the Customer Service Guide Pages.

Local service provided by the AT&T local phone company. Internet access provided by AT&T Internet Services; content by Yahoo! Voice mail offered by AT&T Messaging. Long distance service offered by AT&T Long Distance. AT&T | Dish Network is a co-branded service provided by EchoStar Satellite L.L.C. and AT&T Home Entertainment. Programming provided by EchoStar Satellite L.L.C. Dish Network is the trademark of EchoStar Satellite L.L.C. Yahoo! is a registered trademark of Yahoo! Inc. All other marks are the property of their respective owners.
© 2006 AT&T Knowledge Ventures. All rights reserved.

**Telecommunications Carriers (Cont'd)**

**XO COMMUNICATIONS**


- Voice, Data & Web
  Exclusively for Business
- Nationwide Local & Long Distance Calling
- Voice over IP (VoIP) Integrated Voice,
  Data & Web Bundles
- Dedicated Internet Access
- Managed Security Services • DSL
- www.xo.com

**FOR MORE INFORMATION CALL**
XO COMMUNICATIONS ........ 877 617 2111

**Telecommunications Dealers & Services**

A & M Telecommunications .......800 610 3332
    See Display Ad Next Page
A To Z Telecom Llc
    55 Santa Clara Av ............. 510 465 9500
A & M Telecommunications
    14715 Catalina SnLdro ........ 510 678 0180
**ALTERNATIVE TELECOM & NETWORKS**
    www.alttelnet.com
    ...................... 510 848 4411
American Telesource Inc
    1350 Ocean Av Emvl ......... 510 428 1111
Apex Telcom Inc 113 10th ........510 251 2771
**APM COMMUNICATIONS**
    TELEPHONE AND VOICE MAIL SYSTEMS
    SERVICE • INSTALL • MOVE
    San Leandro 510-635-2810

**AT&T CALIFORNIA ....... 800 313 4214**
    See Display Ad This Page
Bay Area Communications ...... 800 482 5222
    See Display Ad Next Page
Bay Telephone Co ........... 510 547 2000

**CALIFORNIA TELEPHONE ACCESS PROGRAM**
    See Coupon Page For Application
    Eng 800-806-1191 TTY 800-806-4474
    Voz 800-949-5650 TTY 800-896-7670
Cameron Communications .....415 773 2222
Data Connection Corporation
    1001 Marina Village Pkwy Almda  510 748 8230

**DELUXE TELEPHONE SERVICE**

*esi* ALL IN ONE
VOICE MAIL
TELEPHONE SYSTEM

Sales • Installation • Repair
Data Voice Cabling
Moves / Changes On All Systems
Panasonic • Comdial • Avaya • Toshiba
License # 5300111 - Insured PL & PD
Bonded - Fax 510 276 2412
    ...................... 510 276 9442
Destiny 2000 Inc
    4707 Telegraph Av ............510 655 7212

**ENTERPRISE TELCOM**
SMALL BUSINESS SPECIALISTS
LOW PRICED SOLUTIONS
MULTILINE PHONES
PHONE SYSTEMS
VOICE MAIL
NAME BRANDS
WIRING • CABLING
53 YEARS OF EXPERIENCE
$99 JACKS - RESIDENTIAL
**510 535-2545**

Please recycle this directory
when you receive your new
AT&T Yellow Pages.

**EXECUTIVE PHONE SERVICE**

**Panasonic**
**TOSHIBA**
**NEC**
**NORTEL•AVAYA**
Authorized Dealer
**CABLING EXPERTS !**
★ See Display Ad This Classification
**510-452-1006**

Executive Phone Service ........ 510 452 1006
    See Display Ad Next Page
Five 9s Communications Inc
    5801 Christie Av Emvl ....... 510 899 6340
G2 Solutions 1475 Powell Emvl ... 510 985 9600
Gsolutionz Inc
    1650 Palma Dr Ventura ... 510 832 3360
**INTER-TEL**
    6475 Christie Av Emvl ...... **510 450 9777**
Jack London Technology Center
    720 2d ................. 510 763 4886
**JCK COMMUNICATIONS**
    Panasonic Business Telephone Systems
    ..................... **800 840 4027**
Mail Network Services
    1475 Powell Emvl ......... 510 297 2100
Matthews Packaging Graphics
    1851 Harbor Bay Pkwy Almda ... 510 263 1840
Metro Communications ..........510 549 7222
**NEC UNIFIED SOLUTIONS INC—**
    *AUTHORIZED DEALERS*
ATI-AMERICAN TELESOURCE INC
    www.ati-cti.com
    1350 Ocean Av Emvl .........800 333 8394
**NORTEL**

**NORTEL**
**BCM • NORSTAR**
Factory Authorized Sales & Service
Teledynamic Communications
    www.teledynamic.com
**800-400-8184**

Pacific Telemanagement Services
    14472 Wicks Bl SnLdro .........510 483 6502
**PANASONIC COMMUNICATION SYSTEMS**

- Sales - Installation
  - Service
- Business and Residential
  Telephone Systems
- Digital Super Hybrid Systems
- Advanced Hybrid Systems
- Voice Processing Systems
- Wireless Multi-line Solutions
  Visit us online at
  www.panasonic.com/csd

**"CERTIFIED DEALERS"**
PANASONIC ............. **800 211 7262**
    800 211-PANA
    *CERTIFIED DEALER*
METRO COMMUNICATIONS .... 510 549 7222

Peacock Associates Inc
    5900 Hollis Emvl ........... 510 420 5701
Team One Solutions
    14731 Catalina SnLdro ...... 510 357 5555
Tucker Technology Inc
    300 Frank H Ogawa Plaza ....... 510 836 0422
Universal Telecom
    875 Island Dr Almda ........ 510 523 0809
Universal Telecom Inc ........ 510 523 6811
**VOICEPRO**
    MITEL • SHORETEL
    AVST
    www.voicepro.com  925-866-8866

Simplify your buying . . .
Know where to buy it.
The dealers of many nationally
advertised items are listed in
AT&T Yellow Pages.
Find it fast in the
AT&T Yellow Pages.

Looking for

Information on

Advertising Rates

Call the

AT&T

Yellow Pages

Toll-Free:

**1-800-248-2800**



# Business, Voice and Data Solutions

## SALES • SERVICE • INSTALLATION & REPAIR

– PBX / Key Systems / VoIP Systems / Ancillary Equipment
– Full Range of Call Center Solutions from Avaya, Nortel & Rockwell
– PremierSERV Network Support Services, including Design, Delivery & Management
– Video Conferencing Solutions from Polycom, TANDBERG, VTEL and Cisco
– Messaging & Unified Communications

# 800-313-4214
Call Toll Free, Or Visit Us @ TheNewATT.com

VENDEDORES / TÉCNICOS CERTIFICADOS Y AUTORIZADOS


Avaya is a registered trademark of Avaya. Cisco Systems is a registered trademark of Cisco Systems, Inc. Nortel is a registered trademark of Nortel.
© 2006 AT&T Knowledge Ventures. All rights reserved.

# EXHIBIT 8

EX-21 25 ex21.htm SUBSIDIARIES OF AT&T INC.

Exhibit 21

**PRINCIPAL SUBSIDIARIES OF**

**AT&T INC., AS OF DECEMBER 31, 2006**

| Legal Name | State of Incorporation/Formation | Conducts Business Under |
|---|---|---|
| Illinois Bell Telephone Company | Illinois | AT&T Illinois; AT&T Wholesale |
| Indiana Bell Telephone Company, Incorporated | Indiana | AT&T Indiana; AT&T Wholesale |
| Michigan Bell Telephone Company | Michigan | AT&T Michigan; AT&T Wholesale |
| Nevada Bell Telephone Company | Nevada | AT&T Nevada; AT&T Wholesale |
| Pacific Bell Telephone Company | California | AT&T California; AT&T Wholesale |
| AT&T International, Inc. | Delaware | AT&T International |
| SBC Internet Services, Inc. | California | AT&T Internet Services; AT&T Entertainment Services |
| SBC Long Distance, LLC | Delaware | AT&T Long Distance |
| AT&T Teleholdings, Inc | Delaware | AT&T Midwest; AT&T West; AT&T East |
| Southwestern Bell Telephone, L.P. | Texas | AT&T Arkansas; AT&T Kansas; AT&T Missouri; AT&T Oklahoma; AT&T Texas; AT&T Southwest; AT&T Wholesale |
| Southwestern Bell Yellow Pages, Inc. | Missouri | AT&T Advertising & Publishing |
| Sterling Commerce, Inc. | Delaware | same |
| The Ohio Bell Telephone Company | Ohio | AT&T Ohio; AT&T Wholesale |
| The Southern New England Telephone Company | Connecticut | AT&T Connecticut; AT&T Woodbury |
| The Woodbury Telephone Company | Connecticut | AT&T Woodbury |
| Wisconsin Bell, Inc. | Wisconsin | AT&T Wisconsin; AT&T Wholesale |

| Legal Name | State of Incorporation/Formation | Conducts Business Under |
|---|---|---|
| AT&T Corp. | New York | AT&T Corp; AT&T; Conference Operator-AT&T; Connect N'Save; ACC Business; AT&T Worldnet Services; AT&T Worldnet; AT&T Wholesale, Lucky Dog Phone Co., SmarTalk; GTI; prepaidserviceguide.com; ConQuest; CQTalk!; UnispeakSM Service; AT&T Wholesale |
| AT&T Communications of California, Inc. | California | same |
| AT&T Communications of the Mountain States, Inc. | Colorado | Conquest, SmarTalk |
| AT&T Communications of NJ, LP | Delaware | same |
| AT&T Communications of New York, Inc. | New York | same |
| AT&T Communications of Illinois, Inc. | Illinois | same |
| AT&T Communications of the Southern States, LLC | Delaware | ACC Business; SmarTalk; prepaidserviceguide.com; GTI; AT&T; Conquest; CQTalk!, Lucky Dog Phone Co. |
| Teleport Communications New York | New York | same |
| BellSouth Corporation | Georgia | AT&T South |
| BellSouth Telecommunications, Inc. | Georgia | AT&T Southeast AT&T Alabama AT&T Florida AT&T Georgia AT&T Louisiana AT&T Kentucky AT&T Mississippi AT&T North Carolina AT&T South Carolina AT&T Tennessee |

**Exhibit 21**

| Legal Name | State of Incorporation/Formation | Conducts Business Under |
|---|---|---|
| AT&T Mobility LLC | Delaware | Cingular Wireless; AT&T Mobility |
| Cingular Wireless II, LLC | Delaware | Cingular Wireless; AT&T Mobility |
| New Cingular Wireless Services, Inc. | Delaware | Cingular Wireless; AT&T Mobility |

# EXHIBIT 9

## LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C.

ATTORNEYS AT LAW
1330 BROADWAY, SUITE 1800
OAKLAND, CALIFORNIA 94612-2509

PHONE: (510) 839-6824 ● FAX: (510) 839-7839
SENDER'S E-MAIL: LNAKO@LEWISFEINBERG.COM

June 26, 2007

**By U.S. Mail and Facsimile {(415) 357-4605}**

Forrest E. Fang
Lafayette & Kumagai LLP
100 Spear Street, Suite 600
San Francisco, CA 94105

       **RE:**   *Glover v. SBC Communications, Inc.*
               **Case No.:07-02652 CRB**

Dear Mr. Fang:

     This letter confirms our telephone conversation this afternoon regarding the hearing on Defendant's Motion to Dismiss. You requested that we stipulate to schedule hearings for both the Motion to Remand and the Motion to Dismiss on Friday, July 27, 2007.

     In response, we proposed a stipulation which would keep the hearing on the Motion to Remand on Friday, July 20, 2007, and would allow Defendant to respond to the motion and appear before the Court to oppose the motion without consenting to the Court's jurisdiction or waiving any defects in personal jurisdiction. In addition, the stipulation would schedule the hearing on the pending Motion to Dismiss for an appropriate date after the Motion to Remand is decided. We also offered to stipulate that, if your removal of this action is determined to be proper, we will dismiss SBC Communications, Inc. as a defendant and amend our complaint to name the disability benefit plan, the Pacific Telesis Group Comprehensive Disability Benefit Plan, on a benefits claim under ERISA § 502(a)(1)(B).

     In support of this position, we directed you to the *Everhart v. Allmerica Financial Life Insurance Co.*, 275 F.3d 751 (9th Cir. 2001), and *Ford v. MCI Communications Corp. Health & Welfare Plan*, 399 F.3d 1076 (9th Cir. 2005), decisions, which state that the only proper defendant in a benefits claim brought under ERISA is the ERISA plan itself. As the identity of the proper employer is no longer an issue if the Court determines that the plan in question is an ERISA plan, we do not believe that it is a proper use of the parties' and the Court's time and resources to brief an issue that will become moot if our Motion to Remand is denied. We previously discussed this issue with Susan Kumagai when we offered to stipulate to postpone Defendant's responsive pleading to after the decision on the Motion to Remand.

     In addition, as federal courts are courts of limited jurisdiction, federal courts are *presumptively without jurisdiction* over civil actions until the party asserting jurisdiction has carried the burden of demonstrating that jurisdiction is proper. Thus, the court must first decide

Forrest E. Fang
June 26, 2007
Page 2

whether this case is properly before it before it can hear any other motions.

Conversely, if there is no ERISA plan, then the proper court to consider personal jurisdiction is the Superior Court.

Please contact us if you would like to discuss this matter further.

Very truly yours,

LEWIS, FEINBERG, LEE,
RENAKER & JACKSON, P.C.

By  *Lindsay Nako*
Lindsay Nako