Teresa S. Renaker – CA State Bar No. 187800
Lindsay Nako – CA State Bar No. 239090
LEWIS, FEINBERG, LEE, RENAKER & JACKSON, P.C.
1330 Broadway, Suite 1800
Oakland, CA  94612
Telephone: (510) 839-6824
Facsimile: (510) 839-7839
trenaker@lewisfeinberg.com
lnako@lewisfeinberg.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| YVONNE GLOVER,<br><br>        Plaintiff,<br><br>vs.<br><br>AT&T UMBRELLA BENEFIT PLAN NO. 1,<br><br>        Defendant. | Case No. 07-02652-CRB<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        February 29, 2008<br>Time:       10:00 a.m.<br>Courtroom:  8<br>Judge:     Hon. Charles R. Breyer |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

NOTICE IS HEREBY GIVEN that on February 29, 2008, at 10:00 a.m., or as soon thereafter as counsel may be heard, at the U.S. Courthouse, 450 Golden Gate Avenue, San Francisco, California 94102, in Courtroom 8, 19th Floor, before the Honorable Charles R. Breyer, Plaintiff Yvonne Glover will, and hereby does, move the Court for an Order granting summary judgment on her claim for short-term and long-term disability benefits, plus pre-judgment interest thereon, against Defendant AT&T Umbrella Benefit Plan No. 1.

This Motion is based on this Notice of Motion and Motion for Summary Judgment; the following Memorandum of Points and Authorities in support thereof; the accompanying Declaration of Lindsay Nako and exhibits thereto; the pleadings and other documents in the

//

//

1  Court's file in this matter; oral argument; and such other matters as may be presented to the

2  Court at hearing.

3

4  Dated: January 11, 2008                Respectfully submitted,

5                                         LEWIS, FEINBERG, LEE,
                                          RENAKER & JACKSON, P.C.
6
                                          By:  _____/s/_____
7                                              Lindsay Nako
                                               *Attorneys for Plaintiffs*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page No.**

I. STATEMENT OF ISSUES TO BE DECIDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    Ms. Glover's Professional History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Pertinent Plan Terms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.    Ms. Glover's Disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        1.    Dystonia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        2.    Cervical Radiculopathy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        3.    Wrist Ganglion Cyst . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        4.    The Disabling Effects of Ms. Glover's Medications.. . . . . . . . . . . . . . . 8

        5.    Ms. Glover Is Disabled Under the More Stringent Standards of the
            Social Security Administration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    D.    Ms. Glover's Claim for Short-Term Disability Benefits. . . . . . . . . . . . . . . . . . . 8

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Applicable Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.    On *De Novo* Review, There Is No Genuine Issue of Material Fact That
        Ms. Glover is Disabled Under the Terms of the Plan. . . . . . . . . . . . . . . . . . . . . . 11

        1.    The Standard of Review Should Be *De Novo*, As Discretion Was
            Not Exercised by the Entity to Which the Plan
            Grants Discretion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.    On *De Novo* Review, the Evidence Demonstrates that
            Ms. Glover Is Disabled Within the Meaning of the Plan**.** . . . . . . 14

    C.    In the Alternative, There Is No Genuine Issue of Material Fact That SMAART
        Abused Its Discretion By Denying Ms. Glover's Claim for Short-Term
        Disability Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.    The Service Agreement Between Defendant and Sedgwick Claims
            Management Services, Inc. Creates a Conflict of Interest and
            Requires a Heightened Level of Skepticism of SMAART's
            Decision to Deny Ms. Glover's Claim for Benefits. . . . . . . . . . . 17

        2.    SMAART Abused Its Discretion When It Denied Ms. Glover's
            Claim for Benefits**.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            a.    SMAART Attempted to Rewrite the Plan to Impose a
                Requirement That Ms. Glover Demonstrate that She
                Cannot Work Even with Accommodations. . . . . . . . . . 19

b.      SMAART Abused Its Discretion When It Denied Ms.
Glover's Claim for Benefits Based on Erroneous
Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D.      Ms. Glover's Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1

## TABLE OF AUTHORITIES

2 **Federal Cases**                                                                    **Page No.**

3   Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955 (9th Cir. 2006) (en banc) . . . . . . . . . vii, 17

4   Allen v. Adage, Inc., 967 F.2d 695 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5   Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

6   Austin v. Continental Casualty Co., 216 F. Supp. 2d 550 (W.D.N.C. 2002) . . . . . . . . . . . . . . 21

7   Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003) . . . . . . . . . . . . . . . . . . . vii, 21, 23

8   Canseco v. Const. Laborers Pension Trust for So. Cal., 93 F.3d 600 (9th Cir. 1996) . . . . . . . . 19

9   Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

10  Darland v. Fortis Benefits Ins. Co., 317 F.3d 516 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 21

11  Firestone Tire & Rubber v. Bruch, 489 U.S. 101 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

12  Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914 (7th Cir. 2003) . . . . . 23

13  Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan,
        349 F.3d 1098 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
14
    Ladd v. ITT Corp., 148 F.3d 753 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
15
    Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech.,
16      125 F.3d 794 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

17  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986) . . . . . . . . . . . . . 11

18  Nelson v. EG & G Energy Measurements Group, Inc., 37 F.3d 1384 (9th Cir. 1994) . . . . vii, 12

19  Newcomb v. Standard Ins. Co., 187 F.3d 1004 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . vii, 15

20  Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co., 230 F.3d 415 (1st Cir. 2000) . . . . . . . . . . . 9

21  Perry v. Simplicity Engineering, 900 F.2d 963 (6th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . 12

22  Reidl v. General American Life Ins. Co., 248 F.3d 753 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . 9

23  Safavi v. SBC Disability Income Plan, 493 F. Supp. 2d 1107 (C.D. Cal. 2007) . . . . . . . . . . . 9, 14

24  Saffle v. Sierra Pacific Power Co., 85 F.3d 455 (9th Cir. 1996) . . . . . . . . . . . . . . viii, 19, 20, 22

25  Shane v. Albertson's Inc., Employees' Disability Plan, 504 F.3d 1166 (9th Cir. 2007) . . . . vii, 12

26  Taft v. Equitable Life Assur. Soc'y, 9 F.3d 1469 (9th Cir. 1993) . . . . . . . . . . . . . . . . . vii, 17, 24

27

28

1

**Federal Statutes**

2   29 U.S.C. § 1132(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

3   42 U.S.C. § 423(d)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 24

4   **Federal Rules and Regulations**

5   Fed. R. Civ. P. 56(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

<u>**INTRODUCTION AND SUMMARY OF ARGUMENT**</u>

3    Plaintiff Yvonne Glover's claim for short-term and long-term disability benefits arises

4   under the Pacific Telesis Group Comprehensive Disability Benefit Plan ("the Plan"), a

5   component of the larger Defendant AT&T Umbrella Benefit Plan No. 1 ("Defendant").  The Plan

6   is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended,

7   29 U.S.C. § 1001 *et seq*.  At the time Ms. Glover was denied benefits, the Plan was administered

8   by a group of employees of Sedgwick Claims Management Services, Inc. ("Sedgwick"), known

9   as the SBC Medical Absence and Accommodations Resource Team ("SMAART").

10    The standard of review of the administrator's decision to deny Ms. Glover's claim for

11   short-term disability benefits should be *de novo* because the decision to deny Ms. Glover's claim

12   was not made by the entity granted discretionary authority under the Plan.  *See Shane v.*

13   *Albertson's Inc., Employees' Disability Plan*, 504 F.3d 1166, 1171 (9th Cir. 2007); *Nelson v.*

14   *EG&G Energy Measurements Group, Inc.*, 37 F.3d 1384, 1388 (9th Cir. 1994).

15    Applying *de novo* review, Ms. Glover is entitled to summary judgment, as she presents

16   substantial evidence of her disability, which is not outweighed by contrary evidence.  *See*

17   *Newcomb v. Standard Ins. Co.*, 187 F.3d 1004, 1006-07 (9th Cir. 1999).

18    In the alternative, if the Court determines that discretion was properly exercised and the

19   denial of Ms. Glover's claim should be reviewed for abuse of discretion, this review should be

20   "tempered by skepticism" based on the existence of a conflict of interest.  *See Abatie v. Alta*

21   *Health & Life Ins. Co.*, 458 F.3d 955, 959 (9th Cir. 2006) (en banc).  The Agreement for

22   Administration of Disability Claims between the plan sponsor and Sedgwick that was in effect at

23   the time that Ms. Glover applied for short-term disability benefits created incentives for claims

24   administrators to uphold erroneous denials on appeal.  *See Abatie*, 458 F.3d at 969.  Under the

25   agreement, Sedgwick was penalized for overturning denials of benefits at the appeals level where

26   no new information had been supplied by the claimant, thus erecting a financial incentive to

27   affirm erroneous claim denials.

28    SMAART abused its discretion by making a decision on Ms. Glover's claim that both

1  conflicts with the Plan terms and is based on erroneous findings of fact. *See Taft v. Equitable*

2  *Life Assur. Soc'y*, 9 F.3d 1469, 1471-73 (9th Cir. 1993).  First, the Plan provides that an

3  employee has a short-term disability if she is unable to "engag[e] in . . . her normal occupation or

4  employment . . . . or such other occupation or employment as . . . she is assigned in accordance

5  with . . . normal practices."  (Declaration of Lindsay Nako, Exh. 1, p. P00196.)  In its review of

6  her claim, SMAART imposed an additional requirement that Ms. Glover show she was unable to

7  perform her occupation with accommodation, a term not contained in the Plan. *See Saffle v.*

8  *Sierra Pacific Power Co.*, 85 F.3d 455, 459-60 (9th Cir. 1996).

9  Second, SMAART disregarded the opinions of Ms. Glover's well-qualified treating

10  physicians in favor of the more favorable opinions of hired medical reviewers who had never met

11  Ms. Glover in person and reached unsupported conclusions. *See Black & Decker Disability Plan*

12  *v. Nord*, 538 U.S. 822, 823 (2003).  When two of the hired medical reviewers concluded that Ms.

13  Glover was disabled from her normal occupation, SMAART requested that they apply an

14  eligibility requirement not contained in the plan – the inability to work with accommodation.

15  SMAART based its decision largely on these medical reviewers' unsupported opinions that Ms.

16  Glover was able to work with accommodation, in violation of the terms of the Plan.

17  For the foregoing reasons, Ms. Glover's Motion for Summary Judgment should be

18  granted.

19

20

21

22

23

24

25

26

27

28

# I. STATEMENT OF ISSUES TO BE DECIDED

1.     Whether the standard of review is *de novo* or abuse of discretion.

2.     Whether, under *de novo* review, there exists any genuine issue of material fact that Ms. Glover is disabled under the terms of the Plan.

3.     If the standard of review is abuse of discretion rather than *de novo*, what level of skepticism should be applied by the Court.

4.     If the standard of review is abuse of discretion rather than *de novo*, whether there is any genuine issue of material fact that the decision to deny Ms. Glover's short-term disability benefits constituted an abuse of discretion.

# II. STATEMENT OF FACTS

**A.     Ms. Glover's Professional History.**

In June 1989, Ms. Glover began working for Pacific Bell. (Exh. 1, p. P00254, ¶ 3.[1])  Her original position was Operator and she held this position for nine years.  As an Operator, Ms. Glover spoke with an average of 1,000 customers each day.  (*Id.* at ¶ 3.)  However, in 1990, Ms. Glover suffered sudden and unexpected speech loss resulting from a rare vocal chord disorder, known as dystonia, which impeded her ability to communicate with customers over the phone. (*Id.* at ¶ 4.)

Due to her dystonia, SBC transferred Ms. Glover to the position of Staff Associate, which Ms. Glover commenced on November 6, 2000.  (*Id.* at ¶ 8.)  According to SBC's "Job Analysis Document," the position of Staff Associate requires the ability to perform the following activities:

1.     Process payroll by entering data into computer from hand written time sheets (90 minutes per day); 700 keystrokes.

2.     Prepare work schedules.  Will enter data using keyboard into spread sheet (60 min per day); 700 keystrokes; 60 lines handwritten.

3.     Process day off requests by entering data into computer from handwritten forms (90 mins per day); 700 keystrokes; 60 lines handwritten.

---

[1] All references to "Exh." are to exhibits to the Declaration of Lindsay Nako filed herewith.

4.    Assist manager with filing, (60 min per day), faxing (30 min per day), and photocopying (30 min per day) functions.

5.    Word process correspondence (30 min per day)- 650 keystrokes.

6.    Sort and distribute mail (30 min per day).

7.    Answer telephones and take messages (30 min per day).

(*Id*. at P00258.)

As a Staff Associate, Ms. Glover was primarily responsible for managing the calendars, schedules, and bonuses of over 400 employees in four offices. (*Id*. at P00255, ¶ 9.) Her days began with sifting through, sorting, stapling together, and alphabetizing the calendars of the employees in the offices for which she was responsible. (*Id.* at ¶ 10.) This process took several hours, though sometimes more, and involved repetitive use of her hands to sort and staple the calendars. (*Id.*) After noting attendances and bonuses, Ms. Glover entered this information into a database on her computer. (*Id.*) This work involved long hours spent at her desk and close attention to detail for extended periods of time. (*Id.* at ¶ 12.)

In addition to her account-monitoring duties, Ms. Glover managed supplies for the office, which involved lifting, opening, and unpacking various items. (*Id.* at ¶ 13.) Ms. Glover was also responsible for mailing many packages between offices. (*Id.*) This involved packaging and lifting boxes that were often so heavy that she had to place them on a chair in order to roll them to their destination. (*Id.*) Both the packaging and lifting of the packages required Ms. Glover to repetitively use her hands, arms, and upper body.

In 2002, Ms. Glover sustained three separate injuries, one to her wrist and two to her neck, shoulder, back, and bilateral upper extremities. (*Id.* at ¶¶ 14, 15, 16; P00268.) Despite pain from these injuries, Ms. Glover continued working and sought treatment for the pain. (*Id.* at P00255-56, ¶ 18.) She attended physical therapy, attempted acupuncture, and tried electrode treatment, but these treatments were ineffective at best, sometimes even making her symptoms worse. (*Id.*) She received epidural injections, which helped for only short periods of time. (*Id.*) Finally, as her limitations increased, her treating physician restricted Ms. Glover to four-hour workdays in July 2004. (*Id.* at P00256, ¶ 25; P00279.) However, her injuries and illnesses

1  continued to be aggravated by the requirements of her job, particularly keyboarding.  (*Id*. at

2  P00256, ¶¶ 22, 26.)  The cumulative effects of these conditions and the side-effects of necessary

3  medications rendered Ms. Glover unable to work in her normal occupation, even with the

4  accommodation of a reduced schedule.  (*Id*. at ¶ 26.)  Finally, after four months of modified

5  workdays, the pain became unendurable and her productivity dropped below acceptable levels.

6  (*Id*.)  Ms. Glover was forced to leave work due to her disabilities as of October 27, 2004.  (*Id*. at

7  ¶¶ 26, 27.)

8  **B.    Pertinent Plan Terms.**

9          Under the terms of the Plan, a participant is disabled for purposes of short-term disability

10  benefits eligibility if she has:

11          [A] sickness, injury, or other medical, psychiatric, or psychological condition,
        which prevents [her] from engaging in . . . her normal occupation or employment
12          with the Participating Company, or such other occupation or employment as . . .
        she is assigned in accordance with the Participating Company's normal practices.
13

14  (Exh. 1 at P00196.)  Short-term disability benefits are payable for up to fifty-two weeks.  (*Id*. at

15  P00198, § 4.1.1.)

16          At the end of the fifty-two week short-term disability benefit period, a participant is

17  entitled to long-term disability benefits if she continues to be "prevent[ed] . . . from engaging in

18  any occupation or employment for which [she] is qualified, or may reasonably become qualified,

19  based on training, education, or experience."  (*Id*. at P00195.)

20          The Plan Administrator is the Pacific Telesis Group.  (*Id*. at P00196; P00215, § 13.1.)

21  Claims for short-term disability benefits are approved or denied by the General Employees

22  Benefit Committee ("GEBC").  (*Id*. at P00208, § 8.1.)  The GEBC alone is authorized to

23  determine whether to approve or deny claims and has the discretion to resolve factual issues and

24  interpret or adopt reasonable constructions of Plan provisions.  (*Id*. at §§ 8.1, 8.1.1, 8.3.)  The

25  Employees Benefit Claim Review Committee ("Review Committee") is responsible for

26  reviewing benefit denials, at the written request of any participant.  (*Id*. at P00211, § 9.1.)  The

27  Review Committee is designated to decide claims and has the discretion to resolve all factual

28  issues and to interpret and adopt reasonable constructions of Plan provisions.  (*Id*. at §§ 9.3, 9.4.)

1  Pacific Telesis Group is entitled to allocate fiduciary responsibility to persons, committees, or

2  entities in writings signed by the Executive Vice-President – Human Resources.  (*Id*. at P00215,

3  § 13.3.)

4  **C.  Ms. Glover's Disability.**

5  Ms. Glover is disabled due to the cumulative effects of dystonia, a wrist ganglion cyst,

6  and degenerative disc disease causing severe and chronic upper torso and extremities pain.  Ms.

7  Glover's disabling conditions and her resulting inability to work have been confirmed by Dr. Jill

8  Harrell, an orthopedic surgeon and Ms. Glover's treating physician for purposes of her workers'

9  compensation medical benefits.  The complex regimen of medications Ms. Glover must follow

10  for her various symptoms and their effect on her ability to work have also been routinely

11  documented.  Thus, Ms. Glover is not able to "engag[e] in . . . her normal occupation or

12  employment with the Participating Company, or such other occupation or employment as he or

13  she is assigned in accordance with the Participating Company's normal practices" (exh. 1 at

14  P00196), even with accommodations.  Moreover, the Social Security Administration agrees that

15  Ms. Glover is disabled in a manner qualifying as a short-term disability pursuant to the terms of

16  the Plan.  (*Id*. at P00336.)

17  **1.  Dystonia**

18  In 1990, Ms. Glover completely lost her voice, and was originally diagnosed with

19  dysphonia, later diagnosed as dystonia.  (Exh.1 at P00254, ¶¶ 4, 5; P00261, P00263.)  Dystonia is

20  a neurological movement disorder characterized by involuntary muscle contractions, which force

21  certain parts of the body into abnormal, sometimes painful, movements or postures.  (*Id*. at

22  P00427.)  Specifically, the dystonia that affects Ms. Glover is a voice disorder which is caused by

23  sudden involuntary muscle movements or spasms which cause the vocal chords to knock together

24  and stiffen.  (*Id*. at P00430.)  These spasms make it difficult for the vocal chords to vibrate and

25  produce voice.  (*Id*.)  As a result, "speech may be choppy and sound similar to stuttering."  (*Id.*)

26  The voice of an individual with this condition is often described as "strained or strangled and full

27  of effort."  (*Id*.)

28  Dystonia has a variable nature, making it difficult to predict the course of the disorder.

(*Id*. at P00427.)  Currently, there is no medication or therapy that can prevent progression, although some medications help lessen the effects. (*Id*. at P00431.)  The symptoms of dystonia may fluctuate, and stressful situations may worsen the condition. (*Id*. at P00430.)

At the onset of her dystonia, Ms. Glover was referred for voice therapy with Dr. K. Izdebski, a speech pathologist. (*Id*. at P00261-62.)  He diagnosed Ms. Glover with dysphonia and noted that she had "substantial difficulties with consistent repetition of clear phonatory voice, and extension of this fluency into connected speech." (*Id*. at P00261.)  He observed that her phonation was primarily disturbed by "discoordinated movement of the glottic, supraglottic, laryngeal, respiratory and or motor activities." (*Id*.)  At that time, Ms. Glover's "normative sustained phonation" was limited to about ten seconds at a time and to "single bisyllabic words." (*Id*.)  Dr. Izdebski noted that Ms. Glover's prognosis was guarded.  (*Id*.)  On July 27, 2000, Ms. Glover was seen again for dysphonia/dystonia.  (*Id*. at P00263.)  The examining doctor described her voice quality as "hoarse" and "strident" with "excessive tension." (*Id*.)  He rated her voice severity as severe.  (*Id*.)  Her prognosis remained guarded.  (*Id*.)

On February 27, 2003, Dr. Robert E. Leiberson, a neurological surgeon, noted this "spastic type speech pattern" when Ms. Glover spoke.  (*Id*. at P00265.)  When her vocal cords slam together or stiffen, this also results in shortness of breath, so Ms. Glover must frequently pause and rest to catch her breath.  (*Id*. at P00254, ¶ 6.)

In 1999, while on a leave of absence from her job as an operator due to dystonia, Ms. Glover applied for and was approved for Social Security disability insurance ("SSDI") benefits.  (*Id*. at ¶ 7.)  Ms. Glover was determined to return to work, however, so when SBC offered her the Staff Associate position, which did not require her to use her voice as much, she welcomed the opportunity and returned to work.  (*Id*. at ¶ 8.)  Although Ms. Glover returned to work for SBC in a position requiring little talking, her dystonia persists.  To this day, Ms. Glover's dystonia greatly interferes with her speech, which is now labored and slurred.  There is presently no cure for dystonia, and Ms. Glover must live with the disorder indefinitely.  (*Id*. at P00431.)

**2.     Cervical Radiculopathy**

Ms. Glover's primary source of pain results from cervical radiculopathy, or degenerative

1  disc disease.  On January 6, 2003, an MRI was performed on Ms. Glover.  (Exh. 1 at P00269.)

2  Dr. Stuart Mansfield found that "at C4-5, there is a focal central posterior disc herniation with

3  impression on the ventral aspect of the thecal sac and spinal cord.  This disc herniation measures

4  approximately 3-4 mm AP x 7-8 mm transversely." (*Id.*)  Dr. Mansfield also noted "a small

5  central posterior disc bulge/protrusion with slight impression on the ventral aspect of the thecal

6  sac" at C5-6.  (*Id.*)

7      On February 27, 2003, Ms. Glover visited neurosurgeon Dr. Robert E. Lieberson.  After

8  analyzing the results of an electromyogram ("EMG") and nerve conduction test, he noted that

9  "[t]he patient's plain films of the neck show significant multilevel degenerative disease."  (*Id*. at

10  P00265.)  He also observed that Ms. Glover's complaints were "consistent with a C6 level

11  lesion, at least based on the numbness and the EMG" and noted that "[a]n EMG . . . did show a

12  right C6 cervical radiculopathy."  (*Id.*)  Dr. Lieberson opined that Ms. Glover "should avoid

13  lifting more than five pounds, performing any overhead work, or using the hands repetitively or

14  forcefully."  (*Id.*)

15      On March 17, 2003, Dr. Harrell placed Ms. Glover on modified duty "to preclude

16  overhead activity and no lifting greater then five pounds."  (*Id*. at P00273.)  Dr. Harrell also

17  restricted her computer time to "no longer than thirty minutes with a ten minute break."  (*Id.*)

18  Two weeks later, however, Ms. Glover's pain was so severe that Dr. Harrell restricted her from

19  all work from March 31, 2003, through April 18, 2003.  (*Id*. at P00274.)  On October 29, 2003,

20  Dr. Harrell limited Ms. Glover to "no keyboard more than 2 hrs/8 hr shift."  (*Id*. at P00278.)  In

21  an April 26, 2004, "Requested Supplemental Report," Dr. Harrell confirmed that "[w]ith

22  reasonable medical probability, and based upon records review, subjective factors and objective

23  findings, I am able to state that residual permanent disability exists in this case."  (*Id*. at P00275.)

24      Ms. Glover underwent a second MRI on May 24, 2004.  Dr. Philip Rich observed at C4-5

25  a "persistent central disk protrusion extending 4 mm posteriorly, indenting the cord in the

26  midline."  (*Id*. at P00276.)  Dr. Rich noted both "cervical spondylosis with reversal of the normal

27  lordosis" and "C4-5 cord impingement." (*Id.*)  Dr. Rich further opined that the condition had

28  mildly progressed since Ms. Glover's previous MRI on January 6, 2003.  (*Id.*)

On July 7, 2004, as Ms. Glover's pain persisted, Dr. Harrell further restricted Ms. Glover to four-hour days with only half her time spent at the keyboard.  (*Id*. at P00279.)  Ms. Glover's desire to work was strong, and, with restrictions, she continued working modified four-hour days.  (*Id*. at P00256, ¶¶ 25, 26.)  However, her continued attempts to work four-hour days limited her potential for medical improvement.

On October 28, 2004, two days after Ms. Glover's last day of work, Dr. Harrell completed a "Permanent and Stationary Report" in which she noted that Ms. Glover "has reached a point of maximum medical improvement."  (*Id*. at P00280.)  She commented that Ms. Glover's "[r]esidual disability is largely due to chronic soft tissue musculoligamentous strain of the cervical spine, overlying cervical spondylosis and disc protrusion, central, at C5-6."  (*Id.*)

Dr. Harrell further observed:

> Taking into consideration the history according to the patient, including subjective complaints, radiologic findings, physical examination findings and my review of the medical records, it is my opinion that based upon reasonable medical probability, that from an orthopaedic standpoint, Ms. Glover currently experiences a disability referable to the cervical spine which precludes heavy lifting, forceful pushing and pulling activities and repetitive work at or above shoulder level.  She is also precluded from prolonged forward flexion of the neck and prolonged keyboarding.

> Ms. Glover is unable to return to her usual and customary job duties with the prolonged forward flexion of the cervical spine and prolonged keyboarding.

(*Id.* at P00282.)  At that time Ms. Glover's "usual and customary job duties" had already been reduced to four-hour days.  Thus, Dr. Harrell determined that she was not capable of continuing to work in her job *at all*, even with the accommodation of a four-hour schedule.

Dr. Harrell reiterated her conclusions for SMAART on November 2, 2004, finding Ms. Glover's condition to be permanent and stationary as of October 26, 2004, due to "severe pain at neck and right arm" with "permanent restriction."  (*Id*. at P00284.)  These conclusions clearly preclude Ms. Glover from performing the duties of Staff Associate or any other relevant occupation with any accommodation..

### 3.    Wrist Ganglion Cyst

Ms. Glover also experiences chronic pain resulting from a wrist ganglion cyst, which is a cystic enlargement of a tendon sheath on the back of the wrist.  Mosby's Medical, Nursing, and

1  Allied Health Dictionary, at 1735 (5th ed. 1998).  Such cysts can cause pain when they put

2  pressure on surrounding structures, in Ms. Glover's case causing inflammation of the median

3  nerve in her right arm and pain in her right wrist.  (Exh. 1 at P00267.)  The pain from the wrist

4  ganglion continues to cause Ms. Glover significant reduction in the functionality of her right arm

5  and wrist.  (*Id*. at P00255, ¶ 14.)

6      **4.    The Disabling Effects of Ms. Glover's Medications.**

7      Ms. Glover has been prescribed a variety of drugs to help her control her conditions and

8  relieve her constant pain.  At the time her benefits were denied, Ms. Glover was taking

9  approximately 1.0-1.5 mg of Klonopin daily to treat her dystonia.  (Exh. 1 at P00287.)  Klonopin

10  is a powerful anti-seizure medication that causes drowsiness and lack of muscle coordination.

11  (*Id*. at P00434.)  She also took Norco (Vicodin) 10/325 several times a day and 350 mg of Soma

12  twice a day to control her pain.  (*Id*. at P00285, P00287.)  Additionally, she took Lodine daily.

13  (*Id*. P00256-57, ¶ 29.)  These medications are known to cause nausea, dizziness, drowsiness, and

14  lack of coordination.  (*Id*. at P00439, P00445.)  She sometimes suffered from pain so severe that

15  "the only way to manage it is to take so much pain medication that I must lay down."  (*Id*. at

16  P00257, ¶ 29.)  Ms. Glover had also previously been prescribed Valium, Cyclobenzaprine,

17  Vicodin, Feldene, and Zantac.  (*Id.* at P00287.)

18      In July 2003, Dr. Harrell referred Ms. Glover to Sharon L. Mitchell, a pharmacist

19  specializing in pain medication.  (*Id*. at P00285.)  On July 31, 2003, Ms. Mitchell completed a

20  pharmacological pain management consultation and evaluation, advising that the Ms. Glover

21  should "never drive, operate heavy machinery and *perform activities requiring coordination and*

22  *alertness* while taking her medications." (*Id*. at P00287-88, emphasis added.)  Ms. Mitchell made

23  this assessment while Ms. Glover was taking only Klonopin, Norco, and Soma – fewer

24  medications than she was taking at the time her benefits were denied.

25      **5.    Ms. Glover Is Disabled Under the More Stringent Standards of the
           Social Security Court**.

26

27      As noted above, Ms. Glover first applied and was approved for SSDI in 1999 for her

28  dystonia, but ceased receiving the benefits when she returned to work as a Staff Associate.  (Exh.

1 at P00254, ¶¶ 7, 8.)  She reapplied and was reapproved in December 2004 due to the combined

impairments of her dystonia and her general back problems.  (*See id.* at P00336.)  Ms. Glover has

demonstrated that she meets the stringent Social Security Administration disability standard,

under which a claimant must be unable to engage in "any [] substantial gainful work which exists

in the national economy."  42 U.S.C. § 423(d)(2)(A).  This finding is evidence of disability under

the Plan.  *See Ladd v. ITT Corp.*, 148 F.3d 753, 755-56 (7th Cir. 1998) (SSA determination of

disability is relevant evidence of disability); *Reidl v. General American Life Ins. Co.*, 248 F.3d

753, 759, n. 4 (8th Cir. 2001) (SSA determination is admissible evidence to support ERISA

claim for long-term disability benefits); *Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co.*, 230

F.3d 415, 420 (1st Cir. 2000) (SSA determinations are relevant).

## D.    Ms. Glover's Claim for Short-Term Disability Benefits.

At the time Ms. Glover was denied benefits, the Plan was administered by a group of

employees at Sedgwick, an SBC contractor.  (Exh. 1 at P00318.)  The Sedgwick employees

administering claims for benefits and reviewing denials of claims under the Plan were known as

the SBC Medical Absence and Accommodations Resource Team ("SMAART").  (*Id.*; *see also*

*Safavi v. SBC Disability Income Plan*, 493 F. Supp. 2d 1107, 1110 (C.D. Cal. 2007)).

Ms. Glover applied for short-term disability benefits under the Plan on November 2,

2004.  (*Id.* at P00316-17.)  By letter dated November 23, 2004, SMAART denied Ms. Glover's

benefits effective November 3, 2004.  (*Id.* at P00318.)  The Denial Notice stated that the denial

was based on medical documentation provided by Dr. Harrell on November 9, 2004, which

contained an initial physician's statement form.  (*Id.*)

The letter acknowledged that "exam findings noted that you had decreased range of

motion of the cervical spine and an MRI report of the lumbar spine which showed a disc

protrusion.  The treatment plan noted that you were considered permanent and stationary as of

10/26/04 and had permanent restrictions and limitations."  (*Id.*)  Despite this evidence, the letter

noted that after review by SMAART, and an additional review by the SMAART physician

advisor, "the medical information submitted contains insufficient observable documentation to

support an off work status."  (*Id.* at P00319.)  In addition, "[i]n order to determine ongoing

1  disability, SMAART will need clear medical evidence that supports a severe functional

2  impairment or limitation that would give credence to your functional inability to perform your

3  job *with or without reasonable work restrictions*." (*Id*., emphasis added.)

4       On December 23, 2004, SMAART acknowledged that it had received additional medical

5  information from Dr. Harrell, but refused to consider the additional evidence. (*Id*. at P00326.)

6  Instead, SMAART advised Ms. Glover that in order for this information to be considered she

7  would need to submit it with a request for review, which must be filed within 180 days from the

8  date of the denial letter, that is, no later than May 23, 2005. (*Id.*) Without assistance of counsel,

9  Ms. Glover requested review of the decision on January 7, 2005. (*Id*. at P00327.) On January

10  10, 2005, SMAART acknowledged the receipt of Ms. Glover's request for review and advised

11  Ms. Glover that she should submit additional medical records. (*Id*. at P00328.) The letter further

12  stated that Ms. Glover would receive a written response by February 21, 2005. (*Id.*) After

13  receiving this letter, Ms. Glover retained counsel to assist her in assembling and submitted the

14  requested records.

15       On January 24, 2005, Ms. Glover's counsel faxed SMAART a letter explaining that Ms.

16  Glover was in the process of gathering the requested materials and advising that the request for

17  review would be supplemented no later than May 23, 2005, and requesting the claim documents

18  to which Ms. Glover was entitled under ERISA and the regulations. (*Id*. at P00329-30.) Yet, by

19  letter dated January 19, 2005, only *nine days* after SMAART requested that Ms. Glover submit

20  supplemental documentation, SMAART denied Ms. Glover's request for review. (*Id*. at P00334-

21  35.) Despite acknowledging that Ms Glover's treating physician recommended that Ms. Glover

22  remain off work due to her disabilities, the letter explained that "medical information provided

23  for the denial/appeal period did not contain sufficient clinical findings to substantiate a disabling

24  condition." (*Id*. at P00334.) In making its decision, SMAART relied on the analysis of a

25  physician advisor retained by SMAART through Network Medical Review ("NMR"), who

26  "noted that physical examination findings indicated limited range of motion of the cervical

27  spine," but opined "documentation did not provide evidence of neurological deficit, disuse

28  muscle atrophy or clear loss of function," nor did they show any "discreet [*sic*] neural

1  impingement." (*Id.* at P00334-35.)  Therefore, SMAART concluded, Ms. Glover was not

2  disabled within the meaning of the Plan.

3       With the assistance of counsel, Ms. Glover supplemented the appeal of the denial of her

4  claim for benefits on May 20, 2005. (*Id.* at P00173-88.)  However, by letter dated September

5  21, 2005, SMAART upheld its decision to deny benefits, stating that "[t]he medical information

6  provided for the denial/appeal period did not contain sufficient clinical finding to substantiate a

7  disabling condition." (Exh. 2, p. P00809.)  Based on the opinions of three medical reviewers

8  also retained through NMR, SMAART concluded, "Therefore, although some findings are

9  referenced, none are documented to be so severe as to prevent Ms. Glover from performing the

10  job duties of Staff Associate *with or without reasonable accommodations* from November 3,

11  2004 to her return to work." (*Id.* at P00811, emphasis added.)

## III.  ARGUMENT

12

13  **A.    Applicable Legal Standard.**

14       Summary judgment is appropriate under Fed. R. Civ. P. 56 if the evidence shows "that

15  there is no genuine issue as to any material fact and that the moving party is entitled to judgment

16  as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323

17  (1986).  If based on "the record taken as a whole," the applicable legal standards dictate a

18  judgment for the moving party, summary judgment is appropriate.  *See Matsushita Elec. Indus.*

19  *Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A fact issue is material if it must be

20  decided to resolve the plaintiff's substantive claim.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

21  242, 248 (1986).  The "materiality determination rests on the substantive law, [and] it is the

22  substantive law's identification of which facts are critical and which facts are irrelevant that

23  governs."  *Id.*  "A mere scintilla" of evidence in support of the nonmoving party's case is not

24  sufficient to preclude an order granting summary judgment.  *Id.* at 252.

25  **B.    On *De Novo* Review, There Is No Genuine Issue of Material Fact That Ms. Glover is**
      **Disabled Under the Terms of the Plan.**

26

27       The default standard of review to be applied by a district court in reviewing a claim for

28  benefits under an ERISA plan is *de novo*.  *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 115

1    (1989).  In conducting a *de novo* review, "the district court considers a denial-of-benefits

2    challenge afresh, without deferring to the [administrator's] interpretation of the plan."  *Allen v.*

3    *Adage, Inc.*, 967 F.2d 695, 697 (1st Cir. 1992); *see also, Perry v. Simplicity Engineering*, 900

4    F.2d 963, 966 (6th Cir. 1990) (*de novo* review means a review "without deference to the decision

5    or any presumption of correctness").

**1.    The Standard of Review Should Be *De Novo*, As Discretion Was Not
         Exercised by the Entity to Which the Plan Grants Discretion.**

8        *De novo* review is appropriate, unless the benefit plan gives the decision-maker

9    discretionary authority to determine eligibility for benefits or interpret the terms of the plan.

10   *Firestone*, 489 U.S. at 115.  "If the [decision-maker] was not properly vested with such

11   discretion, its decision . . . would not be subject to the deferential standard of review of abuse of

12   discretion."  *Shane v. Albertson's Inc. Employees' Disability Plan*, 504 F.3d 1166, 1170 (9th Cir.

13   2007).

14       Following *Firestone*'s holding that abuse of discretion review applies to decisions made

15   by parties to whom the plan has granted discretionary authority, *Firestone*, 489 U.S. at 115, the

16   Ninth Circuit, has repeatedly held that *de novo* review applies where the Plan has not vested the

17   decision-maker with the requisite discretionary authority.  *See Shane*, 504 F.3d at 1170, 1171;

18   *Nelson v. EG & G Energy Measurements Group, Inc.,* 37 F.3d 1384, 1389 (9th Cir. 1994).

19   Discretion must be exercised in accordance with the Plan terms in order to support abuse of

20   discretion review. *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Protection*

21   *Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003).

22       For example, in *Nelson*, the Ninth Circuit held that abuse of discretion review was not

23   warranted where the action in question had been taken by an employee involved in the

24   administration of the plan, rather than by the Administrative Committee, the body vested with

25   discretionary authority by the plan.  *Nelson*, 37 F.3d at 1389.  Thus, "there is no appropriate

26   exercise of discretion to which to defer" and the court reviewed the claim *de novo*.  *Id.  Nelson* is

27   indistinguishable from the present matter.

28       Here, the General Employees Benefit Committee ("GEBC") is appointed by the board of

1   directors of the Pacific Telesis Group to administer the disability benefit plans and is granted the

2   discretion to interpret the terms of the Plan. (Exh. 1 at P00194; P00208, § 8.1.1.) The Plan

3   states:

4       8.1.1   Discretion of the GEBC.   The GEBC shall have the power and discretion to
        resolve all factual issues presented in a claim for Short Term Disability Benefits . .

5       . in a reasonable manner, and to interpret and adopt reasonable constructions of any
        provision of the Plan whenever interpretation or construction is needed to resolve

6       any issue presented in a request for review. The GEBC shall also have the power
        and discretion to establish general interpretations, rules, and procedures to guide

7       and assist in approving or denying similar claims.

8   (*Id*. at P00208, § 8.1.1) Thus, the GEBC has discretion to decide initial claims for benefits.

9       Benefit denials by the GEBC are reviewed by the Employees Benefit Claim Review

10  Committee ("the Review Committee"). (*Id*. at P00211, § 9.1.)   The Plan provides:

11      9.4   Discretion of the Committee.   The Review Committee shall have the power
        and discretion to resolve all factual issues presented in a request for review in a

12      reasonable manner, and to interpret and adopt reasonable constructions of any
        provision of the Plan whenever interpretation or construction is needed to resolve

13      any issue presented in a request for review. The Review Committee shall also
        have the power and discretion to establish general interpretations, rules, and

14      procedures to guide and assist and [sic] the GEBC in approving or denying similar
        claims under Section 8.

15

16  (*Id*. at § 9.4.)

17      In April 2001, the Plan was amended to maintain the GEBC and the Review Committee,

18  but "[w]ith concurrence from Legal, we are changing the official members to 'titles' rather than

19  names, and are designating titles at Sedgwick as well as SBC as voting members." (Exh. 3, p.

20  DEF000287.) The names of the individuals making up the GEBC and the Review Committee

21  were deleted from the committees' rosters and job titles were added in their places. (*Id*. at

22  DEF000289.) The amendment made clear, however, that the GEBC remained responsible for

23  reviewing first level claims, and the Review Committee remained responsible for reviewing

24  "second level" claims, or requests for review of first level claim denials. (*Id*. at DEF000290.)

25  The titles added were "voting members" of these committees. (*Id*. at DEF000287.) At no time

26  was the Plan amended to bestow discretionary authority on any individual member of these

27  committees. The Plan did not give either body the right to delegate discretion to any other party.

28      Defendant admits in interrogatory responses that the Plan was not amended to give

1 Sedgwick the discretion to interpret the terms of the Plan.  (Exh. 8, p. 2.)  In contrast, a separate

2 SBC Plan has been found to contain an effective delegation of discretionary authority.  *See Safavi*

3 *v. SBC Disability Income Plan*, 493 F. Supp. 2d 1107, 1116 (C.D. Cal. 2007).  The SBC

4 Disability Income Plan at issue in *Safavi* is also administered by Sedgwick.  *Id.* at 1110.  Unlike

5 the Plan at issue here, the SBC Disability Income Plan contained the following language:

6 
7 
8
> [E]ach Claims Administrator and each subcommittee to whom claim determination or review authority has been delegated shall have full and exclusive authority and discretion to grant and deny claims under the Plan, including the power to interpret the Plan and determine the eligibility of any individual to participate in and receive benefits under the Plan.

9 *Id.* at 1116.  The *Safavi* court held that the plan allowed the delegation of discretionary authority

10 to a claims administrator.  *Id.* at 1116.  Here, the Plan governing Ms. Glover's claim for benefits

11 granted discretion only to the GEBC and the Review Committee and did not provide for the

12 delegation of claim determination or review authority to any other claims administrator.  (Exh. 1

13 at P00208, § 8.1.1; P00211, § 9.4.)

14 Ms. Glover's original claim for short-term disability benefits was denied by a Disability

15 Specialist on the SBC Medical Absence & Accommodations Resource Team ("SMAART").  (*Id.*

16 at P00320.)  Ms. Glover's request for review of this denial was twice denied by an Appeals

17 Specialist in the SMAART Quality Review Unit.  (*Id*. at P00335; Exh. 2 at P00811.)  The Plan

18 gives only the GEBC and the Review Committee discretion to resolve factual issues "in a

19 reasonable manner" and to "interpret and adopt reasonable constructions of any provision of the

20 Plan whenever interpretation or construction is needed."  (Exh. 1 at P00208, § 9.4.)   The Plan

21 makes no mention of SMAART or the SMAART Quality Review Unit.  There is no indication

22 that the GEBC or the Review Committee ever reviewed Ms. Glover's claim for benefits or her

23 appeal.  Thus, Thus, this case is on all fours with *Nelson* and the Court's review should be *de*

24 *novo*, as there was no exercise of discretion by the entity on which discretion is conferred.

25 
26
**2.**     **On *De Novo* Review, the Evidence Demonstrates that Ms. Glover Is Disabled Within the Meaning of the Plan.**

27 There is no genuine issue of material fact regarding a participant's disability where she has

28 provided substantial evidence of her disability and that evidence is not outweighed by any

1  contrary evidence.  *See Newcomb v. Standard Ins. Co.*, 187 F.3d 1004, 1006-07 (9th Cir. 1999)

2  (reversing, on *de novo* review, insurer's denial of benefits because the "lone" opinion of the

3  insurance company's physician could not overcome the substantial medical evidence provided by

4  claimant).

5       The following medical findings demonstrate that, no later than November 3, 2004, Ms.

6  Glover became disabled and unable to perform the duties of her normal occupation or any other to

7  which she could be assigned on a modified or full-time basis:

8      •  On four occasions between December 8, 2003, and September 28, 2004, Ms. Glover's

9         pain has been so intolerable that she had to visit the emergency room.  (Exh. 1 at

10         P00337-43.)  Two of these visits occurred *after* Ms. Glover was placed on a four-hour

11         work schedule by Dr. Harrell in July 2004.  (*Id.* at P00340-43.)

12      •  On September 7, 1990, Dr. Izdebski, speech pathologist, diagnosed Ms. Glover with

13         dysphonia. Her prognosis was "guarded."  (*Id.* at P00261.)

14      •  On July 27, 2000, Ms. Glover was again seen for dysphonia/dystonia.  Her prognosis

15         remained "guarded." (*Id.* at P00263.)

16      •  On January 6, 2003, an MRI showed "a focal central posterior disc herniation with

17         impression" at C4-5 and "a small central posterior bulge/protrusion with slight

18         impression on the ventral aspect of the thecal sac" at C5-6. (*Id.* at P00269.)

19      •  On February 27, 2003, an EMG analyzed by Dr. Robert E. Lieberson, neurosurgery,

20         showed "significant multilevel degenerative disease" and cervical radiculopathy at C6.

21         (*Id.* at P00265.)

22      •  The July 31, 2003, pharmacological pain management consultation and evaluation

23         completed by Sharon L. Mitchell, pharmacist, concluded that Ms. Glover should

24         "never drive, operate heavy machinery and perform activities requiring coordination

25         and alertness while taking her medications." (*Id.* at P00287-88.)

26      •  On April 26, 2004, Dr. Jill Harrell confirmed "that residual permanent disability exists

27         in this case."  (*Id.* at P00275.)

28      •  On May 24, 2004, an MRI analyzed by Dr. Philip Rich showed a "persistent central

disk protrusion extending 4 mm posteriorly, indenting the cord in the midline" at C4-5.
Dr. Rich believed the condition had progressed since Ms. Glover's January 6, 2003
MRI. (*Id*. at P00276.)

- On October 28, 2004, Dr. Jill Harrell stated that Ms. Glover's "[r]esidual disability is
  largely due to chronic soft tissue musculoligamentous strain of the cervical spine,
  overlying cervical spondylosis and disc protrusion, central, at C5-6," and that Ms.
  Glover "has reached a point of maximum medical improvement" and was "unable to
  return to her usual and customary job duties with the prolonged forward flexion of the
  cervical spine and prolonged keyboarding." (*Id*. at P00280, P00282.)

- On December 13, 2004, Ms. Glover was approved for SSDI, demonstrating that she
  was unable to engage in "any substantial work which exists in the national economy."
  42 U.S.C. § 423(d)(2)(A).  (*Id*. at P00336.)

- On September 15, 2005, SMMART's own hired medical reviewer, Dr. Been,
  concluded that Ms. Glover was "disabled from her regular job as of 11/03/04 to the
  present." (Exh. 4, DEF000055.)

- On September 15, 2005, a second of SMMART's hired medical reviewers, Dr. Jares,
  also concluded that Ms. Glover was "disabled from her regular job duties as of
  11/03/04 to the present." (Exh. 5, DEF000065.)

The medical evidence demonstrates that Ms. Glover's disabling conditions keep her from
performing the physical tasks her job requires on any schedule.  Ms. Glover's position as a Staff
Associate primarily required her to be seated and keyboarding on a computer for hours each day.
(Exh. 1 at P00256, ¶ 22; P00258.)  Even on a reduced four-hour schedule, much of her time was
spent either keyboarding or conducting waist-level hand and arm motions.  (*Id*. at P00282.)  Her
least physically taxing task – answering the phone and taking messages – is so difficult for Ms.
Glover due to dystonia that it is the reason she was first moved from Operator to Staff Associate.
(*Id*. at P00254, ¶ 8.)  Due to her persistent pain, Ms. Glover has reduced use of her arm and hand,
and when she sits and must flex her head forward, as one does when typing, the pain is
excruciating.  (*Id*. at P00256, ¶ 22.)  Her pain is so severe that even strong medications only dull

it.  (*See id*. at P00256-57, ¶ 29.)  Ms. Glover's job also required her to continually concentrate on detailed tasks:  handling detailed schedules and bonuses of multiple large offices of a major corporation.  (*Id*. at P00255, p 12.)  This was rendered nearly impossible by the high levels of pain she experienced and the pain medication she required to function.  Ms. Glover's position required physical and mental acuity that her pain and medications simply do not permit her.

The only contrary medical evidence are the reports of four hired medical reviewers who have never met Ms. Glover, two of whom concluded that Ms. Glover *was disabled* from her normal occupation (exh. 4, p. DEF000055; exh. 5, p. DEF000065) and one who was unable to conclude that Ms. Glover continued to suffer from a previously diagnosed, incurable disease. (Exh. 6, p. DEF000060.)  Thus, Ms. Glover has presented substantial evidence demonstrating her entitlement to benefits..

**C.    In the Alternative, There Is No Genuine Issue of Material Fact That SMAART Abused Its Discretion By Denying Ms. Glover's Claim for Short-Term Disability Benefits.**

In the alternative, abuse of discretion review applies if a plan contains a clear grant of discretionary authority to the decision-maker.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006).  In addition, review of the decision receives a heightened level of skepticism if the administrator's decision-making is influenced by a conflict of interest.  *Id.* at 965, 971.  The Court's abuse of discretion review is "tempered by skepticism commensurate with the plan administrator's conflict of interest."  *Id.* at 959.

A plan administrator with discretion abuses that discretion if its decision conflicts with the plan terms or is based on erroneous findings of fact.  *See Taft v. Equitable Life Assur. Soc'y*, 9 F.3d 1469, 1471-73 (9th Cir. 1993).  SMAART's denial of Ms. Glover's claim fails on both counts.

**1.    The Service Agreement Between Defendant and Sedgwick Claims Management Services, Inc. Creates a Conflict of Interest and Requires a Heightened Level of Skepticism of SMAART's Decision to Deny Ms. Glover's Claim for Benefits.**

The Agreement for Administration of Disability Claims under SBC Disability Plans and Administration of SBC's Job Accommodation Process Between Sedgwick Claims Management

1  Services, Inc. and SBC Communications, Inc., Agreement No. 00018118, ("the Agreement"), as

2  in effect at the time Ms. Glover's claim for benefits was reviewed, created an incentive-based

3  program which rewarded the administrator for denying benefit claims and penalized the

4  administrator for reversing claim denials upon review.

5      Pursuant to the Agreement, SBC was entitled to assess penalties against Sedgwick based

6  on "key performance service measurements" ("KPSM"). The Agreement provides, "The

7  assessment of penalties will be completed at the end of 12 months for each contract year

8  beginning 7/1/2003, the date the KPSM become effective. If any penalties are payable to SBC a

9  separate check will be issued by Sedgwick CMS in the full amount of the penalty in August

10 following the end of each contract year." (Exh. 7, p. DEF000470.) The KPSM system also

11 provides for incentives directly benefitting individual claims reviewers. The Agreement provides

12 that "[a]ny Performance bonus paid to Sedgwick CMS will be used to reward and recognize the

13 Claims Management Staff." (*Id*. at DEF000495.)

14     The KPSM include penalties for "[a]ny denial overturned due to case management error."

15 (*Id*. at DEF000481.) The Agreement defines case management error as "a clear procedural error

16 which results in the Appeals Specialist reversing the denial." (*Id*.) Clear procedural error is

17 further defined as "an error in processing by a case manager that results in overturning a denial of

18 benefits at the appeals level without any new information." (Exh. 9, p. 5:21-22.) Although the

19 KPSM states that this measure is "aimed at ensuring accuracy of denial decisions" (exh. 7, p.

20 DEF000481), its practical effect is to discourage Segwick from overturning denials of benefit

21 claims at the appeal stage where there has been no addition of new information, even where the

22 original denial was based on erroneous analysis of the original medical records.

23     **2.    SMAART Abused Its Discretion When It Denied Ms. Glover's Claim for Benefits.**

24

25     SMAART abused its discretion in two ways when it denied Ms. Glover's claim for short-

26 term disability benefits. First, SMAART imposed a requirement on Ms. Glover that was not in

27 the Plan. By requiring Ms. Glover to provide evidence that she cannot perform her job even with

28 accommodations, SMAART effectively rewrote the plan, an action beyond the administrator's

1   authority. *See Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455, 459-60 (9th Cir. 1996). Second,

2   SMAART relied upon the unsupported opinions of hired medical reviewers when favorable, and

3   disregarded the reliable medical evidence provided by physicians who actually examined and

4   treated Ms. Glover, as well as evidence from its own medical reviewers that supported Ms.

5   Glover's claim.

**a.     SMAART Attempted to Rewrite the Plan to Impose a Requirement That Ms. Glover Demonstrate That She Cannot Work Even with Accommodations.**

8       The Ninth Circuit has held that where a plan's definition of disability does not require that

9   a participant be unable to perform her job with accommodations, the plan administrator may not

10   impose this requirement. *Saffle*, 85 F.3d 455, 459-60 (9th Cir. 1996). Even where the plan

11   administrator has been granted discretionary authority to determine benefit eligibility, "an

12   administrator lacks discretion to rewrite the Plan." *Id.* Imposing a condition for coverage or other

13   standard that is not set forth in the plan is arbitrary and capricious conduct. *See Canseco v. Const.*

14   *Laborers Pension Trust for So. Cal.*, 93 F.3d 600, 608-09 (9th Cir. 1996).

15       The plan in *Saffle* defined "Totally Disabled" as "unable to engage, for compensation or

16   profit, in any business or occupation for which [a participant] is reasonably fitted by education

17   training or experience." *Saffle*, 85 F.3d at 457. Nearly every one of the plaintiff's physicians

18   concluded that she could "perform some portion of her job with modifications," namely, working

19   with her feet elevated. *Id.* The plaintiff was denied benefits because the plan administrator

20   determined that she could perform a substantial portion of her regular job with accommodations.

21   *Id.* at 457-58. The court held that this was an improper interpretation of the plan because the

22   definition of Totally Disabled "does not talk in terms of accommodation at all." *Id.* at 459.

23       Here, the Plan at issue defines "short-term disability" as:

24   sickness, injury, or other medical, psychiatric or psychological condition, which prevents
     an Employee from engaging in his or her normal occupation or employment with the
25   Participating Company, or such other occupation or employment as he or she is assigned
     in accordance with the Participating Company's normal practices.
26

27   (Exh. 1, p. P00196.) Similar to the *Saffle* plan, the Plan does not reference accommodations at all.

28   However, in its November 23, 2004, claim denial letter, SMAART required Ms. Glover to present

1  "clear medical evidence that supports a severe functional impairment or limitation that would give

2  credence to your functional inability to perform your job with or without reasonable work

3  restrictions." (*Id*. at P00319.) This requirement was reiterated in the denial of Ms. Glover's

4  request for review. (Exh. 2, p. P00811.) This is not the standard for disability set forth in the

5  Plan.

6      A plain reading of the Plan leads to the conclusion that, in order have a short-term

7  disability, Ms. Glover must be prevented from holding her regular position as a Sales Associate or

8  any other position that the Participating Company could assign her to under its normal practices,

9  such as when Ms. Glover was assigned to a Sales Associate position after she became unable to

10 perform the duties of an Operator. To interpret "such other occupation or employment" to include

11 work with any accommodation would drastically limit the definition of short-term disability to

12 those who are "essentially non-conscious," *Saffle*, 85 F.3d at 458, and impose terms for eligibility

13 that are not present in the plain language of the Plan.

14     As described in detail above, SBC's "Job Analysis Document" for the position of Staff

15 Associate details tasks including entering data into a computer spreadsheet, filing, faxing,

16 photocopying, word processing, sorting and distributing mail, and answering the phone and taking

17 messages. (Exh. 1, p. P00258.) Ms. Glover's doctors and two of the medical reviewers hired by

18 SMAART agree that Ms. Glover is unable to perform her normal job duties because she cannot

19 perform repetitive tasks using her upper body, such as the tasks required by her job. (*Id*. at

20 P00256, P00282; Exh. 4, p. DEF000055; Exh. 5, p. DEF000065.) Dr. Harrell, Ms. Glover's

21 treating physician, also found her completely disabled from any occupation or employment. (Exh.

22 1, p. P00284.) The hired medical reviewers were not asked to evaluate Ms. Glover's ability to

23 perform alternative occupations, and provided no opinions on her ability to do so. The medical

24 evidence demonstrates that Ms. Glover is disabled under the terms of the Plan, regardless of her

25 employer's ability to provide her with the accommodation of a reduced schedule. Thus, Ms.

26 Glover can no longer perform basic office tasks or work as a telephone operator, and there is no

27 evidence that she is qualified for any other job. The denial of her benefits was an abuse of

28 discretion.

1

**b.    SMAART Abused Its Discretion When It Denied Ms. Glover's Claim**
**for Benefits Based on Erroneous Findings of Fact.**

2

3        SMAART's reliance on reviews by NMR physicians to the exclusion of all other medical

4    evidence was an abuse of discretion.  Courts have noted that companies such as Network Medical

5    Review, the one for which Drs. Abraham, Jeffrey N. Been, and Joseph J. Jares, III, and Scott

6    Dailey, M.A., CCC-SLP, completed their evaluations, operate under a conflict of interest which

7    calls the validity of their reviewers' medical conclusions into doubt.  *See, e.g.*, *Darland v. Fortis*

8    *Benefits Ins. Co.*, 317 F.3d 516, 527-28 (6th Cir. 2003), *overruled on other grounds by Black &*

9    *Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (noting that the insurer had a clear

10    incentive to contract with a company whose medical experts were inclined to find in its favor);

11    *Austin v. Continental Casualty Co.*, 216 F. Supp. 2d 550, 554 n. 1 (W.D.N.C. 2002) (describing

12    Network Medical Review as "not as 'independent' as defendant asserts").  Moreover, the Supreme

13    Court has observed that "physicians repeatedly retained by benefits plans may have an incentive to

14    make a finding of 'not disabled' in order to save their employers money and to preserve their own

15    consulting arrangements."  *Nord*, 538 U.S. at 832 (internal quotation marks omitted).

16        In addition, SMAART had no justification for disregarding the opinions of Ms. Glover's

17    well-qualified treating physician, Dr. Harrell, who determined that Ms. Glover was completely

18    disabled.  Dr. Harrell's opinions are based on her clinical observations and review of objective

19    medical evidence and Ms. Glover's medical history.  Additionally, four other doctors have

20    confirmed the severity of Ms. Glover's degenerative disc disease diagnosis and two noted spinal

21    cord compression as a result.  (Exh 1, pp. P00265, P00269, P00276, P00280, P00281.)  All of

22    these doctors provided documentation of Ms. Glover's diagnoses and symptoms, and Dr. Harrell

23    has opined that Ms. Glover is unable to work due to her illness and pain.  (*See e.g.*, *id*. at P00275,

24    P00278, P00282, P00284.)   These opinions are based on first-hand knowledge of Ms. Glover and

25    familiarity with her medical condition.

26        The denial notice, subsequent appeal denial, and final appeal denial ignored the opinions

27    of Ms. Glover's physicians and the evidence upon which they are based.  Instead, SMAART

28    based its decisions solely on the opinions of hired medical reviewers whose conclusions have

1  been previously questioned.

2   In Ms. Glover's original claim for benefits, Dr. Abraham concluded that "physical

3  examination does not reveal any objective findings of neurologic deficit to prevent her from

4  functioning with a sedentary level of physical demand," and that Ms. Glover was able to work a

5  full, unrestricted schedule. (*Id*. at P00346.) Yet no requirement for "objective" data appears in

6  the Plan and SMAART is not entitled to impose one. *Saffle*, 85 F.3d at 459-60. Although Ms.

7  Glover's treating physician, Dr. Harrell, had stated that she is "unable to return to her usual and

8  customary job duties with the prolonged forward flexion of the cervical spine and prolonged

9  keyboarding" (*id*. at P00282), Dr. Abraham summarily rejected that finding on the basis of an

10  unjustified requirement for "objective" data. (*Id*. at P00346.) Moreover, objective data

11  supporting Ms. Glover's diagnosis *was* provided in Ms. Glover's original claim for benefits: even

12  Dr. Abraham noted, under the heading "Objective Information," that Ms. Glover has "central disc

13  protrusion." (*Id*.) Dr. Abraham simply ignored the medical evidence and concluded that Ms.

14  Glover could perform a sedentary occupation and therefore was not disabled.

15   In reviewing Ms. Glover's request for review of the denial of her claim for short-term

16  disability benefits, Dr. Been considered the documentation SMAART provided to him and

17  determined, "Based on the information available for review and from an orthopedic perspective,

18  Ms. Glover is disabled from her regular job as of 11/03/04 to the present." (Exh. 4, p.

19  DEF000055.) He determined that her disabling diagnosis was "cervical spondylosis with

20  multilevel disc protrusions" and potentially her dystonia. (*Id*.) Dr. Been noted, "Based upon the

21  objective information provided for the review, with failure to improve from conservative

22  treatment and failure to respond to conservative treatment with the need for chronic pain

23  medication, Ms. Glover would be considered disabled from her regular job." (*Id*.) Despite this,

24  Dr. Been ultimately concluded, "Four hour workday is substantiated based upon the functional

25  limitations of her cervical range of motion or MRI findings or failure to respond to conservative

26  treatment and her subjective complaints of neck pain requiring the use of medication." (*Id*. at

27  DEF000057.) The sole basis for Dr. Been's determination that Ms. Glover was able to work for

28  four hours a day is the fact that Ms. Glover worked four-hour days in the three months prior to her

1  leaving work.  (*Id*. at DEF000056.)  However, "[a] disabled person should not be punished for

2  heroic efforts to work by being held to have forfeited his entitlement to disability benefits should

3  he stop working."  *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918

4  (7th Cir. 2003).  Ms. Glover's previous attempts to continue working are insufficient grounds to

5  find her able to continue working.

6         Dr. Jares concurred that "Ms. Glover is disabled from her regular job duties as of 11/03/04

7  to the present."  (Exh. 5, p. DEF000065.)  From a neurological perspective, Dr. Jares determined

8  that "[t]he disabling diagnosis is herniated cervical disc at C5-C6 with bilateral upper extremity

9  radicular pain" and "[t]he clinical findings do support the presence of a disabling condition."  (*Id*.

10 at DEF000066.)  Dr. Jares observed, "Ms. Glover has evidence of a herniated cervical disc at C5-

11 C6, which has worsened over time and has caused cervical spinal cord compression."  (*Id*.)  And

12 yet, for no explained reason, Dr. Jares concluded, "The clinical findings support transitional work

13 of four-hour days."  (*Id*.)

14        In evaluating the effects of Ms. Glover's dystonia, Mr. Dailey agreed with Ms. Glover's

15 doctors that "there is no cure for spasmodic dysphonia."  (Exh. 6, p. DEF000061.)  However,

16 citing only a lack of documentation, Mr. Dailey concluded that Ms. Glover was not disabled by

17 speech and voice difficulties, noting "[i]t is not within my scope of practice to determine whether

18 the cervical pain is impacting her job and this is to be reviewed by the physician."  (*Id*.)  He stated

19 that a review of Ms. Glover's condition should be performed when "further medical

20 documentation regarding the diagnosis of dystonia and the voice therapy that she received

21 following the diagnosis becomes available."  (*Id*.)  However, Ms. Glover had provided two

22 medical reports diagnosing her with dystonia, an incurable condition.  (Exh. 1, p. P00162-62,

23 P00263.)

24        Ignoring the opinions of Ms. Glover's treating physicians, SMAART relied upon the

25 favorable opinions of the medical reviewers it hired, even where their conclusions were reached

26 for no explained reason or based solely on the absence of information.  The Supreme Court has

27 cautioned that plan administrators "may not arbitrarily refuse to credit a claimant's reliable

28 evidence, including the opinions of a treating physician."  *Nord*, 538 U.S. at 823.  Here, SMAART

1   arbitrarily chose to rely on the favorable opinions of its hired medical reviewers and ignore the

2   medical opinions of Ms. Glover's treating physicians.  Although they had never met or examined

3   Ms. Glover, SMAART determined that Ms. Glover was not disabled based on their assessments,

4   despite the findings of her three treating physicians that she is unable to work in her previous

5   occupation.  Further, SMAART failed to articulate any "specific reasons," *see id.* at 830, as to

6   why their ill-explained conclusions were more reliable than the medical opinions of Ms. Glover's

7   treating physicians or why their conclusions supporting Ms. Glover's disability were disregarded.

8   And when two of the medical reviewers concluded that Ms. Glover *was* disabled from her normal

9   occupation, SMAART merely applied a standard, the ability to work with accommodation, that

10  was not present in the Plan's definition of disability to find Ms. Glover able to work and ineligible

11  for benefits.

12      Finally, not only does Ms. Glover's injury prevent her "from engaging in his or her normal

13  occupation or employment," (*id*. at P00196), but she has been found to be unable to engage in

14  "any substantial gainful work which exists in the national economy." (*Id*. at P00366; 42 U.S.C. §

15  423(d)(2)(A).  Ms. Glover and her doctors have demonstrated that her pain and restrictions from

16  her disabling conditions, as well as the side effects of medication, make her unable to perform the

17  essential functions of her job or any other position to which she could have been assigned.

18  SMAART abused its discretion when it refused to consider this evidence.

19      For the foregoing reasons, SMAART abused its discretion when it denied Ms. Glover's

20  claim for short-term disability benefits based on requirements outside the plan terms and

21  erroneous findings of fact.  *See Taft*, 9 F.3d at 1471-73.

22  **D.    Ms. Glover's Benefits.**

23      Pursuant to ERISA § 502(a)(1)(B), Ms. Glover is entitled to recover the benefits due to her

24  under the terms of the Plan and clarify her rights to future benefits under the terms of the Plan.  29

25  U.S.C. § 1132(a)(1)(B).  Based on her ending wage of approximately $20.74 per hour, less

26  appropriate offsets (exh. 1, p. P00199, § 4.2.2), Ms. Glover's short-term disability benefits total

27  approximately $24,265.80, plus pre-judgment interest.

28      In addition, the Plan provides that a Participant is entitled to long-term disability benefits

if she "does not return to work at the end of the fifty-two week period for which Short Term Disability benefits are payable." (*Id.* at P00202, § 5.1)  Ms. Glover has not returned to work.  Ms. Glover seeks a declaration of her eligibility for long-term disability benefits.  Based on her ending wage, less appropriate offsets (*id.* at P00204, § 5.2.1.), Ms. Glover's long-term disability benefits to date total approximately $4,770.20, plus pre-judgment interest.

Although the Plan provides that participants who are terminated during the 52-week period of short-term disability benefits are not entitled to long-term disability benefits (*id.*), this limitation should not be applied to Ms. Glover, as she was terminated only because she failed to return to work after her employer concluded that she was not disabled and able to work.  If SMAART had properly determined that Ms. Glover was disabled and unable to work, she would have remained on a leave of absence from active employment and eligible for short-term disability benefits through October 2005, and long-term disability benefits through the present.

Thus, Ms. Glover is entitled to both short- and long-term disability benefits, as well as a declaration of her eligibility for long-term disability benefits, pursuant to the terms of the Plan.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment should be granted. Plaintiff should be awarded her short- and long-term disability benefits under the Plan terms, plus pre-judgment interest thereon.

Dated: January 11, 2008              Respectfully submitted,

                                     LEWIS, FEINBERG, LEE,
                                     RENAKER & JACKSON, P.C.

                                     By:      /s/
                                           Lindsay Nako
                                           *Attorneys for Plaintiffs*