# EXHIBIT 1

PART 1-A

LEWIS, FEINBERG, RENAKER & JACKSON, P.C.
ATTORNEYS AT LAW
1330 BROADWAY, SUITE 1800
OAKLAND, CALIFORNIA 94612-2509

PHONE: (510) 839-6824
FAX: (510) 839-7839
SENDER'S E-MAIL: TRENAKERA@LEWISFEINBERG.COM

May 20, 2005

**BY EXPRESS MAIL OVERNIGHT DELIVERY**

Heidi Lassler
Appeals Specialist
SMAART Quality Review Unit
P.O. Box 630528
Irving, TX 75063

      **Re:    Yvonne Glover**
             **Pacific Telesis Group Comprehensive Disability Benefits Plan (CDBP)**
             **Claim Number: A325033343-07**

Dear Ms. Lassler:

      Pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") § 503, 29 U.S.C. § 1133, and the Department of Labor regulations issued thereunder, Yvonne Glover hereby supplements her request for review of the denial of her claim for short-term disability ("STD") benefits under the Pacific Telesis Group Comprehensive Disability Benefits Plan ("the Plan"). This request incorporates by reference all letters and documents previously submitted to SMAART Quality Review Unit ("SBC") by Ms. Glover or on her behalf.

**1.      Introduction**

      Yvonne Glover is a fourteen-year employee of SBC Communications, Inc. and its predecessor, Pacific Telesis Group. Ms. Glover's last position was Staff Associate for SBC Communications, Inc. Ms. Glover's duties as a Staff Associate primarily required sitting, keyboarding, and other repetitive use of her hands, arms and upper torso.

      In November 2002, Ms. Glover suffered two separate injuries at work that resulted in extreme pain in her upper torso and extremities. Despite treatment and medication, Ms. Glover is plagued by chronic pain that results from a wrist ganglion cyst and cervical radiculopathy. For two years she attempted to work through the pain, but finally, on October 26, 2004, Ms. Glover became unable to work. Compounding Ms. Glover's neck and arm injuries, she suffers from dystonia, a rare vocal chord disorder she developed in 1990, which greatly complicates her breathing and speech and places severe limitations on her ability to work.

      The medical evidence unequivocally demonstrates that Ms. Glover is disabled. An MRI of Ms. Glover's spine has confirmed disk protrusion as well as resulting cord indention. Her

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 2

treating physician concluded on October 28, 2004 that Ms. Glover is unable to return to her usual and customary job duties. Moreover, the Social Security Administration has determined that she is disabled due to dystonia.

On November 2, 2004, Ms. Glover applied for STD benefits. SMAART denied her claim on November 23, 2004. Ms. Glover requested review of the denial, and SMAART prematurely denied her request for review on January 19, 2005 after requesting additional information on January 10, 2005. Ms. Glover now supplements her appeal with additional medical information as requested by SMAART on January 10, 2005.

In deciding Ms. Glover's claim, SMAART ignored the medical evidence. In particular, SMAART has ignored the cumulative disabling effects of Ms. Glover's rare vocal disorder, and chronic pain stemming from her wrist ganglion cyst and cervical radiculopathy. SMAART further violated ERISA by failing to provide Ms. Glover with a full and fair review of her claim. Because Ms. Glover's medical conditions prevent her from engaging in her normal employment with SBC, and has not been assigned any alternative employment by SBC, she is entitled to short-term disability benefits.

## 2.    Plan Definition of Disability

According to the Plan, "short term disability" shall mean:

sickness, injury, or other medical, psychiatric, or psychological condition, which prevents an Employee from engaging in his or her normal occupation or employment with the Participating Company, or such other occupation or employment as he or she is assigned in accordance with the Participating Company's normal practices.

(Exh. 1, § 2.1, p.4.)

## 3.    Factual Background

### a.    Ms. Glover's Occupation

Ms. Glover's original position with Pacific Bell was Operator. She held this position for nine years. She was responsible for fielding "0" calls from customers. On an average day she spoke with approximately 1,000 customers, directing calls, connecting collect calls, and answering general inquiries. (Exh. 2 at ¶ 3.) However, her sudden and unexpected speech loss in 1990 resulting from her dystonia caused substantial problems and impeded her ability to communicate with customers over the phone. After numerous leaves of absence due to complications from her dystonia, SBC offered her the position of Staff Associate, which requires far less oral communication.

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 3

Ms. Glover commenced her work as a Staff Associate on November 6, 2000. (Exh. 2 at ¶ 8.) She was primarily responsible for managing the calendars, schedules and bonuses of over 400 employees in four offices. (*Id.* at ¶ 9.) Her days began with her sifting through, sorting, stapling together, and alphabetizing the calendars of the employees in the offices for which she was responsible. This process took at least an hour, though often more, and involved repetitive use of her hands to sort and staple the calendars. After noting attendances and bonuses, Ms. Glover would then enter this information into a database on her computer. This work involved long hours spent at her desk doing rote keyboard data entry, with her neck flexed forward. (*Id.* at ¶ 10.)

Ms. Glover was often required to communicate with employees, although her contact with them was mostly limited to e-mail: "Because my dystonia affected my ability to communicate orally, the majority of my interaction and communication with clients took place over e-mail, which involved extended periods of time spent seated at my keyboard." (*Id.* at ¶ 11.) In fact, some days Ms. Glover was required to spend the entire day at her computer, keyboarding data into the system.

Ms. Glover's work demanded she pay close attention to details for extended periods of time: "My job required me to maintain a high level of concentration and attentiveness. I had to be focused throughout the standard workday to ensure I was entering data correctly into our system." (*Id.* at ¶ 12.)

In addition to her account-monitoring duties, Ms. Glover also managed supplies for the office, which involved the lifting, opening and unpacking of items. Ms. Glover was also responsible for mailing many packages between offices. This involved packaging and lifting boxes that were often so heavy she had to place them on a chair in order to roll them to their destination. (*Id.* at ¶ 13.) Both the packaging and lifting of the packages required Ms. Glover to repetitively use her hands, arms and upper body.

SBC's "Job Analysis Document" describes the following activities for the position of Staff Associate:

1.    Process payroll by entering data into computer from hand written time sheets (90 minutes per day); 700 keystrokes.
2.    Prepare work schedules. Will enter data using keyboard into spread sheet (60 min per day); 700 keystrokes; 60 lines handwritten.
3.    Assist manager with filing, (60 min per day), faxing (30 min per day), and photocopying (30 min per day) functions.
4.    Word process correspondence (30 min per day)- 650 keystrokes.
5.    Sort and distribute mail (30 min per day).
6.    Answer telephones and take messages (30 min per day).

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 4

(Exh. 3.)

Thus, Ms. Glover's job required her to keyboard at least four hours per day.

**b.     Ms. Glover's Medical History**

The cause of Ms. Glover's total disability is a complex of health problems including a rare vocal chord disorder and severe upper torso and right arm pain resulting from three separate accidents and aggravated by the requirements of her job, particularly keyboarding. The cumulative effects of these conditions render Ms. Glover unable to work in her normal occupation.

**i.     Dystonia**

In 1990, Ms. Glover completely lost her voice, and was later diagnosed with dystonia. (Exh. 2 at ¶¶ 4, 5; Exhs. 4, 5.) Dystonia is a neurological movement disorder characterized by involuntary muscle contractions, which force certain parts of the body into abnormal, sometimes painful, movements or postures. (Exh. 31.) Specifically, the dystonia that affects Ms. Glover is a voice disorder which is caused by sudden involuntary muscle movements or spasms which cause the vocal chords to knock together and stiffen. These spasms make it difficult for the vocal chords to vibrate and produce voice. (Exh. 32.) As a result, "speech may be choppy and sound similar to stuttering." *Id.* The voice of an individual with this condition is often described as "strained or strangled and full of effort." *Id.*

Dystonia has a variable nature, making it difficult to predict the course of the disorder. (Exh. 31.) Currently, there is no medication or therapy that can prevent progression, although some medications help lessen the effects. The symptoms of dystonia may fluctuate, and stressful situations may worsen the condition. (Exh. 32.)

At the onset of her dystonia, Ms. Glover was referred for voice therapy with Dr. K. Izdebski, a speech pathologist. He noted that Ms. Glover had "substantial difficulties with consistent repetition of clear phonatory voice, and extension of this fluency into connected speech." He observed that her phonation was primarily disturbed by "discoordinated movement of the glottic, supraglottic, laryngeal, respiratory and or motor activities."(Exh. 4.) At that time, Ms. Glover"s "normative sustained phonation" was limited to about 10 seconds at a time and to "single bisyllabic words." (*Id.*) Dr. Izdebski noted that Ms. Glover's prognosis was guarded. (*Id.*) In July 2000, Ms. Glover was still undergoing voice therapy and her prognosis was still guarded. (Exh. 5.)

To this day, Ms. Glover's dystonia greatly interferes with her speech, which is now quite labored and slurred. On February 27, 2003, Dr. Robert E. Leiberson, a neurological surgeon, noted this "spastic type speech pattern" when Ms. Glover spoke. (Exh. 6.) When her vocal

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 5

cords slam together or stiffen, this also results in shortness of breath, so Ms. Glover must frequently pause and rest to catch her breath. (Exh. 2 at ¶ 6.)

In 1999, after Ms. Glover's dystonia had forced her to take multiple substantial leaves of absence from her job, she applied for and was approved for Social Security Disability Insurance benefits. (Exh. 2 at ¶ 27.) Ms. Glover was determined to return to work, however, so when SBC offered her a position that did not require her to use her voice nearly as much, she welcomed the opportunity and returned to work on November 6, 2000.

Although Ms. Glover returned to work for SBC in a position requiring little talking, her dystonia persists. She takes daily doses of Klonopin, a powerful anti-convulsive drug that commonly causes drowsiness and lack of muscle coordination. (Exh. 33.) There is presently no cure for dystonia, and Ms. Glover must live with the disorder indefinitely.

### ii.    Wrist Ganglion Cyst

Ms. Glover suffers chronic pain resulting from a wrist ganglion cyst, which is a cystic enlargement of a tendon sheath on the back of the wrist. Mosby's Medical, Nursing, and Allied Health Dictionary, at 1735 (5th ed. 1998). Such cysts can cause pain when they put pressure on surrounding structures, in Ms. Glover's case causing inflammation of the median nerve. (Exh. 7.) The pain from the wrist ganglion continues to cause Ms. Glover significant reduction in functionality. (Exh. 2 at ¶ 14.)

### iii.    Cervical Radiculopathy

Ms. Glover's primary source of pain results from cervical radiculopathy, or degenerative disc disease. On November 6, 2002, Ms. Glover sustained the first injury to her shoulders, back, neck and bilateral extremities. As her duties required her to frequently move from one location to another, she was lifting a chair to manually move it. This move strained her back and sent a shooting pain through her back and upper extremities and resulted in an onset of severe neck pain that radiated to her arms and caused a tingling in her fingers. (Exh. 2 at ¶ 15.) Ms. Glover was immediately treated for her injury. (*See* Exh. 8.)

On November 14, 2002, Ms. Glover sustained a second and more serious injury to her neck, shoulders, back and bilateral upper extremities. After complaining of the injury from moving her previous stationary chair, SBC provided her with a chair with wheels. The manufacturer phoned her to discuss how to operate the new chair. The manufacturer told Ms. Glover to pull up on a lever, and when she did, the chair ejected her on to the floor. (Exh. 2 at ¶ 16.) This incident aggravated her previous strain from moving the chair the week prior and aggravated Ms. Glover's chronic and severe pain. (*See id.*)

Despite the pain, Ms. Glover continued working. In order to control and treat her pain,

P00177

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 6

she visited the doctor frequently.  On January 6, 2003, an MRI was performed on Ms. Glover.
(*See* Exh. 9.)  Dr. Stuart Mansfield from Emeryville Open MRI found that "at C4-5, there is a
focal central posterior disc herniation with impression on the ventral aspect of the thecal sac and
spinal cord.  This disc herniation measures approximately 3-4 mm AP x 7-8 mm transversely."
(*Id.*)  Dr. Mansfield also noted a "small central posterior bulge/protrusion with slight impression
on the ventral aspect of the thecal sac at C5-6. "  (*Id.*)

On February 27, 2003 Ms. Glover visited Dr. Robert E. Lieberson, a neurosurgeon.  After
analyzing the results of an electromyogram and nerve conduction test ("EMG"), he noted that
"[t]he patient's plain films of the neck show significant multilevel degenerative disease." (Exh.
6.)  He also observed that Ms. Glover's complaints were "consistent with a C6 level lesion based
on the numbness and the EMG" and noted that "[a]n EMG...did show a right C6 cervical
radiculopathy." (*Id.*)  Dr. Lieberson opined that Ms. Glover "should avoid lifting more than five
pounds, performing any overhead work, or using the hands repetitively or forcefully." (*Id.*)

On March 17, 2003, Dr. Jill Harrell, an orthopedic surgeon and Ms. Glover's treating
physician for purposes of her workers' compensation medical benefits, placed Ms. Glover on
modified duty "to preclude overhead activity and no lifting greater then five pounds." (Exh. 10.)
Dr. Harrell further restricted her computer time to "no longer than thirty minutes with a ten
minute break." (*Id.*)  Two weeks later, however, the pain was so severe for Ms. Glover that Dr.
Harrell restricted Ms. Glover from all work from March 31, 2003 through April 18, 2003. (Exh.
11.)  In an April 26, 2004 "Requested Supplemental Report," Dr. Harrell confirmed that "[w]ith
reasonable medical probability, and based upon records review, subjective factors and objective
findings, I am able to state that *residual permanent disability exists in this case*." (Exh. 12;
emphasis added.)

A second MRI was performed on Ms. Glover on May 24, 2004.  Dr. Philip Rich observed
at C4-5 "persistent central disk protrusion extending 4 mm posteriorly, indenting the cord in the
midline." (Exh. 13.)  Dr. Rich noted both "cervical spondylosis with reversal of the normal
lordosis" and "C4-5 cord impingement." (*Id.*)  Dr. Rich further opined that the condition had
mildly progressed since Ms. Glover's previous MRI on January 6. (*Id.*)

On October 29, 2003, Dr. Harrell limited Ms. Glover to "no keyboard more than 2 hrs/8
hr shift." (Exh. 14.)  On July 7, 2004, as Ms. Glover's pain persisted, Dr. Harrell further
restricted Ms. Glover to four hour days with only half her time spent at the keyboard. (Exh. 15.)
Ms. Glover's desire to work was strong, and, with restrictions, she continued working modified
four-hour days.

On October 28, 2004, two days after Ms. Glover's last day of work, Dr. Harrell
completed a "Permanent and Stationary Report" in which she noted that Ms. Glover "has
reached a point of maximum medical improvement." (Exh. 16.)  She commented that Ms.
Glover's "[r]esidual disability is largely due to chronic soft tissue musculoligamentous strain of

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 7

the cervical spine, overlying cervical spondylosis and disc protrusion, central, at C5-6." *(Id.)*

Dr. Harrell further observed:

Taking into consideration the history according to the patient, including subjective complaints, radiologic findings, physical examination findings and my review of the medical records, it is my opinion that based upon reasonable medical probability, that from an orthopaedic standpoint, Ms. Glover currently experiences a disability referable to the cervical spine which precludes heavy lifting, forceful pushing and pulling activities and repetitive work at or above shoulder level. She is also precluded from prolonged forward flexion of the neck and prolonged keyboarding.

Ms. Glover is unable to return to her usual and customary job duties with the prolonged forward flexion of the cervical spine and prolonged keyboarding.

*(Id.)*

Dr. Harrell reiterated her conclusions for SBC on November 2, 2004, finding Ms. Glover to be permanent and stationary as of October 26, 2004. (Exh. 17.) These conclusions clearly preclude Ms Glover from her duties as Staff Associate.

### iv.    Medication Side-Effects

Ms. Glover has been prescribed a variety of drugs to help her control her conditions and relieve her constant pain. To treat her dystonia, Ms. Glover daily takes approximately .5-2.0 mg of Klonopin, a powerful anti-seizure medication that causes drowsiness and lack of muscle coordination. (Exhs. 17, 32.) She daily takes the anti-inflammatory Feldene, as well as Norco (Vicodin) 10/325 several times a day and 350 mg of Soma twice a day to control her pain. (Exh. 18.) Additionally, she takes 400 mg of Lodine twice daily. *(Id.)* These medications are known to cause nausea, dizziness, drowsiness and lack of coordination. (Exh. 34.) Sometimes the pain is so bad, Ms. Glover must take her pain medication until she "has to lay down." (Exh. 2 at ¶ 29.) Ms. Glover has also previously been prescribed Valium, Flexeril, Cyclobenzaprine, Vicodin, Zantac, Tylenol #3 and 800 mg ibuprofen. *(Id.)*

In July 2003, Dr. Harrell referred Ms. Glover to Sharon L. Mitchell, a pharmacist specializing in pain medication. On July 31, 2003, Ms. Mitchell completed a pharmacological pain management consultation and evaluation, advising that the Ms. Glover should "never drive, operate heavy machinery and *perform activities requiring coordination or alertness* while taking her medications." (Exh. 18 (emphasis added).) Ms. Mitchell made this assessment while Ms. Glover was consuming Klonopin, Norco and Soma – in fact, one less medication than she takes now.

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 8

### 4.    Ms. Glover's Claim for Short-Term Disability Benefits

Ms. Glover first left work due to her disabilities as of October 27, 2004. (Exh. 2 at ¶ 27.) She applied for short-term disability benefits on November 2, 2004. (Exh. 19 at 28.) In a November 23, 2004 letter, SMAART denied Ms. Glover's benefits effective November 3, 2004. (*See* Exh. 20.) The Denial Notice stated that the denial was based on medical documentation provided by Dr. Harrell on November 9, 2004, which contained an initial physician's statement form. (*Id.*)

The letter acknowledged that "exam findings noted that you had decreased range of motion of the cervical spine and an MRI report of the lumbar spine which showed a disc protrusion. The treatment plan noted that you were considered permanent and stationary as of 10/26/04 and had permanent restrictions and limitations." (*Id.*) Despite this evidence, the letter noted that after review, and an additional review by the SMAART physician advisor, "the medical information submitted contains insufficient observable documentation to support an off work status." (*Id.*)

On December 23, 2004, SMAART acknowledged that it had received additional medical information from Dr. Harrell,[1] but refused to consider the additional evidence. (Exh. 21.) Instead, SMAART advised Ms. Glover that in order for this information to be considered she would need to submit it with an appeal, which must be filed within 180 days from the date of the denial letter, that is, no later than May 23, 2005. (*Id.*) Without assistance of counsel, Ms. Glover requested review of the decision on January 7, 2005. (Exh. 22.)

On January 10, 2005, SMAART acknowledged the receipt of Ms. Glover's request for review and advised Ms. Glover that "medical records, including chart notes, diagnostic tests, and hospital summaries, relevant to this current absence should be submitted regardless of the length of the disability." (Exh. 23.) The letter further stated that Ms. Glover would receive a written response by February 21, 2005. (*Id.*) After receiving this letter, Ms. Glover retained counsel to assist her in assembling and submitted the requested records.

On January 24, 2005, Ms. Glover's counsel faxed SMAART a letter explaining that Ms. Glover was in the process of gathering the requested materials and advising that her request for review would be supplemented no later than May 23, 2005, and requesting the claim documents to which Ms. Glover was entitled under ERISA and the regulations. (Exh 24.) The mailed version of the letter crossed in the mail with a letter from SMAART dated January 19, 2005, only *nine days after the letter requesting Ms. Glover submit supplemental documentation.* In the letter, SMAART purported to deny Ms. Glover's request for review. (Exh. 25.) Despite acknowledging that Ms Glover's treating physician recommended that "[she] remain off work; disability is due to chronic soft tissue strain of the cervical spine overlying cervical spondylosis

---

[1] The "additional information" the letter refers to is Dr. Harrell's October 28, 2004 "Permanent and Stationary Report." (Exh. 17 at 10.)

P00180

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 9

and disc protrusion," the letter explained that "medical information provided for the denial/appeal period did not contain sufficient clinical findings to substantiate a disabling condition." *(Id.)*

In making its decision, SMAART relied on the analysis of a SMAART physician advisor who noted that physical examination findings indicated limited range of motion of the cervical spine, but opined "documentation did not provide evidence of neurological deficit, disuse muscle atrophy or clear loss of function," nor did they show any "discreet [*sic*] neural impingement." (*Id.*) Therefore, SMAART concluded, Ms. Glover was not disabled. Subsequently, SMAART provided some of the requested claim documents, but reiterated that it believed Ms. Glover was not entitled to further review even if she submitted the medical records that SMAART had previously instructed her to submit. (Exh. 30.)

5.    **Ms. Glover Is Disabled Under the Terms of the Plan**

The medical evidence establishes that Ms. Glover is disabled due to the cumulative effects of dystonia, a wrist ganglion cyst, and degenerative disc disease causing severe and chronic upper torso and extremities pain. Ms. Glover has submitted documents from her treating physician, Dr. Harrell, who confirms her diagnosis and the severity of her pain and her condition, which prevent her from performing her job. Medical information also documents the complex regimen of medications Ms. Glover must follow for her various symptoms. Thus, Ms. Glover has shown that she is not able to "engag[e] in . . . her normal occupation or employment with [SBC]." As discussed below, SMAART's decision to deny Ms. Glover's disability benefits is contrary to the evidence presented to it in the claims process and contrary to federal case law governing Ms. Glover's claim. Moreover, both the Social Security Administration and the California workers' compensation system agree that Ms. Glover is unable to perform her occupation.

a.    **Ms. Glover Is Disabled Under the More Stringent Standards of the Social Security Administration**

Although Ms. Glover first applied and was approved for Social Security Disability Income in 1999 for her dystonia, she recently reapplied and was reapproved under the combined impairments of her dystonia and her general back problems. (*See* Exh. 26.) Ms. Glover has demonstrated that she meets the stringent Social Security Administration disability standard, in which a claimant must be unable to engage in "any substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). This finding is extremely persuasive evidence of disability under the Plan. *See Ladd v. ITT Corp.*, 148 F.3d 753, 754-56 (7th Cir. 1998) (favorable SSA determination of disability is relevant evidence of disability); *Reidl v. General American Life Ins. Co.*, 248 F.3d 753 (8th Cir. 2001) (SSA determination is admissible evidence to support ERISA claim for long-term disability benefits); *Pari-Fasano v. ITT Hartford Life and Acc. Ins. Co.*, 230 F.3d 415 (1st Cir. 2000) (SSA determinations are relevant). The SSA's

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 10

finding of disability is particularly persuasive here, where the Plan's standard is less stringent, requiring only that Ms. Glover be unable to perform all the essential functions of her "normal occupation or employment with the Participating Company." (Exh. 1, § 2.1, p. 4.)

     **b.**    **Ms. Glover and Her Doctors Have Demonstrated That She Is Unable to Perform Her Job**

Ms. Glover's injuries keep her from performing the physical tasks her job requires. Ms. Glover's position as a Staff Associate primarily required her to be seated, with her head flexed forward, often keyboarding on a computer for hours each day. In fact, according to SBC's own "Job Analysis Document," a Staff Associates daily duties require a total of 270 minutes (4.5 hours) of computer time and 150 minutes (2.5 hours) of activities that involve repetitive hand motion (filing, faxing, photocopying, etc.). (*See* Exh. 3.) This totals seven hours out of a 7.5 hour workday spent either keyboarding or conducting waist-level hand and arm motions. Moreover, the 30-minute task requiring the least forward flexion and repetitive hand motions – answering the phone and taking messages – is such a difficult task for Ms. Glover that it is the reason she was first moved from Operator to Staff Associate. But due to her persistent pain, Ms. Glover has reduced use of her arm and hand and the when she sits and must flex her head forward, as one does when typing, the pain is excruciating. (Exh. 2 at ¶ 22.) Her pain is so severe that even strong medications only dull it. (*See* Exh. 2 at ¶ 29.) In fact, on four occasions since her most recent injury, Ms. Glover's pain has been so intolerable that she had to visit the emergency room. (Exh. 27.)

The Permanent and Stationary Report signed by Dr. Harrell on October 28, 2004, unequivocally states that Ms. Glover has reached a point of maximum medical improvement and is "unable to return to her usual and customary job duties with the prolonged forward flexion of the cervical spine and prolonged keyboarding." (Exh. 16.)

The severity of Ms. Glover's symptoms has impacted her life outside of work as well as preventing her from doing her job. Unable to lift objects or raise her hands above her head, she has difficulty showering and is "unable to wash her hair without the help from a friend." (Exh. 2 at ¶ 30.) She has difficulty cooking for herself and even cleaning her home and washing her clothes. (*Id.*) Because Ms. Glover cannot keyboard, nor complete most tasks involving the repetitive use of her hands, arms and/or upper torso, she cannot do her job.

In addition, Ms. Glover's illness keeps her from performing the cognitive tasks her job requires. Ms. Glover's job required her to continually concentrate on detailed tasks: handling detailed schedules and bonuses of multiple large offices of a major corporation. Ms. Glover's high level of pain makes this continuous concentration impossible for her. As noted on July 31, 2003, over a year before Ms. Glover applied for STD, a pharmacist specialist in pain medication cautioned that Ms. Glover should "never drive, operate heavy machinery and perform activities requiring coordination or alertness while taking her medications." (Exh. 18.) Ms. Glover's

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 11

position required mental acuity and concentration that her pain and medications simply do not
permit her. Though Ms. Glover determinedly continued to work, her medications only further
compounded her inability to perform the essential functions of her job.

### c.  SMAART Has Improperly Ignored the Medical Evidence and the Opinions of Ms. Glover's Treating Physicians

SMAART has no justification for disregarding the opinions of Ms. Glover's well-
qualified treating physician, who has determined that she is disabled from her occupation.
Currently and through the course of the past several months when she has been unable to work,
Ms. Glover has been under the care of a well-qualified orthopedist, Dr. Jill Harrell. Ms.
Glover's treating physician's opinions are based on her clinical observations: she knows Ms.
Glover, she knows her condition, and her medical expertise can not be questioned. Additionally,
four other doctors have confirmed the severity of Ms. Glover's diagnosis and two have noted
cord compression as a result. (Exhs. 6, 9, 13, 16). All of these doctors provide documentation of
Ms. Glover's diagnoses and symptoms, and Dr. Harrell has opined that Ms. Glover is unable to
work due to her illness and pain. (See *e.g.*, Exhs. 12, 14, 16, 17.) These opinions are based on
first-hand knowledge of Ms. Glover and familiarity with her medical condition, and they should
be given great weight.

Both SMAART's original Denial Notice and subsequent Appeal Denial ignored the
opinions of Ms. Glover's treating physicians and the evidence upon which they are based.
Instead, SMAART based its decision solely on the opinion of Dr. Abraham, the Network
Medical Review doctor to whom SMAART referred Ms. Glover's file for review. Because Dr.
Abraham found that "physical examination does not reveal any objective findings of neurologic
deficit to prevent her from functioning with a sedentary level of physical demand," he concluded
that she was able to work a full, unrestricted schedule. (Exh. 28.) Not only does this assessment
blatantly disregard Dr. Harrell's conclusion on October 28, 2004 that Ms. Glove r is permanently
disabled and unable to perform the functions of her job, it in fact disregards the restrictions Dr.
Harrell had placed on Ms. Glover for nearly four months, since Dr. Harrell placed her on
modified four-hour days on July 7, 2004. (*See* Exh. 15.) Moreover, Dr. Abraham's opinion was
based solely on his review of a limited number of documents provided to him, and it is unworthy
of the conclusive importance given it by SMAART. SMAART's reliance on Dr. Abraham's
opinion amounts to an arbitrary disregard of the medical evidence and opinions of Ms. Glover's
treating physicians. Dr. Abraham did not examine Ms. Glover. His letters provide no
substantial evidence on which to base his opinion that she is not disabled -- no evidence that she
was capable of performing the essential functions of her job. Instead, his letter summarily
concludes that her doctor has insufficiently proven that she is disabled.

Dr. Abraham rejected the opinions of Ms. Glover's treating physicians on the grounds
that "objective" medical evidence did not fully explain the severity of Ms. Glover's condition.
(Exh. 28.) Yet no requirement for "objective" data appears in the Plan. Although Ms. Glover's

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 12

treating physician, Dr. Harrell, had stated that she is "unable to return to her usual and customary job duties with the prolonged forward flexion of the cervical spine and prolonged keyboarding," (Exh. 16.), Dr. Abraham summarily rejected that finding on the basis of an unjustified requirement for "objective" data. (Exh. 28.)  Moreover, there *was* objective data supporting Ms. Glover's diagnosis: even Dr. Abraham noted, under the heading "Objective Information," that Ms. Glover has "central disc protrusion." (*Id.*)  Dr. Abraham simply ignored the medical evidence and concluded that Ms. Glover could perform a sedentary occupation and therefore was not disabled.  He pointed to no evidence in the record, as he could not, that proved or even suggested that Ms. Glover was capable of any of the essential functions of her job.

The November 23, 2004 Denial Letter notes that "[t]he independent physician advisor attempted to conduct a teleconference with Dr. Harrell, however the teleconference was not conducted due to Dr. Harrell's unavailability."  The letter explained that on November 11, 2004, SMAART called Dr. Harrell's office to check availability for a consultation with a SMAART physician advisor.  A message was left, asking for "a return call within 24 hours," but no return call was received "therefore, no additional information could be provided by the treating provider at this point." (*Id.*)  Pacific Telesis Group's Claims Manual provides that a claims manager "will continue to attempt contact [with the Treatment Provider's Office] until a total of three (3) attempts to obtain medical information during the initial contact process have been made." (Exh. 29, p.12.)  It appears that the SMAART claims manager did not adhere to the claims manual before initially denying Ms. Glover's claim.

The January 19, 2004 Appeal Denial also notes that teleconference attempts with Dr. Harrell failed.  Indeed, the letter notes that three calls were placed over five days- 1/12/05, 1/14/05, and 1/17/05, but the letter fails to note that two of the passing days (not days when calls were placed) were the weekend.  Dr. Harrell was given *four* business days to return a phone call, and when she did not, teleconference attempts were "completed." (Exh. 25.)

Ignoring the opinions of Ms. Glover's treating physicians, SMAART unquestioningly accepted the opinion of the medical reviewer it hired.  However, the Supreme Court recently cautioned that plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 123 S.Ct. 1965, 1966 (2003).  Here, SMAART arbitrarily chose to rely on the opinion of Dr. Abraham and ignore the medical opinions of Ms. Glover's treating physicians.  Although Dr. Abraham has never met or examined Ms. Glover, SMAART determined that Ms. Glover was not disabled based on his assessment, despite the findings of her three treating physicians that she is unable to work in her previous occupation.  Further, SMAART failed to articulate any "specific reasons," *see id.*, as to why Dr. Abraham's ill-explained conclusion was more reliable than the medical opinions of Ms. Glover's treating physicians.

Not only does Ms. Glover's injury prevent her "from engaging in his or her normal occupation or employment," but she has been found to be unable to engage in "any substantial

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 13

gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Ms. Glover and her doctors have demonstrated that her pain and restrictions from her injuries, as well as the side effects of medication, make her unable to perform all the essential functions of her job. SMAART's contrary conclusion based solely on the suspect evaluation of its hired medical reviewer is unreasonable. Because Ms. Glover is disabled under the terms of the Plan and has provided sufficient documentation of her disability, SMAART must reinstate Ms. Glover's benefits immediately, retroactive to November 3, 2003.

### d. SMAART has failed to Consider the Cumulative Effects of Ms. Glover's Various Co-Morbid Conditions

In denying Ms. Glover's STD, SMAART has failed to consider the cumulative disabling effects of Ms. Glover's medical conditions. Ms. Glover's complex medical history does not lend itself to a simplistic approach. Even if SMAART concludes that Ms. Glover is not disabled due to one particular condition or injury, it must conclude that she is totally disabled when the effects of her various conditions – and the side effects of the medications required to treat them – are considered together.

### 5.    SMAART Must Consider This Supplement to Ms. Glover's Request for Review.

SMAART is obligated to consider this supplement to Ms. Glover's request for review because it is Ms. Glover's effort to comply with the instructions that SMAART issued to her on January 10, 2005, concerning the medical information to be submitted with her request. Having instructed Ms. Glover to submit information and established a date for its decision that was several weeks away, SMAART was not entitled to turn around and deny the request for review without waiting for the additional information. Should SMAART decline to consider this supplement to the request for review, a federal court will not look favorably on this manipulation of the process by SMAART. In addition, should SMAART refuse to consider this request for review, Ms. Glover will vigorously oppose any later request by SBC to remand this matter to SMAART for consideration of the evidence attached hereto.

### 6.    Should SMAART Uphold Its Decision to Deny Ms. Glover's Claim, That Decision Will Be Subject to de Novo Review by a Federal Court.

The default standard of review to be applied by a district court in reviewing a claim for benefits under an ERISA plan is the de novo standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Abuse of discretion review may apply if the plan contains a clear grant of discretionary authority, *id.* at 115, but only if the administrator's decision-making is not influenced by a conflict of interest. *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech.*, 125 F.3d 794, 798 (9th Cir. 1997).

Here, the Plan gives the Employees' Benefit Claim Review Committee ("EBCRC")

P00185

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 14

discretion to resolve factual issues "in a reasonable manner" and to "interpret and adopt reasonable constructions of any provision of the Plan whenever interpretation or construction is needed." (Exh. 1, § 9.4.) However, there is no language in the Plan conferring any such discretion on SMAART, and there is no indication that the EBCRC has ever reviewed Ms. Glover's claim. Where there is no exercise of discretion by the entity on which discretion is conferred, review will be de novo. *Nelson v. EG & G Energy Measurements Group, Inc.,* 37 F.3d 1384 (9th Cir. 1994).

Even if SMAART has discretion, discretion is restricted by a standard of reasonableness under the terms of the Plan, which a court will have to apply in place of any deferential review. Moreover, SBC's plainly self-interested handling of Ms. Glover's claim will not support abuse of discretion review. SBC's role as both the funding source and the administrator (through SMAART) of the Plan presents an inherent conflict of interest that must be taken into consideration in assessing its termination of Ms. Glover's benefits. *See Lang,* 125 F.3d at 797. On judicial review, the decision of a plan administrator acting under such a conflict is entitled to no deference if the affected participant presents "'material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations to the beneficiary.'" *Id.* at 798, quoting *Atwood v. Newmont Gold Co., Inc.,* 45 F.3d 1317, 1322 (9th Cir. 1995).

In this case, ample evidence demonstrates that SMAART placed its SBC's financial self-interest in limiting Ms. Glover's benefits ahead of its fiduciary obligations. SMAART first denied Ms. Glover's benefits. When Ms. Glover appealed that decision, SMAART turned to a hired insurance reviewer to manufacture an opinion supporting its decision to terminate the benefits in the face of conclusions by her treating and examining physician that Ms. Glover could not work as a Staff Associate as of October 26, 2004. Moreover, SMAART advised Ms. Glover to submit all her medical records, then raced to deny her claim a mere nine days later. Under these circumstances, SMAART's decision will be subject to *de novo* review should SMAART again uphold the denial of Ms. Glover's benefits.

Finally, courts have repeatedly noted that companies such as the one for which Dr. Abraham completed his evaluation of Ms. Glover's claim operate under a conflict of interest which calls the validity of their reviewers' medical conclusions into doubt. *See, e.g., Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 516, 527-28 (6th Cir. 2003) (noting that the insurer had a clear incentive to contract with a company whose medical experts were inclined to find in its favor); *Austin v. Continental Casualty Co.,* 216 F. Supp. 2d 550, 554 n. 1 (W.D.N.C. 2002) (describing independent review company as "not as 'independent' as defendant asserts"); *Smith v. Continental Casualty Co.,* 276 F. Supp. 2d 447, (D. Md. 2003) (noting that review physicians were used only to discredit information submitted by the claimant, and that their opinions were not based on substantial evidence). Moreover, the Supreme Court has observed that "physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements."

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 15

*Nord*, 123 S. Ct. at 1966, internal quotation marks omitted.

7.    **SMAART Has Not Provided Ms. Glover With a Full and Fair Review**

Under the Department of Labor regulations implementing ERISA, SMAART is charged with providing a full and fair review process so that the claimant, or her duly authorized representative, can appeal a denial of her claim. ERISA § 503, 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1. A court will review SMAART's decision *de novo* because SMAART has failed to comply with these requirements in the processing of Ms. Glover's claim.

ERISA also requires that the written denial letter state, in terms designed to be understood by the claimant, (i) the specific reason or reasons for the adverse determination; (ii) reference to the specific plan provisions on which the determination is based; (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; (iv) a description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review; (v) an explanation of any internal rule, guideline, protocol or similar criterion that was relied upon. 29 C.F.R. § 2560.503-1(g). The Supreme Court recently emphasized that an administrator cannot deny disability benefits without "setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." *Nord*, 123 S.Ct. at 1966, quoting 29 U.S.C. § 1133.

SMAART's November 23, 2004 Denial Notice does not comply with these requirements. First, it does not provide "specific reasons" for the adverse determination: it only states erroneously that "clinical information does not document a severity of your condition(s) that supports your inability to perform your occupation as a Staff Associate." (Exh. 20.) This asserted lack of documentation does not justify the denial. But equally importantly for ERISA purposes, it does not *explain* the denial – it is not a "specific reason" to deny Ms. Glover's claim, because even if SMAART were correct, which it is not, a lack of documentation would in no way suggest that she had suddenly become able to work. Second, the letter fails to set forth the additional material or information necessary for Ms. Glover to perfect *her* claim or explain why that information is necessary. The denial only contains a general description of the type of information Ms. Glover "may" submit if she wishes to appeal. (*Id.*)[2]

SMAART's purported appeal denial on January 19, 2005, did not cure the initial denial notice's failures under ERISA. The letter simply relates the reviewer's opinion, which cited no evidence suggesting Ms. Glover is able to work, and then stated in conclusory fashion that the

---

[2] Even if SMAART provided more detailed explanations and advice to Ms. Glover over the telephone, which there is no indication it did, it could not rely on that explanation to cure the defects in its Denial Letter because ERISA requires all adverse benefit determinations to be explained to the claimant in writing. 29 C.F.R. § 2560.503-1(g).

Heidi Lassler
SMAART Quality Review Unit
May 20, 2005
Page 16

"findings" were not documented to be so severe as to keep Ms. Glover from performing her job duties. (Exh. 25.) Like the October 23, 2004, Denial Notice, the January 19, 2005 letter fails to explain the specific reasons for SMAART's determination and fails to describe the additional material necessary for Ms. Glover to perfect *her* claim.

ERISA also requires a plan administrator to provide a beneficiary appealing a decision with all relevant plan documents and all material relevant to its claim decision. 29 C.F.R. § 2560.503-1(h). SMAART did not comply with these requirements. On January 24, 2005, I requested, on behalf of Ms. Glover "copies of all documents relevant to her claim." (Exh. 24.) The Department of Labor regulations under ERISA § 503, 29 U.S.C. § 1133, require that these documents be provided free of charge. 29 C.F.R. § 2560.503-1(h)(iii).

Because Ms. Glover's claim has never been properly denied, the January 10 purported denial must be disregarded.

**8.    Conclusion**

Because Ms. Glover is disabled within the meaning of the Plan, SMAART must immediately reinstate her short-term disability benefits retroactive to November 3, 2004.

Should you have any questions or require additional information concerning Ms. Glover's request for review, please contact me.

Very truly yours,

LEWIS, FEINBERG,
RENAKER & JACKSON, P.C.

By

Teresa S.  Renaker

**Adopted By
Executive Resolution
Dated May 10, 1995**

# PACIFIC TELESIS GROUP
# COMPREHENSIVE DISABILITY BENEFITS PLAN

**(First Restatement As of February 1, 1995)**

27093

P00189

# TABLE OF CONTENTS

**Page**

Section 1.  Introduction.........................................................................................................................1
    1.1  Establishment and Purposes ...............................................................................1
Section 2.  Definitions.............................................................................................................................1
Section 3.  Participation...........................................................................................................................5
    3.1  Commencement of Participation .........................................................................5
    3.2  Continuation of Participation After Termination of Employment .....................5
    3.3  Continuation of Participation During or Following a Leave of Absence ...........6
    3.4  Termination of Participation................................................................................6
Section 4.  Short Term Disability Benefits .............................................................................................6
    4.1  Commencement of Entitlement ...........................................................................6
        4.1.1  Entitlement for Transition Employees .................................................6
        4.1.2  Termination of Entitlement...................................................................6
    4.2  Amount of Short Term Disability Benefit ...........................................................6
        4.2.1  Schedule of Benefits .............................................................................7
        4.2.2  Integrated Benefits ...............................................................................7
        4.2.3  Rules to Offset Integrated Benefits ......................................................8
        4.2.4  Withholding of Plan Benefits to Recover Overpayments and Advances ..........9
        4.2.5  Full Pay ................................................................................................9
        4.2.6  Half Pay ................................................................................................9
        4.2.7  Fifty-Two Week Maximum; Relapse Rule ..........................................9
    4.3  Timing of Payments ............................................................................................9
    4.4  Commutation of Short Term Disability Benefits to Lump Sum Payments .......10
    4.5  No Duplication of Payments .............................................................................10
    4.6  Leaves of Absence ............................................................................................10
Section 5.  Long Term Disability Benefits ...........................................................................................10
    5.1  Commencement and Duration of Entitlement ...................................................10
        5.1.1  Entitlement Under Predecessor Plan ..................................................10
        5.1.2  Maximum Disability Benefit Period for Participants Who Commenced
            Receiving Long Term Disability Benefits Before June 1, 1992 ........10
        5.1.3  Maximum Disability Benefit Period for Participants Who Commence
            Receiving Long Term Disability Benefits On or After June 1, 1992 .....11
        5.1.4  Loss of Entitlement .............................................................................12
        5.1.5  Relapse Rule .......................................................................................12
    5.2  Amount of Long Term Disability Benefit .........................................................12
        5.2.1  Integrated Benefits .............................................................................12
        5.2.2  Rules to Offset Integrated Benefits ....................................................13
        5.2.3  Withholding of Plan Benefits to Recover Overpayments and Advances ........14
    5.3  Timing of Payments ..........................................................................................14
Section 6.  Vocational Rehabilitation Benefits .....................................................................................14
    6.1  Commencement of Entitlement .........................................................................14
    6.2  Amount of Vocational Rehabilitation Benefits .................................................14
        6.2.1  Amount of Covered Expenses .............................................................14
        6.2.2  Limit on Number of Vocational Rehabilitation Plans ........................15
    6.3  Payment of Vocational Rehabilitation Benefits................................................15
    6.4  Relationship to Benefits under the California Labor Code................................15

27093

i

P00190

Section 7.  Discontinuance of Benefits under the Plan ................................................................. 15
    7.1  Failure to Obtain Proper Treatment .................................................................... 15
    7.2  Failure to Pursue a Vocational Rehabilitation Plan ............................................ 15
    7.3  Failure to Cooperate with Administrator ............................................................ 15
    7.4  Travel without Permission .................................................................................... 16
    7.5  Restoration After Discontinuance of Benefits ..................................................... 16
Section 8.  Claims for Short Term Disability Benefits and Vocational Rehabilitation Benefits ...... 16
    8.1  Responsibility of GEBC .......................................................................................... 16
        8.1.1  Discretion of the GEBC .............................................................................. 16
    8.2  Presentation of Claims for Short Term Disability Benefits .................................... 16
    8.3  Disposition of Claims for Short Term Disability Benefits ...................................... 16
        8.3.1  Procedures for Approval of Payment of Short Term Disability Benefits ..... 16
        8.3.2  Procedures for Denial of Claims for Short Term Disability Benefits ........... 17
    8.4  Recognition of Claims for Vocational Rehabilitation Benefits .............................. 17
        8.4.1  Investigation of Claims for Vocational Rehabilitation Benefits ................... 18
        8.4.2  Procedures for Approval of Vocational Rehabilitation Benefits ................. 18
        8.4.3  Denial of Claim for Vocational Rehabilitation Benefits ............................... 18
    8.5  Contents of Written Denial Notices ...................................................................... 18
Section 9.  Review Procedure for Denials of Claims for Short Term Disability Benefits and Vocational
    Rehabilitation Benefits ............................................................................................... 19
    9.1  Employees' Benefit Claim Review Committee ..................................................... 19
    9.2  Rights to Documents .............................................................................................. 19
    9.3  Consideration by the Committee ........................................................................... 19
    9.4  Discretion of the Committee .................................................................................. 19
    9.5  Decision by the Committee .................................................................................... 19
    9.6  Finality of the Review Procedure .......................................................................... 19
Section 10.  Claims for Long Term Disability Benefits ................................................................... 20
    10.1  Responsibility of the Long Term Disability Claims Administrator ........................ 20
    10.2  Presentation of Claims for Long Term Disability Benefits .................................... 20
    10.3  Disposition of Claims for Long Term Disability Benefits ...................................... 20
        10.3.1  Conditions for Approval of Payment of Long Term Disability Benefits ...... 20
        10.3.2  Conditions for Denial of Claims for Long Term Disability Benefits ........... 21
    10.4  Contents of Written Denial Notices ...................................................................... 21
Section 11.  Review Procedure for Denials of Claims for Long Term Disability Benefits ............... 21
    11.1  Long Term Disability Claim Review Administrator ............................................... 21
    11.2  Rights to Documents .............................................................................................. 21
    11.3  Consideration by the Claims Review Administrator .............................................. 22
    11.4  Discretion of the Long Term Disability Claim Review Administrator .................... 22
    11.5  Resolution by the Long Term Disability Claims Review Administrator ................. 22
    11.6  Finality of the Review Procedure .......................................................................... 22
Section 12.  General Provisions ..................................................................................................... 23
    12.1  Plan Creates Rights Only to Benefits .................................................................... 23
    12.2  Right to Recover Overpayments ........................................................................... 23
    12.3  Release of Benefits under the Plan ........................................................................ 23
Section 13.  ERISA Provisions ........................................................................................................ 23
    13.1  Plan Administration ................................................................................................ 23
    13.2  Named Fiduciaries .................................................................................................. 23
    13.3  Allocation of Fiduciary Responsibility ................................................................... 23
    13.4  Multiple Fiduciary Capacities ................................................................................ 23
    13.5  Employment of Advisers ........................................................................................ 24
    13.6  Unfunded Plan ........................................................................................................ 24
    13.7  No Insurance ........................................................................................................... 24
    13.8  Plan Year ................................................................................................................ 24

27093

P00191

Section 14. Amendments and Termination...............................................................................24
    14.1 Authority to Amend and Terminate ........................................................................24
    14.2 Procedure to Amend.................................................................................................24
    14.3 No Deemed Amendments.........................................................................................24
    14.4 Certain Amendments Prohibited .............................................................................24

27093

iii

# PACIFIC TELESIS GROUP
# COMPREHENSIVE DISABILITY BENEFITS PLAN

### (First Restatement As of February 1, 1995)

## Section 1. Introduction

1.1    Establishment and Purposes.  Effective as of March 1, 1990, Pacific Telesis Group established the Pacific Telesis Group Comprehensive Disability Benefits Plan ("Plan") to replace the Predecessor Plans for all Employees who were not then receiving benefits under the Predecessor Plans.  The Predecessor Plans remained in effect for all Employees or former Employees who were then receiving benefits from such plan and for Transition Employees.

The Plan is hereby amended and restated as of February 1, 1995 and includes the following retroactive amendments.  Effective as of December 31, 1991, the Predecessor Plans are deemed terminated and any Participant who was then entitled to benefits under the Predecessor Plans shall be entitled to continue such benefits under this Plan, as provided herein.  Effective as of March 1, 1990, the Plan is amended to clarify the integration provisions of this Plan with other comparable benefits.  Effective as of April 14, 1991 and as of June 1, 1992, the Plan is amended to meet the requirements of the Older Workers Pension Benefits Act of 1990.  Effective as of January 1, 1995, the definition of Incentive Pay shall include sales incentives for certain sales managers for purposes of Short Term Disability Benefits only.

The purposes of the Plan are to provide:

(a)  Short Term Disability Benefits to Participants who are absent from work, for temporary periods of fifty-two weeks or less, because of Short Term Disability;

(b)  Long Term Disability Benefits to Participants who, because of Long Term Disability, do not return to work when fifty-two weeks of Short Term Disability Benefits have been exhausted; and

(c)  Vocational Rehabilitation Benefits to Participants who may be unable to perform the requirements of an occupation or employment at a cost which is expected to be no greater than the additional cost that would be incurred to continue to provide Short Term Disability Benefits or Long Term Disability Benefits without providing rehabilitation.

## Section 2. Definitions

2.1    Defined Terms.  Capitalized terms, used in the text of the Plan, shall have the meaning set forth in this Section 2.1, as follows:

"Base Pay" shall mean the Employee's basic rate of pay, as reflected on the payroll records of the Participating Company.  Basic Pay shall be determined on a weekly basis for Short Term Disability Benefits and on a monthly basis for Long Term Disability Benefits.  The following conversion factors shall be applied as needed in those cases where it is necessary to convert the basic rate of pay that is kept on the payroll records of the Participating Company to a weekly or monthly basis.

(a)  Where the basic rate of pay is kept on a hourly basis, such rate shall be converted to a weekly rate by multiplying the hourly rate by the lesser of (i) forty hours per week or (ii) such number of hours per week, less than forty, which are included in the Employee's normal work schedule (exclusive of overtime), unless such lesser number of hours per week are treated as the equivalent of a forty hour week under the terms of a collective bargaining agreement.

27093

I

P00193

(b) Where the basic rate of pay is kept on a weekly basis (or was converted from an hourly rate to a rate determined on a weekly basis), such rate shall be converted to a monthly rate by multiplying the weekly rate by the factor of 4.35.

(c) Where the basic rate of pay is kept on a monthly basis (or has been converted from an annual rate to a rate determined on a monthly basis), such rate shall be converted to a weekly rate by dividing the monthly rate by the factor of 4.35 weeks per month.

(d) Where the basic rate of pay is kept on an annual basis, such rate shall be converted to a monthly rate by dividing the annual rate by the factor of 12 months per year.

"*DAP*" shall mean the Disability Assistance Program, a unit within the Health Services organization established by Pacific Bell.

"*Effective Date*" shall mean March 1, 1990.

"*Eligible Employee*" shall mean an Employee (a) who is receiving a regular and stated compensation for personal services actually rendered to a Participating Company as a regular, term or temporary employee, or (b) who is on a leave of absence from such active employment, but only if the terms of the leave policy established in writing by the Company provide for continued eligibility for Short Term Disability Benefits under this Plan. An Employee who is classified as an occasional employee by the Participating Company shall not be considered an Eligible Employee.

"*Employee*" shall mean a common law employee of a Participating Company, other than a Retiree Provisional Employee. In addition, an individual who is a leased employee, within the meaning of section 414(n) of the Internal Revenue Code, shall not be considered an Employee for purposes of the Plan.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time

"*Executive Vice President-Human Resources*" shall mean the Executive Vice President-Human Resources of Pacific Telesis Group.

"*FMD Leave*" shall mean a leave of absence designated as a "following maximum disability" leave which is granted by a Participating Company for a period beginning with the expiration of 52 weeks of Short Term Disability and ending not later than 12 months later, during which the Employee is expected to return to work and remains an Eligible Employee.

"*Full Pay*" shall mean the sum of the Participant's Base Pay, and Incentive Pay.

"*GEBC*" shall mean the General Employees Benefit Committee, a committee appointed by the board of directors of Pacific Telesis Group to administer certain employee benefit plans.

"*Half Pay*" shall mean fifty percent of Full Pay.

"*Incentive Pay*" shall mean:

(a) For sales personnel (other than commissioned management sales personnel) of Pacific Bell Directory, the Participant's daily sales average, in effect immediately before the date that a Participant's Short Term Disability Benefits begin, converted to a weekly amount under the rules set forth in the definition of Base Pay. A Participant's "daily sales average" shall be determined by Pacific Bell Directory, in accordance with applicable collective bargaining agreements.

27093                                        2

P00194

(b) Effective January 1, 1995, only for purposes of Short Term Disability Benefits, and only for management sales/marketing employees of the business market organizations of Pacific Bell, the Participant's annual target sales incentive in effect immediately prior to the effective date that the Participant's Short Term Disability Benefits begin, converted to a weekly amount or monthly amount under the rules set forth in the definition of Base Pay.

"*Leave of Absence*" shall mean a leave of absence formally granted in accordance with the rules and regulations of the Participating Company.

"*Long Term Disability*" shall mean a sickness, injury, or other medical, psychiatric, or psychological condition which prevents an Employee from engaging in any occupation or employment for which the Employee is qualified, or may reasonably become qualified, based on training, education, or experience. An Employee shall be considered disabled if found by the Long Term Disability Claims Administrator to be incapable of performing the requirements of an occupation or employment other than an occupation or employment for which the base rate of pay is less than fifty percent of the Employee's Base Pay at the time when entitlement to Long Term Disability Benefits commenced. An Employee who may reasonably become qualified for an occupation or employment based on training, education, or experience, shall be considered to be disabled by Long Term Disability during the period in which the Employee is attempting to become qualified for such an occupation or employment by actively pursuing a Vocational Rehabilitation Plan.

"*Long Term Disability Benefits*" shall mean the Long Term Disability Benefits provided under Section 5 of this Plan.

"*Long Term Disability Claims Administrator*" shall mean Mutual of Omaha, an insurance company which was appointed pursuant to Section 10.1 or such other person or persons, committee, or entity appointed under Section 10.1.

"*Long Term Disability Claim Review Administrator*" shall mean the person or persons, committee, or entity appointed pursuant to Section 11.1 of this Plan.

"*Maximum Disability Benefit Period*" shall mean the maximum combined period during which Short Term Disability Benefits followed by Long Term Disability Benefits may be payable, under the schedule set forth in Section 5.1.2 or Section 5.1.3, whichever applies.

"*Nonrepresented Participant*" shall mean a Participant whose position on the last day of the fifty-two week period for which Short Term Disability Benefits are payable is either: (a) a position of a "salaried employee" (within the meaning of the Pacific Telesis Group Pension Plan for Salaried Employees); or (b) a position of a "nonsalaried employee" (within the meaning of the Pacific Telesis Group Pension Plan) which is not included in any collective bargaining unit for which the Participating Company has recognized a collective bargaining representative as the exclusive representative for collective bargaining purposes.

"*Participant*" shall mean an Eligible Employee or former Eligible Employee who is determined to be a Participant under Section 3 of this Plan.

"*Participating Company*" shall mean Pacific Telesis Group; its subsidiary corporations Nevada Bell, Pacific Bell, Pacific Bell Directory, Pacific Bell Information Services, Telesis Technology Laboratories, Inc., Pacific Telesis Group - Washington, PacTel Finance, Pacific Telesis Enhanced Services (effective April 1, 1994), Pacific Telesis Video Services (effective April 1, 1994), Pacific Telesis Electronic Publishing Services (effective April 1, 1994, and Pacific Bell Mobile Services (effective July 1, 1994); and such other subsidiaries of Pacific Telesis Group as shall be determined, with the consent of the Executive Vice President - Human Resources, to participate in and maintain this Plan.

27093                                                   3

P00195