# EXHIBIT 1

PART 2

**Executive Resolutions**

**Amendments to Plans**

Whereas it is desirable to amend the Pacific Telesis Group Cash Balance Pension Plan for Salaried Employees to allow management employees to designate non-spouse beneficiaries, including domestic partners to receive pension benefits, and to extend coverage and benefits to domestic partners under the Pacific Telesis Group health and welfare plans;

Now, T h e r e f o r e, be it

RESOLVED  that the Pacific Telesis Group Cash Balance Pension Plan for Salaried Employees is amended as provided in Attachment A to these resolutions as of the effective dates stated;

and be it

FURTHER RESOLVED    that, the Pacific Telesis Group Healthcare Network Plan, Pacific Telesis Group Vision Care Plan, Pacific Telesis Group Dental Expense Plan, Pacific Spending Account Plan; Pacific Telesis Group Before Tax Contribution Plan; Pacific Telesis Group Basic and Supplemental Death Benefit Plan; Pacific Telesis Group Dependent Life Insurance Plan; and Leave Policy are amended as provided in Attachment B to these resolutions as of the effective dates stated;

and be it

FURTHER RESOLVED    that the Pacific Telesis Group Comprehensive Disability Benefits Plan is amended as provided in Attachment C to these resolutions as of the effective date stated.

These resolutions are made pursuant to the delegation of authority granted to the Executive Vice President - Human Resources, Pacific Telesis Group, by the Board of Directors of Pacific Telesis Group on June 28, 1991 and the subdelegation of such authority granted to the Vice President and General Counsel designated below.  Plan text further delineating the changes will be submitted to the officer of SBC Communications Inc. responsible for Human Resource matters.

Executed on _August 28_, 1997
at San Francisco, California
by

_Paul White_
Paul White

0051589.01

**ATTACHMENT A**

### SUMMARY OF RECOMMENDATIONS

### PACIFIC TELESIS GROUP CASH BALANCE PENSION PLAN
### FOR SALARIED EMPLOYEES

Effective October 1, 1997, amend the Pacific Telesis Group Cash Balance Pension Plan for Salaried Employees (Plan) to authorize salaried employees and certain former salaried employees with deferred pension benefits to designate one or more non-spouse beneficiaries, including a domestic partner, to receive the employee's, or former employee's, pension benefits in the event of the employee's or former employee's death.

- All active employees as of October 1, 1997, may designate a beneficiary to receive any vested pension benefits payable at the employee's death. The benefit may be either a cash balance benefit, an accelerated transition benefit or, for a rehired employee, a service pension.

- Employees who terminate employment on and after October 1, 1997, and former employees who terminated employment prior to that date, may designate a non-spouse beneficiary, provided the terminated employee is eligible for any of the following pension benefits after termination of employment:

    A cash balance benefit for which the annuity start date has not occurred.

    An accelerated transition benefit or service pension, provided the individual is not married at termination of employment, and has not consented to immediate distrubution so that the monthly pension payments are accumulating in the Plan.

    A 10-year certain annuity under a nonqualified pension plan. If the spouse is the sole beneficiary, the spouse may elect to receive the remaining monthly payments or to receive the lump sum equivalent based on the Plan's current interest rate. A non-spouse beneficiary will receive his or her benefits in a lump sum. If the spouse is one of two or more beneficiaries of the 10-year certain annuity, the spouse may take his or her percentage of the benefit in monthly payments over the remainder of the term or as a lump sum equivalent.

0051583.01

**ATTACHMENT A**

- An alternate payee under a qualified domestic relations order may designate any beneficiary if payments have not commenced.

- A surviving spouse who is deferring the annuity start date of a cash balance benefit may designate any beneficiary to receive the value of the surviving spouse benefit if the surviving spouse dies before receiving a lump sum or annuity payments have commenced.

- If the employee, or former employee, is married, the employee must obtain the written and notarized consent of his or her spouse.

- Beneficiary designations made prior to the year in which the employee attains age 35 must be resubmitted in order to remain valid after the close of the year in which the employee attains age 34. Beneficiary designations also expire upon an employee's marriage or remarriage and must be resubmitted with the consent of the new spouse.

- The following benefits will be payable at the employee's death:

  If an individual dies as an employee, is married at the time of death and either does not have a valid beneficiary form on file or the form names the spouse as the sole beneficiary, the spouse will receive the greater of (i) 45% of the accelerated transition benefit, with no age discount if the employee has at least 15 years of service or (ii) the value of the cash balance account. The greater benefit is determined at the date of death, based on the cashout factor for the spouse's age at that time. The spouse can take the benefit as an annuity or as a lump sum. The cashout factor for the spouse's age at the annuity start date is used to convert both forms of benefit.

  If an individual dies while an employee, and is not married at the time of death, or if the employee is married at death but has a valid beneficiary designation under which the spouse is not the sole beneficiary, the benefit payable to the beneficiaries is the greater of (i) 45% of the cashout value of the accelerated transition benefit with no age discount if the employee had at least 15 years of service or (ii) the value of the cash balance account. The cashout value of the accelerated transition benefit is determined using the factor

0051583.01

applicable for the employee's age at death.  The greater benefit is determined as of the date of death.  If the spouse is named as one of two or more beneficiaries, the spouse may elect an annuity with a value equivalent to his or her portion of the survivor benefit (e.g., 45% of the participant's life annuity) or the lump sum equivalent based on the participant's age.

If an individual dies after termination of employment, the benefit payable depends on the applicable benefit formula, which iswas determined at termination of employment.  If the benefit is a cash balance benefit for which the annuity start date has not occurred, the beneficiary receives the designated percentage of the account balance at the annuity start date.  If the benefit is an accelerated transition benefit or service pension for an unmarried participant for which distributions have been deferred, the benefit payable to the beneficiary is the designated percentage of the accumulated annuity payments at the time of the participant's death.  If the benefit form is a 10-year certain annuity, the benefit payable to the beneficiary is the present value of the designated percentage of the remainder of the 120 payments or, if the beneficiary is the spouse, the spouse may elect to receive his or her designated percentage as annuity payments over the remainder of the term.

A deferred vested pension for either a former employee or a rehired current employee is not payable as a benefit under a beneficiary designation.

0051583.01

ATTACHMENT B

## SUMMARY OF RECOMMENDATIONS

**PACIFIC TELESIS GROUP HEALTHCARE NETWORK PLAN
PACIFIC TELESIS GROUP VISION CARE PLAN
PACIFIC TELESIS GROUP DENTAL EXPENSE PLAN
PACIFIC TELESIS GROUP SPENDING ACCOUNT PLAN
PACIFIC TELESIS GROUP BEFORE TAX CONTRIBUTION PLAN
PACIFIC TELESIS GROUP BASIC AND SUPPLEMENTAL DEATH BENEFIT PLAN
PACIFIC TELESIS GROUP DEPENDENT LIFE INSURANCE PLAN
LEAVE POLICY**

Effective September 1, 1997, amend the Pacific Telesis Group Healthcare Network Plan (Health Plan) to make coverage under the Employee Assistance Program available to registered domestic partners of management employees of Pacific Telesis Group (PTG) and any subsidiary of PTG that participates in the Health Plan and is doing business in California. A registered domestic partner is any person who has registered a domestic partnership with a governmental body pursuant to state or local laws authorizing such registrations.

Effective October 1, 1997, amend the Pacific Telesis Group Dependent Life Insurance Plan (Dependent Life Plan) as necessary to make coverage available to a registered domestic partner of a management employee of PTG and any subsidiary of PTG that participates in the Dependent Life Plan and is doing business in California, and to any dependent of such domestic partner. A registered domestic partner is any person who has registered a domestic partnership with a governmental body pursuant to state or local laws authorizing such registrations.

Effective September 1, 1997, amend the policy with respect to Family Care Leave to include a registered domestic partner of a management employee of Pacific Telesis Group (PTG), and any subsidiary of PTG doing business in California as an eligible individual for whom such an employee may take a Family Care Leave to the extent, and subject to the rules, applicable to the spouse of an employee.

Effective January 1, 1998, amend the health plans listed above, to the extent necessary, to make coverage available under such plans to individuals employed by Pacific Bell Mobile Services (PBMS) as Direct Sales Commissions and Retail Sales Specialists on the same basis as such coverage is extended to other PBMS employees.

0051583.01

- Such employees may elect coverage during the open enrollment period applicable to the 1998 plan year.

- For the period beginning September 1, 1997 and ending December 31, 1997, any premium otherwise payable for employee and dependent coverage by such employees for coverage under the Aetna U.S. Healthcare HMO will be waived.

*0051583.01*

## SUMMARY OF RECOMMENDATIONS

### PACIFIC TELESIS GROUP COMPREHENSIVE DISABILITY BENEFITS PLAN

Effective July 1, 1997, amend the Pacific Telesis Group Comprehensive Disability
Benefits Plan to provide that Aetna U.S. Healthcare shall act as a third party
administrator for the short term disability and long term disability claims of employees of
Pacific Bell Communications, consistent with the requirements of the
Telecommunications Act of 1996.

0051583.01

PGA-401(4)
A

February 27, 1998


MS. CARR:

This is to request your authorization to take the following actions with respect to
employee benefit plans maintained by Pacific Telesis Group:

1.      Amend the Pacific Telesis Group Supplemental Retirement and Savings Plan for
        Salaried Employees and the Pacific Telesis Group Supplemental Retirement and
        Savings Plan for Salaried and Nonsalaried Employees (Leveraged ESOP), as
        amended to April 1, 1997 (collectively, the "Salaried Savings Plan"), as described
        in Attachment A, to allow employees of Pacific Bell Interactive Media ("PBIM"),
        a subsidiary of Pacific Telesis Group, to participate in the Salaried Savings Plan
        effective January 1, 1998.  Currently, PBIM employees are eligible to participate
        in the Pacific Bell Interactive Media Savings Plan (formerly the ESS Ventures
        Savings Plan) (referred to as the "PBIM Plan"), a separate tax-qualified savings
        plan sponsored by Pacific Telesis Group that does not offer a fixed matching
        contribution.  To effect the change to the Salaried Savings Plan:

        (a)     the definition of "Employing Company," which lists the subsidiaries and
                affiliates authorized to participate in the Salaried Savings Plan, is amended
                to name PBIM; and

        (b)     the definition of "Salary" is amended to confirm that, for purposes of
                determining the amount of an employee's salary deferrals, the term refers
                to a PBIM employee's basic salary rate, but excludes unpaid time.  Absent
                a specific exclusion, the term includes paid and unpaid time.

2.      Amend the PBIM Plan effective January 1, 1998 to provide that no further
        contributions will be made under the PBIM Plan as approved by the Board of
        Directors of PBIM in the resolutions attached as Attachment F.  Employee
        accounts existing at December 31, 1997 will be maintained under the PBIM Plan
        until distributed or transferred as provided under the terms of the PBIM Plan.
        Plan text further delineating the changes will be submitted at a later date to the
        Executive Vice President - Human Resources, Pacific Telesis Group.


Carr_PBIM_DGA

P00224

3.      Amend the Pacific Telesis Group Cash Balance Pension Plan for Salaried Employees ("Cash Balance Plan"), as described in Attachment B, to allow employees of PBIM to participate in the Cash Balance Plan effective January 1, 1998.  To effect the change:

      (a)      the definition of "Adjusted Monthly Compensation" is amended to confirm that, for purposes of calculating the monthly pay-based contribution, the term refers to a PBIM employee's basic monthly salary rate, but excludes unpaid time; and

      (b)      the definition of "Participating Company," which lists the subsidiaries and affiliates authorized to participate in the Cash Balance Plan, is amended to name PBIM.

4.      Amend the welfare plans sponsored by Pacific Telesis Group that are listed in Attachment C to provide for participation by employees of PBIM, effective January 1, 1998.

5.      Amend the disability and life insurance component of the PBIM Health, Life and Disability Plan to cease participation by employees of PBIM, effective January 1, 1998 as approved by the Board of Directors of PBIM in the resolutions attached as Attachment F.

6.      Amend the health care plans sponsored by Pacific Telesis Group that are listed in Attachment D, effective March 1, 1998, to provide for participation for employees of PBIM.

7.      Amend the health care component of the PBIM Health, Life and Disability Plan, to cease participation by employees of PBIM, effective March 1, 1998 as approved by the Board of Directors of PBIM in the resolutions attached as Attachment F.

8.      Amend the Digital Graphics ADvantage 401(k) Savings Plan ("DGA Plan") and its related Trust Agreement effective January 1, 1998 in the form approved by the Board of Directors of PBD Holdings (which does business as Digital Graphics ADvantage) in the resolutions attached as Attachment E.  The amendments will provide for:

      (a)      Matching contributions equal to sixty-six and two-thirds percent (66 2/3%) of the salary deferrals made by a participant not in excess of six percent (6%) of the participant's compensation.  The deferrals upon which the matching contribution are made are characterized as "basic contributions."

P00225

Digital Graphics ADvantage ("DGA") is a subsidiary of Pacific Telesis Group. DGA employees currently are eligible to participate in retirement, health and welfare plans maintained by Pacific Telesis Group solely for employees of DGA. The DGA Plan currently provides for matching contributions at the rate of fifty percent (50%). matching contributions on participants' basic contributions under the DGA Plan will continue to be made in cash.

(b)     The right to elect to make salary deferral contributions of from one percent (1%) to ten percent (10%) of compensation to the DGA Plan, which are characterized as "supplemental contributions" by the participant. No matching contributions are made on salary deferrals characterized as supplemental contributions. The exception is necessary to accommodate employees who are eligible to participate in the SBC Stock Savings Plan ("SSP"), and elect to have all or part of their matching contributions made on their basic contributions under the SSP, but also want to contribute under the DGA Plan.

(c)     Replace the current trustee of the DGA Plan, Barclays Global Investors, National Association ("BGI"), with Merrill Lynch Trust Company, FSB, effective January 1, 1998. Merrill Lynch, Pierce, Fenner & Smith Incorporated acquired the MasterWorks division of BGI, which provides integrated services to the DGA Plan.

(d)     The retention of two collective investment funds sponsored by BGI as investment options under the DGA Plan in order to minimize the effect of the acquisition of MasterWorks on participants.

(e)     Make additional changes in the DGA Plan to facilitate administration of the loan provisions and to incorporate changes made necessary by changes in the Internal Revenue Code and related regulations and guidance.

Plan text further delineating the changes described in paragraphs 4 through 7 will be submitted at a later date to the Executive Vice President - Human Resources, Pacific Telesis Group.

The Pacific Telesis Group Legal Department has reviewed this letter and the attachments.

Carr_PBIM_DGA                    3

P00226

Please sign below to indicate your authorization of the actions described in paragraphs 1 through 7 above.  Please indicate your authorization of the actions described in paragraph 8 by executing three copies each of Exhibit A (Amendment No. 2 to the Digital Graphics ADvantage 401(k) Savings Plan and Trust), Exhibit B (Change of Trustee Amendment), and Exhibit C (Adoption Agreement--BGI Collective Investment Trusts), which are attached as Attachment G.

*Ron Horris*

Attachments

Authorized:

_____
Cassandra C. Carr
Executive Vice President - Human Resources
Pacific Telesis Group

_3-3-98_____
Date

Carr_PBIM_DGA                                    4

P00227

**ATTACHMENT A**

AMENDMENT NUMBER THREE TO PACIFIC TELESIS GROUP
SUPPLEMENTAL RETIREMENT AND SAVINGS PLAN
FOR SALARIED EMPLOYEES
AND
PACIFIC TELESIS GROUP
SUPPLEMENTAL RETIREMENT AND SAVINGS PLAN
FOR SALARIED AND NONSALARIED EMPLOYEES
(LEVERAGED ESOP)

(as amended to April 1, 1997)

The Pacific Telesis Group Supplemental Retirement and Savings Plan for Salaried Employees
and the Pacific Telesis Group Supplemental Retirement and Savings Plan for Salaried and
Nonsalaried Employees (Leveraged ESOP), as amended to April 1, 1997 (collectively, the
"Plan"), is amended as of January 1, 1998 to provide for participation by employees of Pacific
Bell Interactive Media, a subsidiary of Pacific Telesis Group.

1.      Effective January 1, 1998, the definition of "Employing Company" in Section 2 of the
Plan is amended to read:

      "Employing Company" shall mean the Corporation or any member of the Affiliated
      Group which shall have determined, with the concurrence of the Corporation, to
      participate in the Plan. Employing Company includes Pacific Bell, Nevada Bell, Pacific
      Bell Directory, Pacific Bell Information Services, Pacific Bell Interactive Media, Pacific
      Telesis Group - Washington, PacTel Finance, Telesis Technologies Laboratory, Pacific
      Telesis Enhanced Services (formerly, Telesis Enhanced Services, Inc.), Pacific Telesis
      Video Services, Pacific Telesis Electronic Publishing Services and Pacific Bell Mobile
      Services. Employing Company does not include PacTel Corporation or any other
      member of the Affiliated Group which participates in the PacTel Corporation Retirement
      Plan.

2.      Effective January 1, 1998, clause (i) in the definition of "Salary" in Section 2 of the Plan
is amended to read:

      (i)      For periods that an Employee is employed by Pacific Bell Directory, Pacific Bell
            Information Services, Pacific Bell Interactive Media, Pacific Bell Mobile
            Services, Telesis Enhanced Services, Pacific Telesis Video Services, Pacific Bell
            Internet Services, Pacific Bell Network Integration, Pacific Telesis Enterprises,
            Pacific Bell Communications, Pacific Telesis Shared Services or Pacific Telesis
            Electronic Publishing Services, the Employee's basic salary rate shall exclude
            unpaid time from compensation related to the basic monthly salary rate. For
            periods that an Employee works on a part-time basis for any such Employing
            Company, the Employee's basic salary rate shall be equal to compensation for
            regular hours actually paid.

Carr_PBIM_DGA

**ATTACHMENT B**

AMENDMENT NUMBER TWO TO THE
PACIFIC TELESIS GROUP
CASH BALANCE PENSION PLAN
FOR SALARIED EMPLOYEES
(as amended to April 1, 1997)

The Pacific Telesis Group Cash Balance Pension Plan for Salaried Employees (the "Cash Balance Plan"), as amended to April 1, 1997, is further amended as of January 1, 1998 to provide for participation by employees of Pacific Bell Interactive Media, a subsidiary of Pacific Telesis Group.

1.     Effective January 1, 1998, subsection (e) of the definition of "Adjusted Monthly Compensation" in Section 1 of the Cash Balance Plan is amended to read:

     (e)     Adjustment to Basic Rate.  For periods that an Employee is employed by Pacific Bell Directory, Pacific Bell Information Services, Pacific Bell Interactive Media, Pacific Bell Mobile Services, Telesis Enhanced Services, Pacific Telesis Video Services, Pacific Bell Internet Services, Pacific Bell Network Integration, Pacific Telesis Enterprises, or Pacific Telesis Electronic Publishing Services, the Employee's basic salary rate shall exclude unpaid time from compensation related to the basic monthly salary rate.  For periods that such an Employee works on a part-time basis, the Employee's basic salary rate shall be equal to the compensation for regular hours actually paid.

2.     Effective January 1, 1998, the definition of "Participating Company" in Section 1 of the Cash Balance Plan is amended to read:

     *"Participating Company"* means PTG or any subsidiary of PTG which participates in the Plan with the concurrence of PTG.  No Former Affiliate or Associated or Allied Company, whether or not previously a Participating Company in this or any Predecessor Plan, is considered a Participating Company under the Plan.  As of January 1, 1998, the PTG subsidiaries that are Participating Companies are Pacific Bell, Nevada Bell, Pacific Bell Communications, Pacific Bell Directory, Pacific Bell Development Company, Pacific Bell Extras, Pacific Bell Information Services, Pacific Bell Interactive Media, Pacific Bell Internet Services, Pacific Bell Mobile Services, Pacific Bell Network Integration, PacTel Finance, Pacific Telesis Legal Group, Pacific Telesis Group - Washington, Telesis Enhanced Services, Inc., Pacific Telesis Electronic Publishing Services, Pacific Telesis Enterprises, Pacific Telesis Video Services, and Telesis Technologies Laboratory, Inc.

Carr_PBIM_DGA

## Amendments to the SBC Medical and Group Life Insurance Plan - CustomCare ("the Plan")

I.    Effective January 1, 1999 (except as otherwise specified), the SBC Medical and Group Life Insurance Plan - CustomCare is hereby amended with regard to Nonbargained Employees, Retired Nonbargained Employees, and their respective eligible Dependents of all Participating Companies to provide that:

A.    Eligibility

1.    The definition of "Bargained-for Employee" is expanded to include PTG company nonsalaried employees who do not fit within one of the other Bargained-for Employee categories described in this definition. In accordance with this change, a reference to a Nonbargained Employee shall be interpreted to exclude all PTG company nonsalaried employees, and a reference to a Bargained-for Employee shall be interpreted as including all PTG company nonsalaried employees.

2.    Newly Hired Employees

(a)    "Term Employee" shall mean a Nonbargained Employee of a Participating Company engaged for a specific project or for a period of time of more than one year, but no more than three years, with the definite understanding that such employment is to terminate upon completion of the project or at the end of the period of time, whichever occurs first.

(b)    A regular, Term or temporary part-time or full-time Nonbargained Employee (and his/her eligible Dependents) hired on or after January 1, 1999, shall be covered under the Plan retroactive to the Nonbargained Employee's date of hire, provided such Nonbargained Employee (and his/her eligible Dependents) enrolls within 31 calendar days from the Nonbargained Employee's date of hire and makes the required contribution for coverage under the Plan.

(c)    A regular, Term or temporary part-time or full-time Nonbargained Employee (and his/her eligible Dependents) hired between July 2, 1998 and December 31, 1998, shall be eligible to receive Participating Company contributions for Plan coverage effective January 1, 1999, provided such Nonbargained Employee (and his/her eligible Dependents) enrolls no later than January 1, 1999, and makes the required contribution for coverage under the Plan.

3.    Other Enrollments

    (a)    If an eligible Nonbargained Employee or Retired Nonbargained Employee acquires an eligible Dependent, the eligible Nonbargained Employee or Retired Nonbargained Employee may enroll himself/herself and/or each of the Nonbargained Employee's or Retired Nonbargained Employee's eligible Dependents, and coverage under the Plan for each newly enrolled Participant shall be retroactive to the date the Nonbargained Employee or Retired Nonbargained Employee acquires the newly-acquired eligible Dependent, provided the Nonbargained Employee or Retired Nonbargained Employee is enrolled prior to or concurrently with each of the Nonbargained Employee's or Retired Nonbargained Employee's newly enrolled eligible Dependents, and provided further, that the Nonbargained Employee or Retired Nonbargained Employee and/or each of the Nonbargained Employee's or Retired Nonbargained Employee's eligible Dependents is enrolled within thirty-one (31) days from the date the Nonbargained Employee or Retired Nonbargained Employee acquires the newly-acquired eligible Dependent and the Nonbargained Employee or Retired Nonbargained Employee makes the required contribution for coverage under the Plan.

    (b)    If an eligible Nonbargained Employee or Retired Nonbargained Employee fails to enroll himself/herself and/or his/her eligible Dependents within thirty-one (31) days of the date of the Nonbargained Employee's or Retired Nonbargained Employee's date of hire (as described in A.2.(b) above), or if an eligible Nonbargained Employee or Retired Nonbargained Employee fails to enroll himself/herself and/or his eligible Dependents within thirty-one (31) days of the date the Nonbargained Employee or Retired Nonbargained Employee acquires an eligible Dependent (as described in A.3.(a) above), or if an eligible Nonbargained Employee or Retired Nonbargained Employee and/or his/her eligible Dependent is otherwise eligible to enroll for coverage under the Plan, the eligible Nonbargained Employee or Retired Nonbargained Employee may enroll himself/herself and/or each of his/her eligible Dependents under the Plan, and coverage for each newly enrolled Participant shall be effective as of the first day of the month following the month in which each newly enrolled Participant is enrolled and the Nonbargained Employee or Retired Nonbargained Employee makes the required contribution for coverage under the Plan, provided the Nonbargained Employee or Retired Nonbargained Employee is enrolled prior to or concurrently with each newly enrolled Participant.

P00231

4.    Part-Time Employees

   (a)    The Plan provision that grandfathered pre-January 1, 1981 part-time Nonbargained Employees under the same contribution provisions as apply to full-time Nonbargained Employees is eliminated, and all part-time Nonbargained Employees shall be subject to the contributions outlined in 3(b) and (c) below.

   (b)    A regular, Term or temporary part-time Nonbargained Employee who is scheduled to work 20 or more hours per week shall pay 50% of the full cost of coverage.

   (c)    A regular, Term or temporary part-time Nonbargained Employee who is scheduled to work less than 20 hours per week shall pay 100% of the full cost of coverage.

5.    Employees on Long Term Disability ("LTD")

   (a)    A regular or temporary part-time Nonbargained Employee who is eligible to begin receiving long term disability ("LTD") benefits under the provisions of the disability plan of the former Nonbargained Employee's employing Participating Company on or after January 1, 1999, and who is scheduled to work 20 or more hours per week at the start of short term disability ("STD") benefits under the provisions of the disability plan of the former Nonbargained Employee's employing Participating Company shall pay 50% of the full cost of coverage.

   (b)    A regular or temporary part-time Nonbargained Employee who is eligible to begin receiving LTD benefits under the provisions of the disability plan of the former Nonbargained Employee's employing Participating Company on or after January 1, 1999, and who is scheduled to work less than 20 hours per week at the start of STD benefits under the provisions of the disability plan of the former Nonbargained Employee's employing Participating Company shall pay 100% of the full cost of coverage.

6.    Class II Dependent and Sponsored Child

   Coverage for a Class II Dependent and a Sponsored Child, except for any person covered as a Class II Dependent or a Sponsored Child on December 31, 1998, is eliminated.

7.    Surviving Spouse Extended Coverage

   (a)    For the death of a Nonbargained Employee or a Retired Nonbargained Employee that occurs on or after January 1, 1999, surviving Spouse extended coverage shall be provided pursuant to the provisions of (b), (c), and (d) below.

(b)     Surviving Spouse extended coverage for a surviving Spouse and other eligible covered Dependents for the six month period beginning on the first day of the month following a Nonbargained Employee's or Retired Nonbargained Employee's death shall be subject to the contributions otherwise required of the Nonbargained Employee or Retired Nonbargained Employee, as applicable, including those contributions required in connection with the selection of the HMO alternative to CustomCare Article IV pursuant to Section G of this Attachment D.

Following the initial six month period of surviving Spouse extended coverage, the Nonbargained Employee's surviving Spouse or Retired Nonbargained Employee's surviving Spouse may continue surviving Spouse extended coverage for himself/herself and other eligible covered Dependents by contributing 100% of the full cost of coverage.

(c)     Surviving Spouse extended coverage of a Nonbargained Employee's or Retired Nonbargained Employee's surviving Spouse and other covered Dependents shall terminate at the end of the month in which such surviving Spouse is remarried.

(d)     No new or additional Dependent may be enrolled through surviving Spouse extended coverage under the Plan.

(e)     For the death of a Nonbargained Employee or a Retired Nonbargained Employee that occurs prior to January 1, 1999:

(1)     The eligibility and duration of surviving Spouse extended coverage provided in connection with such a death shall be administered pursuant to the provisions of the plan in which the surviving Spouse is enrolled on December 31, 1998; and

(2)     Effective January 1, 1999, surviving Spouse extended coverage provided in connection with such a death shall be subject to provisions (c) and (d) above.

8.     Disabled Dependent

Unmarried Child Class I Dependent coverage based on disability (i.e., mentally, physically and/or medically incapable of self support and fully dependent upon a Nonbargained Employee or Retired Nonbargained Employee for financial support) is limited to a Child Class I Dependent who is so disabled as of the last day of the month in which the Child reaches 19 (or 23, if in full-time attendance at an Institution of Learning), other than a disabled Child Class I Dependent covered under the Plan on December 31, 1998.

9.    Registered Domestic Partners

(a)    The term "Registered Domestic Partner" is defined to mean the
individual with whom a Participant has entered into a domestic
partnership that has been registered with a governmental body
pursuant to state or local law authorizing such registration.

(b)    Plan coverage is extended to Registered Domestic Partners of
Nonbargained Employees and Retired Nonbargained Employees of
the Participating Companies listed below, under the same terms
and conditions as are made available to eligible Dependents of
Nonbargained Employees and Retired Nonbargained Employees:

Pacific Telesis Group
Pacific Bell
Pacific Bell Directory
Pacific Bell Information Services
Pacific Bell Internet Services
Pacific Bell Mobile Services
Pacific Telesis Shared Services
PBD Holdings (d/b/a Digital Graphics Advantage)
SBC Interactive (formerly known as Pacific Bell Interactive
     Media)
PacTel Finance
Pacific Telesis Electronic Publishing Services
Pacific Bell Extras
Southwestern Bell Communications Services, Inc.
California Celcom Communications Corporation (effective 2/1/99)
SBC Management Services USA, Inc. (effective 2/1/99)

B.    Medicare Part B Premium Reimbursement

1.    The Medicare Part B premium reimbursement cap of $45 shall not apply
to a former PTG Participating Company Nonbargained Employee and
his/her eligible Class I Dependents, if such former PTG Company
Nonbargained Employee terminated employment before January 1, 1991
and was eligible to receive Medicare Part B premium reimbursement,
provided such former PTG Company Nonbargained Employee and his/her
eligible Class I Dependents otherwise remain eligible for Medicare Part B
premium reimbursement.

2.    A Nonbargained Employee who retires on or after January 1, 1999, shall
not be eligible to receive Medicare Part B premium reimbursement for
his/her Class I Dependents.

3.    A former PTG company Nonbargained Employee, who is (a) receiving
Medicare Part B premium reimbursement, and (b) eligible to receive LTD
benefits under the provisions of the disability plan of the former

Nonbargained Employee's employing PTG Participating Company before January 1, 1999, shall, along with his/her eligible Class I Dependents, continue to be eligible to receive Medicare Part B premium reimbursement.

C.    Post-Retirement Medical

1.    For a Retired Nonbargained Employee, the annual defined dollar cap formula for calculating Retired Employee medical contributions as bargained by Southwestern Bell Telephone Company for its Bargained-for Employees and approved by a resolution dated September 9, 1998, shall apply to Retired Nonbargained Employees, except that the $5,500 cap shall be frozen and not automatically increased by one percent per calendar year.

2.    A PTG Participating Company Retired Nonbargained Employee with a pension effective date before January 1, 1991, shall not be subject to the $5,500 annual defined dollar cap.

3.    A PTG Participating Company Retired Nonbargained Employee with a pension effective date on or after January 1, 1991, but before January 1, 1999, shall be subject to the $5,500 annual defined dollar cap.

D.    Contributions

1.    The Working Spouse Contribution is eliminated.

2.    Regular and temporary full-time Nonbargained Employees who are eligible to begin receiving LTD benefits under the provisions of the disability plan of the former Nonbargained Employee's employing Participating Company on or after January 1, 1999, shall contribute towards the cost of coverage in the amount of :

(a)    for single person coverage, 7% of the Plan premium equivalent cost for single person coverage, rounded to the nearest dollar;

(b)    for two person coverage, 7% of the Plan premium equivalent cost for single person coverage, plus 11% of the difference between the Plan premium equivalent cost for single person coverage and the Plan premium equivalent cost for two person coverage, rounded to the nearest dollar; or

(c)    for three or more person coverage, 7% of the Plan premium equivalent cost for single person coverage, plus 11% of the difference between the Plan premium equivalent cost for single person coverage and the Plan premium equivalent cost for three or more person coverage, rounded to the nearest dollar.

3.      Application of the CPI-Medical escalator to Copayments and Deductibles for Nonbargained Employees and Retired Nonbargained Employees and their eligible Dependents is eliminated.

E.      Copayments and Deductibles

Copayments and Deductibles for a Nonbargained Employee or Retired Nonbargained Employee and his/her eligible Dependents shall be as specified below:

1.      The Copayment for an emergency room visit shall be $25.

2.      The annual Deductible shall be as follows:

| Type | Non-Network Deductible | Outside Network Area Deductible |
|---|---|---|
| Single person | $410 | $185 |
| Two person | $820 | $370 |
| Three or more persons | $1,230 | $555 |

3.      The Outside Network Area ("ONA") $50,000 lifetime Supplemental Benefits maximum for Nonbargained Employees, Retired Nonbargained Employees, former Nonbargained Employees eligible to receive LTD benefits under the provisions of the disability plan of their employing Participating Company, and the eligible Dependents of said Nonbargained Employees, Retired Nonbargained Employees, and former Nonbargained Employees is eliminated.

4.      The Covered Charge for an ONA Physician home or office visit shall be 100% of the Reasonable and Customary ("R&C") charge after a $15 Copayment without satisfaction of the Deductible.

5.      Immunizations (not including any associated Physician office visit charges), limited to those associated with well child care and paid according to the guidelines established by the American Academy of Pediatricians, shall be covered as an ONA Basic Benefit at 100% of R&C without satisfaction of the Deductible.

6.      The routine care benefit for ONA Participants, under which the charges of Physician, Hospital or laboratory for routine health assessments and associated laboratory tests and x-ray examinations, mammograms, immunizations, inoculations, and vaccinations are covered at 80% of R&C after satisfaction of the Deductible, up to a maximum of $350 per Covered Individual per calendar year (the "ONA $350 Annual Routine Care Maximum"), shall be extended to all Participating Companies.

7.    The Covered Charge for an ONA Physician home or office visit or an ONA well child immunization shall not apply toward the ONA $350 Annual Routine Care Maximum.

8.    The Retail Prescription Drug Program shall include an annual drug Deductible of $50 per Covered Individual, a $15 Copayment per brand name drug prescription, and a $5 Copayment per generic drug prescription.

9.    The Mail Service Prescription Drug Program shall include a $15 Copayment per brand name drug prescription and a $5 Copayment per generic drug prescription.

10.    Coverage for oral contraceptives under the Retail Prescription Drug Program and the Mail Service Prescription Drug Program shall be a Covered Charge without regard to the Medically Necessary requirement, but otherwise subject to the terms of the Plan.

**The remainder of this page has been intentionally left blank.**

11.  The Mental Health and Chemical Dependency Program ("MH/CD Program") is changed in the following manner:

| | Managed by the MH/CD Program Administrator: | Not managed by the MH/CD Program Administrator: | |
|---|---|---|---|
| For inpatient mental health treatment: | Copayment: $35 per inpatient admission.(1) Plan payment: 100% of Covered Charges.(1) | Deductible: $300 per calendar year.(3) | Plan payment: 50% of R&C Covered Charges.(1) Plan maximum: $300 per day.(1) Plan limit: 20 days per calendar year MH/CD combined.(1) |
| For outpatient mental health treatment: | Copayment: $15 per outpatient visit.(2) Plan payment: 100% of Covered Charges.(2) | Deductible: not applicable. | Plan payment: 50% of R&C Covered Charges. Plan maximum: $55 per outpatient visit. Plan limit: 20 outpatient visits per calendar year MH/CD combined. |
| For inpatient chemical dependency treatment: | Copayment: $35 per inpatient admission.(1) Plan payment: 100% of Covered Charges.(1,4) | Deductible: $300 per calendar year.(3) | Plan payment: 50% of R&C Covered Charges.(1) Plan maximum: $300 per day.(1) Plan limit: 20 inpatient days per calendar year MH/CD combined.(1, 4) |
| For outpatient chemical dependency treatment: | Copayment: None.(1) Plan payment: 100% of Covered Charges.(1,4) | Deductible: $300 per calendar year.(3) | Plan payment: 50% of R&C Covered Charges.(1) Plan limit: 20 outpatient visits per calendar year MH/CD combined.(1, 4) |

(1)   Subject to precertification by the MH/CD Program Administrator.

(2)   Subject to precertification by the MH/CD Program Administrator after five visits.

(3)   Combined Deductible for inpatient mental health treatment and inpatient and outpatient chemical dependency treatment Covered Charges.

(4)   Benefits for managed and nonmanaged chemical dependency treatment are also subject to a combined inpatient and outpatient annual maximum of 30 days, in addition to the 60 day inpatient lifetime maximum. One outpatient visit equals one-half day of inpatient treatment for purposes of both the 30 day annual and 60 day lifetime maximums.

12. Except as otherwise indicated above, Copayments and Deductibles for all Participating Companies shall be those in effect for SBC Management Services, Inc. Participants as of December 31, 1998.

F. Depo-Provera Injections

For a Nonbargained Employee or a Retired Nonbargained Employee, and his/her eligible Dependents, Depo-Provera injections for birth control shall be covered as follows:

1. For Network coverage, the injections shall be covered at 100% subject to a $15 Copayment.

2. For Non-Network coverage, the injections shall be covered at 80% of the R&C charge after the annual Deductible has been met.

3. For ONA Supplemental Benefit coverage, the injections shall be covered at 80% of the R&C charge after the annual Deductible has been met. Covered Charges for this benefit shall not be applied toward the ONA $350 Annual Routine Care Maximum.

G. HMO Contributions and MH/CD Program Coverage

1. For a Nonbargained Employee Participant or a Retired Nonbargained Employee Participant and his/her eligible Dependent Participants who select an HMO under the HMO alternative to CustomCare Article IV benefits, when cost of coverage for that HMO is equal to or less than the geographically adjusted maximum HMO contribution (including the MH/CD Program cost of coverage contribution), such Participant shall be required to contribute towards the cost of coverage for that HMO in the same amount as provided under Section D of this Attachment D, in addition to any and all contributions required under the other provisions of the Plan.

2. For a Nonbargained Employee Participant or a Retired Nonbargained Employee Participant and his/her eligible Dependent Participants who select an HMO under the HMO alternative to CustomCare Article IV benefits, when the cost of coverage for that HMO is greater than the geographically adjusted maximum HMO contribution (including the MH/CD Program cost of coverage contribution), such Participant shall be required to contribute towards the cost of coverage for that HMO in the same amount as provided under Section D of this Attachment D, in addition to any and all contributions required under the other provisions of the Plan.

3. A Nonbargained Employee Participant or a Retired Nonbargained Employee Participant and his/her eligible Dependent Participants who

elect HMO coverage under the HMO alternative to CustomCare Article IV
benefits shall be eligible to participate in the MH/CD Program.

H.     Health Insurance Portability and Accountability Act of 1996 ("HIPAA")

The March 11, 1997 amendments to Section 3.2 of the Plan are rescinded and the
appropriate provisions of the Plan for the following Participating Companies
(whose Nonbargained Employees and Retired Nonbargained employees are
subject to cost of coverage contributions) are changed as follows:

> Associated Directory Services, Inc.
> Southwestern Bell Advertising Group, Inc.
> Southwestern Bell Advertising, L.P.
> Southwestern Bell Mobile Systems, Inc.
> Southwestern Bell Printing Company
> Southwestern Bell Telephone Company Competitive Services Unit
> Southwestern Bell Wireless Inc.
> Southwestern Bell Video Services, Inc.
> Times Journal Publishing Company

1.     Effective July 1, 1997 through December 31, 1998, a Nonbargained
Employee or Retired Nonbargained Employee of one of the above
Participating Companies, who previously failed to enroll in the Plan
within 31 days of his/her employment or retirement date or during a
subsequent enrollment period, may enroll himself/herself and each of
his/her eligible Dependents within 31 days of any change in eligibility due
to the occurrence of one or more of the following events, as applicable:

    (a)     Loss of coverage by a Nonbargained Employee or a Retired
Nonbargained Employee or a Dependent of such Nonbargained
Employee or Retired Nonbargained Employee under another group
health plan or other health insurance coverage as a result of:

        (1)     legal separation;

        (2)     divorce;

        (3)     death of a Spouse or former Spouse;

        (4)     loss of employment by a Spouse or former Spouse; or

        (5)     reduction in the hours of employment of a Spouse or a
former Spouse;

    (b)     change in a Nonbargained Employee's work status (i.e., change in
work classification and/or work hours);

    (c)     return of a Nonbargained Employee from a leave of absence (if
coverage has lapsed);

(d)     an employer terminates contributions towards the group health plan coverage of a Spouse or former Spouse of a Nonbargained Employee or Retired Nonbargained Employee; or

(e)     a Nonbargained Employee, or a Retired Nonbargained Employee exhausts COBRA continuation coverage.

If enrollment is completed within 31 days of the loss of coverage event, coverage for the Nonbargained Employee or Retired Nonbargained Employee and his/her eligible Dependents, including those previously unenrolled eligible Dependents, shall be effective as of the first day of the month following the month of enrollment.

If enrollment is not completed within 31 days of the loss of coverage event, coverage for the Nonbargained Employee or Retired Nonbargained Employee and his/her eligible Dependents, including those previously unenrolled eligible Dependents, shall be effective as of the first day of the month following the month of enrollment.

2.   Effective July 1, 1997, a Nonbargained Employee or Retired Nonbargained Employee of one of the above Participating Companies, who has already enrolled in the Plan, may enroll each of his/her eligible Dependents within 31 days of any change in eligibility due to the occurrence of one or more of the following events, as applicable:

(a)     Loss of coverage by a Nonbargained Employee or Retired Nonbargained Employee or Dependent of such Nonbargained Employee or Retired Nonbargained Employee under another group health plan or other health insurance coverage as a result of:

(1)     legal separation;

(2)     divorce;

(3)     death of a Spouse or former Spouse;

(4)     loss of employment by a Spouse or former Spouse; or

(5)     reduction in the hours of employment of a Spouse or a former Spouse;

(b)     change in a Nonbargained Employee's work status (i.e., change in work classification and/or work hours);

(c)     return of a Nonbargained Employee from a leave of absence (if coverage has lapsed);

(d)    an employer terminates contributions towards the group health plan coverage of a Spouse or former Spouse of a Nonbargained Employee or Retired Nonbargained Employee; or

(e)    a Nonbargained Employee or Retired Nonbargained Employee exhausts COBRA continuation coverage.

If enrollment is completed within 31 days of the loss of coverage event, coverage for the Nonbargained Employee or Retired Nonbargained Employee and his/her eligible Dependents, including those previously unenrolled eligible Dependents, shall be effective as of the first day of the month following the month of enrollment.

If enrollment is not completed within 31 days of the loss of coverage event, coverage for the Nonbargained Employee or Retired Nonbargained Employee and his/her eligible Dependents, including those previously unenrolled eligible Dependents, shall be effective as of the first day of the month following the month of enrollment.

3.    Effective July 1, 1997, a Nonbargained Employee or Retired Nonbargained Employee of one of the above Participating Companies, who previously failed to enroll in the Plan within 31 days of his/her employment or retirement date or during a subsequent enrollment period, may enroll himself/herself and each of his/her eligible Dependents within 31 days of any change in eligibility due to the occurrence of one or more of the following events, as applicable:

(a)    marriage;

(b)    birth of a Child;

(c)    adoption or placement for adoption of a Child;

(d)    granting of legal guardianship for a Child living with the Nonbargained Employee or Retired Nonbargained Employee;

(e)    a Child who is a stepchild begins living with a Nonbargained Employee or Retired Nonbargained Employee; or

(f)    a Child becomes a full-time student.

If enrollment is completed within 31 days from the event, coverage for the Nonbargained Employee or Retired Nonbargained Employee and each of his/her eligible Dependents shall be effective as of the date of the event. The Nonbargained Employee or Retired Nonbargained Employee may enroll himself/herself and other unenrolled eligible Dependents at the same time he/she adds the newly acquired Dependent.

If enrollment is not completed within 31 days of the event, coverage for
the Nonbargained Employee or Retired Nonbargained Employee, his/her
newly acquired Dependents and his/her previously unenrolled eligible
Dependents shall be effective the first day of the month following the
month of enrollment.

4.    Effective July 1, 1997, a Nonbargained Employee or Retired
      Nonbargained Employee of one of the above Participating Companies,
      who has already enrolled in the Plan, may enroll each of his/her eligible
      Dependents within 31 days of any change in eligibility due to the
      occurrence of one or more of the following events, as applicable:

      (a)    marriage;

      (b)    birth of a Child;

      (c)    adoption or placement for adoption of a Child;

      (d)    granting of legal guardianship for a Child living with the
             Nonbargained Employee or Retired Nonbargained Employee;

      (e)    a Child who is a stepchild begins living with a Nonbargained
             Employee or Retired Nonbargained Employee; or

      (f)    a Child becomes a full-time student.

      If enrollment is completed within 31 days from the event, coverage for the
      newly acquired Dependent shall be effective as of the date of the event.
      The Nonbargained Employee or Retired Nonbargained Employee may
      enroll his/her other unenrolled eligible Dependents at the same time he
      adds the newly acquired Dependent with coverage effective the first day of
      the month following the month of enrollment.

      If the enrollment is not completed within 31 days of the event, coverage
      for his/her newly acquired eligible Dependents and his/her previously
      unenrolled eligible Dependents shall be effective the first day of the month
      following the month of enrollment.

5.    A dropped or canceled enrollment shall be irrevocable for the remainder of
      the plan year unless and until the Nonbargained Employee or Retired
      Nonbargained Employee experiences a change in eligibility (i.e., birth,
      marriage, adoption or placement for adoption or loss of Dependent
      coverage).

I.    Knox-Keene Compliance

For CustomCare Network Participants residing in California, the following changes shall apply:

1.    If a Participant is totally disabled and under the care of a Network Physician and said Participant's coverage under the Plan would otherwise cease as a result of the termination of SBC's CustomCare California Network group contract with the Claims Administrator with regard to one or more of the Participating Companies or any unit thereof, the Participant's coverage under the Plan shall be extended for the time the Participant remains totally disabled and under the care of a Network Physician up to a maximum period of 12 months after the Participant's Plan coverage would otherwise end because of the termination of said group contract, subject to the following conditions:

(a)    this extended coverage shall only apply to the Participant's disabling condition and any related sickness or injury;

(b)    this extended coverage shall only apply to the extent coverage for the Participant's disabling condition is not available through SBC or any of its companies; and

(c)    a Participant shall be considered totally disabled,

(i)    if the Participant is an active or former Employee, when the Participant is unable to work for wage or profit, and due to a sickness or injury is unable to perform for wage or profit the material and substantial duties of any job for which the Participant is reasonably fitted by the Participant's education, training or experience; or

(ii)    if the Participant is a Dependent, when the Participant is not able, because of a sickness or injury, to carry on the regular and customary activities of a person in good health and of the same age and family status.

2.    Upon termination of coverage, a Participant may elect to convert to an individual HMO policy only.

J.    Coordination of Benefits

The Plan is changed to apply the birthday rule in lieu of the gender rule currently in use under the Plan for purposes of establishing the order for coordination of benefits for Nonbargained Employees, Retired Nonbargained Employees and their respective eligible Dependents, pursuant to which the benefits of a plan which covers the person on whose expenses claim is based as a dependent of the parent

P00244

whose birthday falls first in the calendar year shall be determined before the benefits of a plan which covers such person as a dependent of the parent whose birthday falls second in the calendar year.

II.  Effective January 1, 1999 (except as otherwise specified), the SBC Medical and Group Life Insurance Plan – CustomCare is hereby amended with regard to Retired Bargained-for Employees of Southwestern Bell Telephone Company ("SWBT") and their eligible Dependents, other than Retired Bargained-for Employees of the SWBT Competitive Services Unit and their eligible Dependents, to provide that:

A.  Oral contraceptives shall be covered under the Retail Prescription Drug Program and the Mail Order Prescription Drug Program without regard to the Medically Necessary requirement, but otherwise subject to the terms of the Plan.

B.  Effective July 1, 1998, the current air ambulance $2,000 limit per medical emergency is eliminated. All Network charges for air ambulance shall be covered at 100%. All Non-Network and ONA charges shall be covered at 80% of R&C after satisfaction of the Deductible.

C.  Immunizations (not including any associated Physician office visit charges), limited to those associated with well child care and paid according to the guidelines established by the American Academy of Pediatricians, shall be covered as an ONA Basic Benefit at 100% of R&C without satisfaction of the Deductible.

D.  The ONA annual Deductible is reduced as follows:

1.  Single person coverage - from $190 to $180;

2.  Two person coverage - from $380 to $360; and

3.  Three or more person coverage - from $570 to $540.

The ONA Out-of-Pocket Maximum is reduced for each type of coverage by the same corresponding amount.

III.  Effective January 1, 1999, the SBC Medical and Group Life Insurance Plan – CustomCare is hereby amended with regard to all Participants from all Participating Companies to provide that the definition of "Clinician" shall include a Licensed Marriage and Family Therapist ("LMFT") with an LMFT credential.

IV.  Effective April 1, 1999 (except as otherwise specified), the SBC Medical and Group Life Insurance Plan – CustomCare is hereby amended to provide that the Bargained-for Employees, Retired Bargained-for Employees and their respective eligible Dependents of the Southwestern Bell Messaging Services, Inc. – Voice Processing Division Unit ("VPD") (formerly a bargaining Unit of SBC Operations, Inc.) shall participate in the Plan in accordance with the same terms, conditions and provisions that are applicable to SWBT

Bargained-for Employees, Retired Bargained-for Employees and their respective eligible Dependents as of April 1, 1999, as those terms, conditions and provisions were amended by a Plan resolution dated September 9, 1998, except as otherwise provided below:

A.  the Defined Dollar Benefit Cap (DDBCAP) 1% increase shall be effective on October 23, 1998; and

B.  effective January 1, 1999, VPD full-time Bargained-for Employees and Retired Bargained-for Employees shall be subject to the same cost of coverage contributions as SWBT Bargained-for Employees and Retired Bargained-for Employees as of January 1, 1999.

## Amendments to the SBC CarePlus – A Supplemental Medical Plan
### ("the Plan")

Effective January 1, 1999 (except as otherwise specified), the SBC CarePlus – A Supplemental Medical Plan is hereby amended with regard to Nonbargained Employees, Retired Nonbargained Employees and their respective eligible Dependents of all Participating Companies to provide that:

A.    Eligibility

     1.    The definition of "Bargained-for Employee" is expanded to include PTG company nonsalaried employees who do not fit within one of the other Bargained-for Employee categories described in this definition. In accordance with this change, a reference to a Nonbargained Employee shall be interpreted to exclude all PTG company nonsalaried employees, and a reference to a Bargained-for Employee shall be interpreted as including all PTG company nonsalaried employees.

     2.    Newly Hired Employees

         (a)    "Term Employee" shall mean a Nonbargained Employee of a Participating Company engaged for a specific project or for a period of time of more than one year, but no more than three years, with the definite understanding that such employment is to terminate upon completion of the project or at the end of the period of time, whichever occurs first.

         (b)    A regular, Term or temporary part-time or full-time Nonbargained Employee (and his/her eligible Dependents) hired on or after January 1, 1999, shall be covered under the Plan retroactive to the Nonbargained Employee's date of hire, provided such Nonbargained Employee (and his/her eligible Dependents) enrolls within 31 calendar days from the Nonbargained Employee's date of hire and makes the required contribution for coverage under the Plan.

     3.    Other Enrollments

         (a)    If an eligible Nonbargained Employee or Retired Nonbargained Employee acquires an eligible Dependent, the eligible Nonbargained Employee or Retired Nonbargained Employee may enroll himself/herself and/or each of the Nonbargained Employee's or Retired Nonbargained Employee's eligible Dependents, and coverage under the Plan for each newly enrolled Participant shall be retroactive to the date the Nonbargained Employee or Retired Nonbargained Employee acquires the newly-acquired eligible Dependent, provided the Nonbargained Employee or Retired Nonbargained Employee is enrolled prior to or concurrently with each of the Nonbargained Employee's or Retired Nonbargained Employee's newly enrolled

eligible Dependents, and provided further, that the Nonbargained Employee or Retired Nonbargained Employee and/or each of the Nonbargained Employee's or Retired Nonbargained Employee's eligible Dependents is enrolled within thirty-one (31) days from the date the Nonbargained Employee or Retired Nonbargained Employee acquires the newly-acquired eligible Dependent and the Nonbargained Employee or Retired Nonbargained Employee makes the required contribution for coverage under the Plan.

(b)    If an eligible Nonbargained Employee or Retired Nonbargained Employee or an eligible Dependent of an eligible Nonbargained Employee or Retired Nonbargained Employee incurs a loss of group health plan coverage or other health insurance coverage, the Nonbargained Employee or Retired Nonbargained Employee may enroll himself/herself and/or each of his/her eligible Dependents under the Plan within thirty-one (31) days of the loss of coverage date, and coverage for each newly enrolled Participant shall be effective as of the first day of the month following the month in which each newly enrolled Participant is enrolled and the Nonbargained Employee or Retired Nonbargained Employee makes the required contribution for coverage under the Plan, provided the Nonbargained Employee or Retired Nonbargained Employee is enrolled prior to or concurrently with each newly enrolled Participant.

(c)    If an eligible Nonbargained Employee or Retired Nonbargained Employee fails to enroll himself/herself and/or his/her eligible Dependents in accordance with A.3.(a) or (b) above, each unenrolled Nonbargained Employee, Retired Nonbargained Employee and Dependent may not enroll until the next Enrollment Period, unless otherwise eligible to enroll in accordance with A.3.(a) or (b) above.

4.    **Disabled Dependent**

Unmarried Child Class I Dependent coverage based on disability (i.e., mentally, physically and/or medically incapable of self support and fully dependent upon a Nonbargained Employee or Retired Nonbargained Employee for financial support) is limited to a Child Class I Dependent who is so disabled as of the last day of the month in which the Child reaches 19 (or 23, if in full-time attendance at an Institution of Learning), other than a disabled Child Class I Dependent covered under the Plan on December 31, 1998.

5.    **Registered Domestic Partners**

(a)    The term "Registered Domestic Partner" is defined to mean the individual with whom a Participant has entered into a domestic partnership that has been registered with a governmental body pursuant to state or local law authorizing such registration.

(b)    Effective February 1, 1999, Plan coverage is extended to Registered Domestic Partners of Nonbargained Employees and Retired Nonbargained Employees of the Participating Companies listed below, under the same terms and conditions as are made available to eligible Dependents of Nonbargained Employees and Retired Nonbargained Employees:

> California Celcom Communications Corporation
> SBC Management Services USA, Inc.

B.    Health Insurance Portability and Accountability Act of 1996 ("HIPAA")

The March 11, 1997 amendments to Section 3.2 of the Plan are rescinded and the appropriate provisions of the Plan for the following Participating Companies (whose Nonbargained Employees and Retired Nonbargained employees are subject to cost of coverage contributions) are changed as follows:

> Associated Directory Services, Inc.
> Southwestern Bell Advertising Group, Inc.
> Southwestern Bell Advertising, L.P.
> Southwestern Bell Mobile Systems, Inc.
> Southwestern Bell Printing Company
> Southwestern Bell Telephone Company Competitive Services Unit
> Southwestern Bell Wireless Inc.
> Southwestern Bell Video Services, Inc.
> Times Journal Publishing Company

1.    Effective July 1, 1997 through December 31, 1998, a Nonbargained Employee or Retired Nonbargained Employee of one of the above Participating Companies, who previously failed to enroll in the Plan within 31 days of his/her employment or retirement date or during a subsequent enrollment period, may enroll himself/herself and each of his/her eligible Dependents within 31 days of any change in eligibility due to the occurrence of one or more of the following events, as applicable:

(a)    Loss of coverage by a Nonbargained Employee or a Retired Nonbargained Employee or a Dependent of such Nonbargained Employee or Retired Nonbargained Employee under another group health plan or other health insurance coverage as a result of:

(1)    legal separation;

(2)    divorce;

(3)    death of a Spouse or former Spouse;

(4)    loss of employment by a Spouse or former Spouse; or

(5)    reduction in the hours of employment of a Spouse or a former Spouse;

(b)    change in a Nonbargained Employee's work status (i.e., change in work classification and/or work hours);

(c)    return of a Nonbargained Employee from a leave of absence (if coverage has lapsed);

(d)    an employer terminates contributions towards the group health plan coverage of a Spouse or former Spouse of a Nonbargained Employee or Retired Nonbargained Employee; or

(e)    a Nonbargained Employee, or a Retired Nonbargained Employee exhausts COBRA continuation coverage.

If enrollment is completed within 31 days of the loss of coverage event, coverage for the Nonbargained Employee or Retired Nonbargained Employee and his/her eligible Dependents, including those previously unenrolled eligible Dependents, shall be effective as of the first day of the month following the month of enrollment.

If enrollment is not completed within 31 days of the loss of coverage event, the Nonbargained Employee or Retired Nonbargained Employee and his/her eligible Dependents cannot enroll until the next Enrollment Period.

2.    Effective July 1, 1997, a Nonbargained Employee or Retired Nonbargained Employee of one of the above Participating Companies, who has already enrolled in the Plan, may enroll each of his/her eligible Dependents within 31 days of any change in eligibility due to the occurrence of one or more of the following events, as applicable:

(a)    Loss of coverage by a Nonbargained Employee or Retired Nonbargained Employee or Dependent of such Nonbargained Employee or Retired Nonbargained Employee under another group health plan or other health insurance coverage as a result of:

(1)    legal separation;

(2)    divorce;

(3)    death of a Spouse or former Spouse;

(4)    loss of employment by a Spouse or former Spouse; or

(5)    reduction in the hours of employment of a Spouse or a former Spouse;

(b)  change in a Nonbargained Employee's work status (i.e., change in work classification and/or work hours);

(c)  return of a Nonbargained Employee from a leave of absence (if coverage has lapsed);

(d)  an employer terminates contributions towards the group health plan coverage of a Spouse or former Spouse of a Nonbargained Employee or Retired Nonbargained Employee; or

(e)  a Nonbargained Employee or Retired Nonbargained Employee exhausts COBRA continuation coverage.

If enrollment is completed within 31 days of the loss of coverage event, the eligible Dependents who lost coverage may be enrolled in the Plan with coverage effective the first day of the month following the month of enrollment. No other eligible Dependents may be enrolled until the next Enrollment Period.

If enrollment is not completed within 31 days of the loss of coverage event, the Nonbargained Employee or Retired Nonbargained Employee and his/her eligible Dependents cannot enroll until the next Enrollment Period.

3.  Effective July 1, 1997, a Nonbargained Employee or Retired Nonbargained Employee of one of the above Participating Companies, who previously failed to enroll in the Plan within 31 days of his/her employment or retirement date or during a subsequent enrollment period, may enroll himself/herself and each of his/her eligible Dependents within 31 days of any change in eligibility due to the occurrence of one or more of the following events, as applicable:

(a)  marriage;

(b)  birth of a Child;

(c)  adoption or placement for adoption of a Child;

(d)  granting of legal guardianship for a Child living with the Nonbargained Employee or Retired Nonbargained Employee;

(e)  a Child who is a stepchild begins living with a Nonbargained Employee or Retired Nonbargained Employee; or

(f)  a Child becomes a full-time student.

If enrollment is completed within 31 days from the event, coverage for the Nonbargained Employee or Retired Nonbargained Employee and each of his/her eligible Dependents shall be effective as of the date of the event. The Nonbargained Employee or Retired Nonbargained Employee may enroll

himself/herself and other unenrolled eligible Dependents at the same time he/she adds the newly acquired Dependent.

If enrollment is not completed within 31 days of the event, the Nonbargained Employee or Retired Nonbargained Employee, his/her newly acquired Dependents and his/her previously unenrolled eligible Dependents cannot enroll until the next Enrollment Period.

4.    Effective July 1, 1997, a Nonbargained Employee or Retired Nonbargained Employee of one of the above Participating Companies, who has already enrolled in the Plan, may enroll each of his/her eligible Dependents within 31 days of any change in eligibility due to the occurrence of one or more of the following events, as applicable:

   (a)    marriage;

   (b)    birth of a Child;

   (c)    adoption or placement for adoption of a Child;

   (d)    granting of legal guardianship for a Child living with the Nonbargained Employee or Retired Nonbargained Employee;

   (e)    a Child who is a stepchild begins living with a Nonbargained Employee or Retired Nonbargained Employee; or

   (f)    a Child becomes a full-time student.

If enrollment is completed within 31 days from the event, coverage for the newly acquired Dependent shall be effective as of the date of the event. The Nonbargained Employee or Retired Nonbargained Employee may not enroll his/her other unenrolled eligible Dependents until the next Enrollment Period.

If the enrollment is not completed within 31 days of the event, the Nonbargained Employee or Retired Nonbargained Employee may not enroll his/her newly acquired eligible Dependents and his/her previously unenrolled eligible Dependents until the next Enrollment Period.

5.    A dropped or canceled enrollment shall be irrevocable until the next Enrollment Period unless and until the Nonbargained Employee or Retired Nonbargained Employee experiences a change in eligibility (i.e., birth, marriage, adoption or placement for adoption or loss of Dependent coverage).

C.     Coordination of Benefits

The Plan is changed to apply the birthday rule in lieu of the gender rule currently in use under the Plan for purposes of establishing the order for coordination of benefits for Nonbargained Employees, Retired Nonbargained Employees and their respective eligible Dependents, pursuant to which the benefits of a plan which covers the person on whose expenses claim is based as a dependent of the parent whose birthday falls first in the calendar year shall be determined before the benefits of a plan which covers such person as a dependent of the parent whose birthday falls second in the calendar year.

## Declaration of Yvonne Glover

I, Yvonne Glover, declare as follows:

1. Each of the facts stated herein is true and correct and within my personal knowledge, and if called as a witness, I would competently testify thereto.

2. I experience excruciating back, upper torso and extremities pain every day and my doctors tell me it is due to cervical radiculopathy and a dorsal wrist ganglion cyst. These injuries are the result of several incidents that occurred at work in 2002. I also suffer from dystonia, which causes muscle spasms in my throat and neck that further compound the pain in my next, shoulders and arms.

3. I began working for Pacific Bell in June 1989 at age 32. My first position was an Operator, which required me to constantly speak over the telephone to customers. I daily talked to approximately 1,000 people, handling a variety of tasks from directing calls to connecting collect calls to answering general inquiries.

4. In 1990, I suddenly and completely lost my voice and was unable to work for an extended period of time. Over the next nine years, problems with my voice caused me to take multiple leaves of absence. Either I could not speak, or my voice was so slurred or strained that I could not complete my duties as an Operator.

5. In 1999, I was finally diagnosed with dystonia, a condition in which one or more muscles of the larynx or voicebox involuntarily contract, causing interruptions of speech and affecting voice quality.

6. The dystonia made speaking very difficult. I have difficulty articulating my words, which now often sound labored and slurred. This greatly affected, and continues to affect, my confidence. To avoid the humiliation of speaking, I socialized less and less. The dystonia also causes me to lose my breath. I often have to stop and rest in order to catch my breath.

7. In 1999, I applied and was approved for Social Security Disability Insurance benefits for my dystonia.

8. Soon thereafter, SBC, aware of my limitations and inability to speak well, contacted me and offered me the position of Staff Associate–a position where I would not be required to use my voice to the extent I did as an Operator. I commenced my Staff Associate position on November 6, 2000. This new position required much less oral communication.

**Declaration of Yvonne Glover**                                              **Page 1**

9.      As a Staff Associate, my tasks included managing the calendars, schedules and bonuses of over 400 employees in four offices.

10.     My days began by sifting through, sorting, stapling together and alphabetizing the calendars of the employees in the offices for which I was responsible. This often took several hours, though sometimes even longer. After noting attendances and bonuses, I then was required to enter the information into a database on my computer. This involved long hours spent at my desk doing rote keyboard data entry, with my neck flexed forward as I sat in front of the computer.

11.     I also was often required to communicate with employees. Because my dystonia affected my ability to communicate orally, the majority of my interaction and communication with clients took place over e-mail, which involved extended periods of time spent seated at my keyboard. Some days I was in front of my computer the entire day.

12.     To complete this data entry, I had to pay close attention. My job required me to maintain a high level of concentration and attentiveness. I had to be focused throughout the standard workday to ensure I was entering data correctly into our system.

13.     I also managed supplies, which involved the lifting, opening and unpacking of items. Additionally, I was responsible for mailing many packages between offices. This required me to lift and assemble packages that sometimes were so heavy I would have to place them on a chair to roll them to their destination.

14.     On July 19, 2002, while emptying a box of paper, I felt a pop in my wrist followed by sharp, shooting pain. I was immediately, and continue to be, treated for a wrist ganglion cyst, but I still experience pain in my wrist and arm as a result of the accident.

15.     On November 6, 2002, while I was lifting a chair to manually move it, since the wheels did not function properly, I strained my back and felt a shooting pain through my upper torso. Severe neck pain resulted, which shot through my arms and caused tingling in my fingers.

16.     On November 14, 2002, the manufacturer of my new ergonomic chair phoned me to provide assistance. The man on the phone told me to pull up on a lever on the chair, and when I did, I was ejected from the chair and hit my desk before falling to the floor. This action further injured my neck, shoulders, upper extremities and back.

17.     After my back injuries in November 2002, I visited my doctor on many occasions, seeking a diagnosis and treatment.

18.     I attempted many things to help ease the pain. I attended physical therapy twice a week for months, but it did not help much. I attempted acupuncture, but it only made my

**Declaration of Yvonne Glover**                                                    **Page 2**

P00255

symptoms worse. I attempted electrode treatment, but this did not work either. The only reprieve I found was with epidurals, though the relief was short lived.

19. Not a day went by that the pain was not an issue, or an obstacle for me to overcome. The pain in my right arm was excruciating, and even following the epidural it not only hurt, but then plagued me with numbness and the feeling of pins and needles. The pain was so bad it would keep me up at night.

20. In addition to the pain in my back and neck, I have numbness and stabbing pains in my right hand. Sometimes it feels as if someone is cutting my hand with a knife. If I lift something or attempt overhead activities, the pain and sensations are even worse.

21. It is also very difficult to turn my neck to the right. When I attempt to do so, and turn it too far, I feel a pressure-like pain that extends into my right hand. It is also very painful to flex my neck forward. When I do, it sends pain and tingling to my right fingers.

22. Keyboarding greatly increases the pain in my torso. The typing aggravates the pain in my wrist and arm, and the need to flex my neck forward to see the keyboard causes an unbearable pain.

23. From my injuries, I developed a protrusion in my neck.

24. Despite my best efforts to treat my injury, the pain in my upper torso became debilitating and began interfering with my productivity. My limitations increased as I was consistently unable to make it through entire work days.

25. In July 2004, Dr. Jill Harrell restricted me to four hour work days. Though it was still difficult, I attempted to work as much as I could.

26. Finally, after over four months of modified four-hour workdays, the pain became too much for me to endure and was causing my productivity to drop below a level at which it was reasonable for me to keep trying to work. I notified my supervisor that I would have to stop working. My last day of work was October 26, 2004.

27. I left work due to my back, neck and arm pain as of October 27, 2004. I applied for short term disability, and was denied on November 23, 2004. I appealed on January 6, 2005. SBC denied my appeal January 19, 2005.

28. In November 2004, I also reapplied for Social Security Disability Insurance benefits, which were was immediately reapproved.

29. Despite all of my best efforts at recovery described above, I still experience chronic, severe pain. I can only control it by taking medications such as Norco, Soma and

**Declaration of Yvonne Glover**                                                    **Page 3**

Lodine. I also take Klonopin daily to control my dystonia. Sometimes these pills make me nauseous or dizzy, and they also make me drowsy. Sometimes the pain is so bad that the only way to manage it is to take so much pain medication that I must lay down.

30. My pain impedes severely my everyday life. It is difficult for me to take a shower, and I am unable to wash my hair without help from a friend. Friends must help me wash clothes and do other household chores like cooking and cleaning because these tasks cause me too much pain. I cannot lift things nor raise my arms above my head because of the strain this places on my neck.

31. Before my injury I enjoyed painting, drawing and knitting. I now cannot enjoy any of these things. I cannot even put together a jigsaw puzzle without great pain due to sitting in one spot for an extended time and having to look down.

32. I am still seeing Dr. Harrell regularly to treat my condition, manage my pain, and try to get better. I do not enjoy being in excruciating pain every day. I want to recover and return to work.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on May 20, 2005, 2005 at Oakland, California.

_Yvonne Glover_
Yvonne Glover

**Declaration of Yvonne Glover**                                    **Page 4**

# SBC JOB ANALYSIS DOCUMENT

| | | | |
|---|---|---|---|
| Employer: | **SBC** | Date of Analysis: | 1/30/04 |
| Contact Person: | Gary Watts | Carrier Number: | |
| Address: | 2600 Camino Ramon | | |
| | San Ramon, CA 94583 | | |
| Phone Number: | (925)824-7665 | On Site: | ☒ YES   ☐ NO |
| | | U&C Job ☒   Mod. Job ☐   Alt Job ☐ |
| Employee: | | Analyst: | Emily Tincher M.S., CRC |

---

**JOB TITLE:**            **Staff Associate (Personnel Scheduler Function)**

**D.O.T. NUMBER:**        215.367-014

**1. Description of Job Duties per the D.O.T.**

Applicable Description:     Available ☒          Unavailable ☐

Job duties vary depending on needs of the department. Staff associate report to department manager to provide administrative support in a variety of clerical functions as needed. Compiles weekly personnel assignment schedules for department. Determines and records work assignments according to worker availiablity, senority, job classification. Completes and oversees distribution of work schedule. Adjusts schedules to meet emergencies caused by staffing needs  or increased demand for services .

**2. Description of Job Duties:**

1. Process payroll by entering data into computer from hand written time sheets.( 90 min per day) 700 keystrokes.

2. Prepare work schedules. Will enter data using keyboard into spread sheet (60 min per day) 700 keystrokes.

3. Process day off requests by entering data into computer from hand written forms (90 min per day ); 700 keystrokes ; 60 lines handwritten.

4. Assist manager with filing, (60 min per day),  faxing (30 min  per day),  and photocopying  (30 min per day) functions.

5. Word process correspondence (30 min per day) -650 keystrokes.

6. Sort and distribute mail (30 min per day).

7. Answer telephones and take messages (30 min per day ).

**3. Work Hours:**     Varies

| | | | |
|---|---|---|---|
| Hours per day: | 7.5 | Hours per week: | 37.5 | Days per week: | 5 |
| Breaks: | 2-15 minute breaks | | Lunch break: | 1-30 minutes |

P00258

## Definitions of physical activity level:

**Frequency:**   **RARELY:  Activity performed (1 - 10%)**     **OCCASIONALLY:  Activity performed (11 - 33%)**
       **FREQUENTLY:  Activity performed (34 - 66%)**     **CONTINUOUSLY:  Activity performed (67 - 100%)**

**Duration:** Amount of time activity performed

**NOTE:** Not all activities are required on each shift. When a specific activity duration is Frequent, other actives are reduced to Occasional. Certain assignments will increase to Constant activities. Average duration is noted.

APPLIES ☐   DOES NOT APPLY ☒

| Physical Activity | Activity Performed | | Frequency | Duration |
|---|---|---|---|---|
| Bending (head/neck) | YES ☒ | NO ☐ | Occasionally | 1-5 minutes |
| Bending (waist) | YES ☒ | NO ☐ | Rarely | 1 minute |
| Squatting | YES ☒ | NO ☐ | Rarely | 30 seconds |
| Balancing | YES ☐ | NO ☒ | n/a | n/a |
| Kneeling | YES ☐ | NO ☒ | n/a | n/a |
| Crawling | YES ☐ | NO ☒ | n/a | n/a |
| Twisting (head/neck flexion) | YES ☒ | NO ☐ | Occasionally | 1-5 minutes |
| Twisting (waist) | YES ☒ | NO ☐ | Occasionally | 1  minute |
| Reach above shoulder level | YES ☒ | NO ☐ | Rarely | 10-30 seconds |
| Reach at waist level | YES ☒ | NO ☐ | Frequently | 50 minutes (keyboarding) |
| Reach below waist level | YES ☒ | NO ☐ | Occasionally | 30 seconds |
| Climb Stairs | YES ☐ | NO ☒ | n/a | n/a |
| Climb Poles | YES ☐ | NO ☒ | n/a | n/a |
| Climb Ladders | YES ☐ | NO ☒ | n/a | n/a |
| Walk (level surface) | YES ☒ | NO ☐ | Rarely | 3-10 minutes |
| Walk (uneven surface) | YES ☐ | NO ☒ | n/a | n/a |
| Stooping | YES ☒ | NO ☐ | Rarely | 1 minute |
| Crouching | YES ☒ | NO ☐ | Rarely | 1  minute |
| Sitting | YES ☒ | NO ☐ | Constantly | 50 minutes |
| Standing | YES ☒ | NO ☐ | Rarely | 2 -15 minutes |
| Vision/Hearing | YES ☒ | NO ☐ | Constantly | 7.5 hours |
| Computer-Keyboarding | YES ☒ | NO ☐ | Occasionally | 20 sec to -2 minutes |
| Computer-Mousing | YES ☒ | NO ☐ | Occasionally | 10 seconds-2 minutes |
| Gripping | YES ☒ | NO ☐ | Rarely | 10-30 seconds |
| Pinching | YES ☒ | NO ☐ | Rarely | 1-20 seconds |

1/12/2005

| | | LIFTING ACTIVITIES | | | | | CARRYING ACTIVITIES | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| WEIGHT RANGES | NA | 0-3 Hours | 3-6 Hours | 6-8+ Hours | Height | NA | 0-3 Hours | 3-6 Hours | 6-8+ Hours | Dis. |
| 0-10 Pounds | | X | | | 4 ft. | | X | | | 50 FT |
| 11-25 Pounds | X | | | | | X | | | | |
| 26-50 Pounds | X | | | | | X | | | | |
| 51-75 Pounds | X | | | | | X | | | | |
| 76-100 Pounds | X | | | | | X | | | | |
| 100+ Pounds | X | | | | | X | | | | |

Heaviest Item Lifted (Independently):     Documents-3 ring binder up to 5 lbs.(copier)   Frequency:   1-2 times per shift
Heaviest Item Carried (Independently):   Document-3 ring binder up to 5 lbs. 50 FT    Frequency:   1-2 times per shift

| Physical Activity | Resistance Level | Activity Performed | Frequency | Duration |
|---|---|---|---|---|
| PUSHING: | Heavy Resistance 50-100#s | YES ☐   NO ☒ | | |
| (task assessment) | Medium Resistance 21-49#s | YES ☐   NO ☒ | | |
| | Light Resistance 1-20#s | YES ☐   NO ☒ | | |
| PULLING: | Heavy Resistance 50-100#s | YES ☐   NO ☒ | | |
| | Medium Resistance 21-49#s | YES ☐   NO ☒ | | |
| | Light Resistance 1-20#s | YES ☐   NO ☒ | | |

Please indicate if the job requires the following:     Describe:

Driving car, trucks, forklifts, or equipment?   n/a

Working around equipment/machinery?   n/a

Exposure to excessive noise?   n/a

Exposure to dust, gas, fumes, or chemicals?   n/a

Exposure to extremes in temperature or humidity?   n/a

Working at heights (scaffolding, etc.)?   n/a

Operation of foot controls or repetitive foot movement?   n/a

Use of special visual or auditory protective equipment?   n/a

Working with bio-hazards such as blood, sewage, waste?   n/a

Types of machines, tools, equipment used:   Filing shelves, computer, keyboard, mouse telephone, fax,  printer

Assistive devices:   Head set, document holder, sit /stand work station, ergonomic keyboards, variety of mouse types available, ergonomic chair.

## JOB MODIFICATIONS:
Can the position be modified:      Temporarily:    YES ☐      NO ☐
                                   Permanently:   YES ☐      NO ☐

If YES, How:

1/12/2005

P00260