IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YVONNE GLOVER,<br><br>    Plaintiff,<br><br>v.<br><br>SBC COMMUNICATIONS INC,<br><br>    Defendant._____/ | No. C 07-02652 CRB<br><br>**SUMMARY JUDGMENT ORDER** |

    Plaintiff Yvonne Glover, a former employee of Pacific Bell Telephone Company, appeals the denial of her claim for short-term disability ("STD") benefits under the Pacific Telesis Group Comprehensive Disability Benefits Plan ("Plan"). Defendant's motion for summary judgment is GRANTED – and Plaintiff's motion is DENIED – because the Plan administrator's determination that Glover could work a four-hour shift was not clearly erroneous.

**BACKGROUND**

    As an employee of Pacific Bell, Glover participated in the company's welfare benefit plan. See Third Amended Complaint ("TAC") ¶ 4. The Plan is administered by Sedgwick Claims Management Services, Inc., a third-party independent administrator.

    Glover began her career at Pacific Bell as an Operator, a position that required her to speak to approximately 1,000 people each day. Id. ¶ 8. Glover was diagnosed with

1  dysphonia in 1990, which precluded Glover from producing "normative sustained phonation"
2  for more than ten seconds, see Administrative Record ("AR") 102, but Glover continued to
3  work as an Operator until 2000 when she was again diagnosed with moderate to severe voice
4  problems. See AR 104. The speech pathologist who examined Glover in 2000 observed that
5  her voice was hoarse, strident and excessively tense. Id. Accordingly, Pacific Bell
6  transferred Glover into another position, as a Staff Associate, see TAC ¶ 9.

7  According to the defendant's job description, a Staff Associate – or Personnel
8  Scheduler – provides administrative support in a variety of clerical functions by, among other
9  things, processing payroll by entering data from time sheets into a computer, entering work
10 schedule data into a computer, filing, faxing, word process correspondence and answering
11 telephones. See P00258. A typical Staff Associate working 7.5 hours per day can expect to
12 spend 4.5 hours per day typing on a computer and 30 minutes per day talking on the
13 telephone. See id.

14 In November of 2002, Glover allegedly sustained injuries to her wrist, neck, shoulder,
15 back, and bilateral upper extremities. See TAC ¶ 12. Glover visited a physician on
16 November 7, 2002, complaining that she was experiencing a sudden onset of severe neck
17 pain and tingling in her arms after picking up an ergonomically incorrect chair at work. See
18 AR 134. The physician conducted a comprehensive examination, concluding that Glover
19 should limit overhead work and the lifting, pushing, or pulling of items over ten pounds. See
20 id.

21 On January 6, 2003, an MRI was performed on Glover. See AR 139. Dr. Stuart
22 Mansfield found that the MRI revealed a "focal central posterior disc herniation with
23 impression on the ventral aspect of the thecal sac" at C4-5, and "a small central posterior disc
24 bulge/protrusion with slight impression on the ventral aspect of the thecal sac" at C5-6. Id.

25 On February 27, 2003, Glover visited Dr. Robert Liberson for a neurosurgical
26 consultation. See AR 106. Dr. Lieberson observed that Glover complained of "agonizingly
27 severe pain extending from her neck to the fingers of her right arm." AR 107. Somewhat
28 affirming Glover's prior diagnosis of dysphonia, Dr. Liberson observed "a spastic type of

2

speech pattern." Id.  In reviewing the MRI firms, Dr. Liberson concluded that Glover's neck had "significant multilevel degenerative disease." Id.  Dr. Lieberson recommended that Glover avoid lifting more than five pounds, performing any overhead work, or using her hands repetitively and forcefully.  Id.

Glover was then examined on March 17, 2003 by orthopedic surgeon, Dr. Jill Harrell. See AR 109.  Glover complained to Dr. Harrell of right hand numbness and stabbing pain, and neck pain.  AR 110.  Upon examination, Dr. Harrell observed limited movement in Glover's upper right extremities, and that Glover experienced significant tenderness to touch on her neck and right back.  See AR 110-11.  Dr. Harrell concluded that Glover "certainly presents with a likely history of cervical spondylosis with probable right upper extremity radiculopathy," and placed Glover on modified duty with no overhead activity or lifting of more than five pounds.[1]  AR 111-12.  In addition, Dr. Harrell restricted Glover's computer time to no longer than thirty minutes at a time with a ten minute break.  AR 112.

On April 1, 2003, Dr. Harrell ordered Glover off work until April 18.  AR 113.  Then on October 29, 2003, Dr. Harrell limited Glover to no more than two hours of keyboard time in an eight hour shift.  AR 119.  On April 26, 2004, Dr. Harrell reviewed her treatment reports of Glover and other medical records, and stated that "residual permanent disability exists in this case."  AR 121.

A second MRI was conducted by Dr. Philip Rich on May 24, 2004.  See AR 140. Dr. Rich concluded that there was "a persistent central disk protrusion extending 4mm posteriorly, indenting the cord in the midline" at C4-5.  Dr. Rich also found that the "broad-based central disk protrusion" at C5-6 had not changed significantly since the earlier MRI. See id.  Dr. Rich's impression was "[c]ervical spondylosis with reversal of the normal lordosis,"[2] and "[c]entral disk protrusions – C3-4 through C5-6 with C4-5 cord

---

[1] Spondylosis is "[a] degenerative disease of the spinal column, especially one leading to fusion and immobilization of the vertebral bones." The American Heritage Medical Dictionary (2007). Radiculopathy is a "[d]isease of the spinal nerve roots." Id.

[2] Lordosis is "[a]n abnormal forward curvature of the spine in the lumbar region." The American Heritage Medical Dictionary (2007).

3

1  impingement." Id. Dr. Rich noted that there had been "[m]ild progression" in the disk
2  protrusions since the earlier MRI. Id.
3      On July 12, 2004, Dr. Harrell restricted Glover to four-hour days with only half that
4  time spent at the keyboard. See AR 120. Pacific Bell complied with Dr. Harrell's order,
5  limiting Glover to four-hour days. See AR 79.
6      On October 28, 2004, Dr. Harrell completed a "Permanent and Stationary Report," in
7  which she concluded that Glover had "reached a point of maximal medical improvement."
8  AR 122. Dr. Harrell concluded that Glover was disabled "largely due to chronic soft tissue
9  musculoligamentous strain of the cervical spine, overlying cervical spondylosis and disc
10 protrusion, central, at C5-6." Id. Dr. Harrell provided her opinion – based on the patient's
11 history, including subjective complaints, radiologic findings, physical examination findings,
12 and the doctor's own review of the medical records – "that from an orthopaedic standpoint,
13 Ms. Glover currently experiences a disability referable to the cervical spine, which precludes
14 heavy lifting, forceful pushing and pulling activities and repetitive work at or above shoulder
15 level. She is also precluded from . . . prolonged keyboarding." AR 124. Based on Glover's
16 injuries, Dr. Harrell concluded that Glover was "unable to return to her usual and customary
17 job duties," and was accordingly "a qualified injured worker and . . . eligible for vocational
18 rehabilitation services." Id.
19     On November 2, 2004, Glover filed her claim for STD benefits under the Plan. See
20 AR 269. By letter dated November 23, 2004, Jennifer Fennessy, a Disability Specialist with
21 Sedgwick, notified Glover of the denial of her claim. See AR 241. Fennessey notified
22 Glover that after a review of the medical documentation, "it was determined that the medical
23 information submitted contains insufficient observable documentation to support an off work
24 status." AR 241-42.
25     In January of 2005, Glover requested a review of her denial. See AR 229. Glover
26 also submitted further medical information. On January 19, 2005, Heidi Lasser – a Claims
27 Specialist and member of the Plan's Employees' Benefit Claim Review Committee –
28 informed Glover that her appeal had been reviewed and denied. See AR 208. The letter

1  confirmed that the CRC had considered Dr. Harrell's opinion, but concluded that "[t]he
2  medical information provided for the denial/appeal period did not contain sufficient clinical
3  findings to substantiate a disabling condition." Id.
4       Lasser relied, in part, on the report of independent physician advisor Dr. William
5  Abraham. See AR 213-16. In his report, Dr. Abraham concluded that although physicians
6  had reported Glove r suffering from constant neck pain aggravated by repetitive activities,
7  and although there was objective evidence of disc protrusion at the C5-6 level, there was no
8  indication of cord compression and electrodiagnostic studies were found to be normal. AR
9  214. Because Dr. Abraham believed there was not sufficient objective evidence to support
10 Glover's subjective complaints of pain, the physician concluded that Glover could work a
11 full 7.5 hour day. See AR 215.
12      Notwithstanding the apparent finality of Lasser's letter, Glover's counsel
13 supplemented the record on May 20, 2005 and requested that Glover's STD benefits be
14 retroactively awarded. See AR 165. The Plan reopened Glover's appeal, see AR 192, but
15 again denied her claim. See AR 47. In a letter dated September 21, 2005, Lasser indicated
16 that the Plan had retained three new independent physicians – an orthopaedic surgeon, a
17 speech pathologist and a neurologist – to review Glover's file. See id. Based on their
18 review, Lasser again concluded that the information submitted by Glover "did not contain
19 sufficient clinical findings to substantiate a disabling condition," and that none of the
20 findings were documented to be "so severe as to prevent Ms. Glover from performing the job
21 duties of Staff Associate with or without reasonable accommodations. . . ." AR 47, 49. The
22 letter summarized certain findings made by the independent physicians, including that there
23 was no documented loss of functionality in the upper extremities with regard to strength,
24 there was no clear radiculopathy pattern consistent with MRI or EMG findings, and that it
25 was unclear why Glover could no longer work four-hour days when she had been able to do
26 so five months prior and there was no significant change in her functional status. See AR 48.
27 ///
28

United States District Court
For the Northern District of California

**STANDARD OF REVIEW**

This Court reviews a challenge to an ERISA plan's denial of benefits de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115(1989). Thus, the default standard of review in ERISA cases is de novo unless the discretion to determine eligibility under the terms of the plan is "unambiguously retained." Kearney v. Standard Ins. Co., 175 F.3d 1084, 1090 (9th Cir. 1999) (en banc) (quotation omitted).

If the plan does confer discretionary authority as a matter of contractual agreement, then the standard of review shifts to abuse of discretion. See Firestone, 489 U.S. at 115. It is clear from a review of the Plan at issue in this case that the discretion to determine eligibility was unambiguously retained by the Plan administrator. The Plan confers on the General Employees Benefit Committee ("GEBC") – a committee appointed by the board of directors of the Pacific Telesis Group – "the power and discretion to resolve all factual issues presented in a claim for" STD benefits, the power to interpret reasonable constructions of any provision of the Plan, and "the responsibility to approve or deny claims for" STD benefits. See AR 343. Similarly, the Plan confers on the Employees' Benefit Claim Review Committee – a committee established by Pacific Telesis Group consisting of three or more persons – the responsibility to provide a full and fair review whenever a participant's claim has been denied, the power and discretion to resolve all factual issues presented in a request for review, and the power and discretion to adopt reasonable constructions of any provision of the Plan. See AR 346.

Despite the unambiguous retention of discretion, Glover argues that de novo review is appropriate because neither the GEBC nor the CRC actually exercised its discretion to deny Glover's claim. See Plfs. Mot. at 12. Rather, Glover claims that her claim for STD benefits was initially denied by Jennifer Fennessy, a Disability Specialist for Sedgwick who does not serve on the GEBC. Moreover, Glover alleges that her appeal was decided by only one

1 member of the CRC – Heidi Lasser – and that there is no evidence that her claim was
2 considered by the CRC as a whole.

3       Defendant is only entitled to the abuse of discretion standard of review if the party
4 that made the decision to deny Glover benefits was the party vested with discretion to grant
5 or deny claims. See Shane v. Albertson's Inc., 504 F.3d 1166, 1170 (9th Cir. 2007) ("If the
6 [decision-maker] was not properly vested with such discretion, its decision . . . would not be
7 subject to the deferential standard of review of abuse of discretion."). The Court is troubled
8 by the fact that the initial denial of benefits was communicated to Glover by a Sedgwick
9 employee who did not serve on the GEBC. There is no evidence in the Administrative
10 Record to support the conclusion that members of the GEBC even considered Glover's
11 claim, and were the GEBC the final determinative body, the Court would apply de novo
12 review.

13       The initial denial was reviewed, however, by the CRC, the body vested with authority
14 by the Plan to uphold or reverse STD claim denials. Pursuant to federal law, members of the
15 CRC were obligated to review Glover's claim without deference to the initial determination.
16 See 29 C.F.R. § 2560.503-1(h)(3)(ii). The administrative record confirms that at least two of
17 the three members of the CRC – Claims Specialist Heidi Lasser and Manager of Quality
18 Review Unit Cam Reinhart – approved of the decision to uphold the denial of benefits. See
19 AR 10. The third CRC member – ERISA Specialist Doreen Ongayo – was at least
20 tangentially involved in the decision-making process, receiving and forwarding copies of
21 pertinent medical information to other members of the committee. See AR 13, 14. Even
22 assuming that Ongayo never formally voted to uphold the initial denial, Glover has presented
23 no persuasive evidence that it was improper for the CRC to uphold the denial of her claim by
24 way of a majority vote.

25       Glover's reliance on the case of Nelson v. EG & G Energy Measurements Group, Inc.,
26 37 F.3d 1384 (9th Cir. 1994), is misplaced. In Nelson, the plan at issue expressly delegated
27 the power to interpret the plan's terms to a committee consisting of at least three people.
28 That committee could only change the rules and procedures governing the plan's

7

administration by a vote of the majority of the committee. See id. at 1388. The Ninth Circuit held that deference was not due to an interpretation provided by the Pension Administrator because the interpretative power was delegated expressly to a majority of the Committee. Nelson is distinguishable both because there is no express provision in the Pacific Bell Plan that contravenes the way in which Glover's claim was denied, and because a majority of the CRC did vote to deny Glover's claim. Under the circumstances, it is not at all clear that the decision-making authority was improperly exercised, and therefore the CRC's judgment is entitled to deference.

Because the Court applies an abuse of discretion standard to the denial of benefits, the administrator's decision can only be set aside if arbitrary and capricious. See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 875 (9th Cir. 2004). Administrators abuse their discretion by rendering decisions without any explanation, construing provisions of the plan in a way that conflicts with the plan's plain language, or relying on clearly erroneous findings of fact in making benefit determinations. See Schikore v. BankAmerica Supplemental Retirement Plan, 269 F.3d 956, 960-61 (9th Cir. 2001); Taft v. Equitable Life Assur. Soc'y, 9 F.3d 1469, 1473 (9th Cir. 1993). A decision grounded on "any reasonable basis" is not arbitrary or capricious. Jordan, 370 F.3d at 875 (quotation omitted).

"Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." Bendixen v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999). Because the abuse of discretion standard is apposite to the facts of this case, the Court will treat the cross-motions for summary judgment as an opportunity to resolve the legal questions presented by Glover's claim.

## DISCUSSION

Glover argues that even if the Court reviews the denial for abuse of discretion, any deference must be tempered in light of the financial conflict of interest between Defendant

8

and Sedgwick. Under this reduced level of deference, summary judgment is appropriate, Glover argues, because: (1) the CRC evaluated Glover's ability to work "with or without accommodation," whereas the inability to work with accommodation is not required by the terms of the Plan; and (2) the CRC relied on erroneous findings of fact when it concluded that Glover could work with accommodation. The Court concludes that summary judgment to Defendant is appropriate because Glover has not identified a meaningful conflict of interest, the Plan does contemplate evaluation of STD claims in light of possible accommodation, and the CRC's decision was grounded on a reasonable basis.

### A. Conflict of Interest

Even where an ERISA plan grants discretion to the plan administrator, the Court's review may be "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 967 (9th Cir. 2006) (en banc). Such a conflict exist where, for example, the plan administrator both administers the plan and funds it. See id.

Glover argues that Sedgwick operated under a contract which authorized Defendant to impose a penalty for, inter alia, "[a]ny denial overturned due to case management error." AR 481. The contract defined case management error as when "[a] case manager makes a clear procedural error which results in the Appeals Specialist reversing the denial." Id. According to Glover, this provision creates an incentive for Sedgwick to uphold denials when those denials are based on clear procedural error.

Glover's argument is unconvincing. Any risk that the CRC would uphold a denial flawed by procedural error is likely outweighed by the positive effect of the penalty in preventing unwarranted denials at the initial stage. Moreover, the penalty is limited to situations where the denial is marked by procedural, not substantive, error. There is no evidence to suggest that such procedural errors are so common that the penalty has a marked effect on the CRC's analysis. In short, if the penalty has any effect on CRC decision-making, the effect is almost certainly infinitesimal.

9

B. Accommodation

Glover argues that the administrator abused its discretion by imposing a requirement – that Glover not be able to perform her job <u>with or without accommodations</u> – that is not rooted in the terms of the Plan. Glover's argument is unpersuasive because the Plan and Plan Summary, when read in combination, do support the CRC's requirement.

In <u>Saffle v. Sierra Pacific Power Co.</u>, 85 F.3d 455 (9th Cir. 1996), the Ninth Circuit held that an administrator abuses his discretion when he misconstrues the language of the plan and applies an incorrect standard to the benefits determination. The administrator in <u>Saffle</u> construed the plan's definition of "total disability" – which was defined as "completely unable to perform each and every duty of [the participant's] regular occupation" – to mean "unable to perform a substantial portion of her regular job <u>with accommodations that could have been made</u>." <u>Id.</u> at 456 (emphasis added). The court held that because the plan did not talk in terms of accommodation at all, the administrator had essentially rewritten the plan's terms in a way that conflicted with its plain language. <u>Id.</u> at 458, 460.

<u>Saffle</u> is not controlling in this case, however, because the language of Pacific Bell's plan is materially distinguishable. In relevant part, Pacific Bell's plan defined short term disability as a "medical . . . condition, which prevents an Employee from engaging in his or her normal occupation or employment with the Participating Company, or <u>such other occupation or employment as he or she is assigned in accordance with the Participating Company's normal practices</u>." AR 331 (emphasis added). Glover had already been assigned to a four-hour workday. Thus, in determining whether Glover's medical condition prevented her from engaging in her "normal . . . employment," the Plan's independent physicians were permitted to consider whether she could continue to work four hour days.

Moreover, the Plan expressly permitted the administrator to consider whether Glover could engage in employment assigned in accordance with Pacific Bell's normal practices. The Plan Summary reveals that Pacific Bell's normal practice was to place injured or sick employees on modified duty. <u>See</u> AR 318 ("STD benefits are designed to provide benefits only if you are disabled from all work; benefits are not paid if you can perform available

10

1 modified duty."). Modified duty could include modified work assignments or partial days.
2 See AR 320. Whether designated "modified duty" or "accommodation," the import of the
3 summary's language is clear: the administrator was permitted to consider whether Glover
4 could work if certain concessions were made by Pacific Bell. It is of no matter that Pacific
5 Bell's normal practices are spelled out in the Plan summary rather than the Plan itself. See
6 Bergt v. Retirement Plan for Pilots Employed by MarkAir, Inc., 293 F.3d 1139, 1143 (9th
7 Cir. 2002) ("[W]e conclude the [summary plan document] is a plan document and should be
8 considered when interpreting an ERISA plan.").

Because Pacific Bell's Plan and plan summary are most reasonably read as incorporating an "accommodations" standard, the administrator did not rewrite the terms of the plan when she denied Glover benefits because Glover could have performed a job with modified duties, such as a partial workday.

### C. Clearly Erroneous Findings of Fact

Glover's final – and most weighty – argument is that even under an abuse of discretion standard, the administrator's denial should be reversed because the denial was based on clearly erroneous findings of fact. Although the administrator's denial was dubious – and might require reversal under de novo review – the Court cannot say that the denial was arbitrary and capricious. Accordingly, summary judgment must be GRANTED to Defendant.

The Ninth Circuit confronted similar facts to the case at bar in Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869 (9th Cir. 2004). In Jordan, the claimant complained of pain as a result of fibromyalgia that interfered with her ability to work. Id. at 871. On one hand, the claimant's treating physicians diagnosed her with fibromyalgia and concluded that she could not perform even sedentary work. Id. at 873. On the other hand, the plan administrator hired independent physicians who concluded that the claimant, although disabled, could perform sedentary work. Id. at 874. After unsuccessfully requesting follow-up information from the claimant's treating physicians, the administrator

11

denied benefits, finding that the claimant's fibromyalgia was not so severe as to disable her from sedentary work. Id.

The claimant filed suit, but the denial was affirmed by the Ninth Circuit. The court noted that the no special deference was accorded to treating physicians, and the fact that the treating physicians failed to respond to the administrator's inquiries undermined their opinions. See id. at 878, 879. Further, the court noted that it is "typical" for administrators to be confronted with conflicting medical reports, and that a denial must be upheld under the abuse of discretion standard so long as those medical reports supporting denial have a reasonable basis. See id. at 880. The court recognized the particular difficulty in reviewing an application for benefits based primarily on pain:

> After a certain age, most people have pain, with or without palpation, in various parts of their body, and they often have other medical conditions. Sometimes their medical conditions are so severe that they cannot work; sometimes people are able to work despite their conditions; and sometimes people work to distract themselves from their conditions. Physicians have various criteria, some objective, some not, for evaluating how severe pain is and whether it is so severe as to be disabling. It is not for a[] . . . court to decide that fibromyalgia should be treated by ERISA plan administrators as disabling in a particular case. That is a medical and administrative judgment committed to the discretion of the plan administrator based on a fair review of the evidence.

Id.

As in Jordan, the plan administrator in this case did not conclude that Glover was not disabled or that her reports of pain were unbelievable. Rather, the plan administrator decided to rely on reports by two independent physicians who – contrary to the opinion of Glover's treating physician – concluded that despite Glover's disability, she could work a four-hour shift. See AR 57 (report of orthopaedic surgeon Jeffrey Been concluding that although Glover's "cervical spondylosis with multilevel disc protrusions" was disabling, a four-hour workday was appropriate); AR 66 (report of neurologist Joseph Jares concluding that although "herniated cervical disc at C5-C6 with bilateral upper extremity radicular pain" was disabling, "[t]he clinical findings support transitional work of four-hour days").

Per Jordan, the only question for the Court is whether there is a reasonable basis for the administrator's conclusion that despite Glover's disability, she could work a four-hour

1  shift. The Court concludes that there was. As to the 1990 and 2000 diagnoses of dysphonia,
2  the most recent evidence suggested that although Glover's speech was impaired, she was
3  understandable. See AR 128. Thus, there was support for the conclusion that Glover could
4  spend minimal time on the phone.

5  As to Glover's back and neck pain, there was some evidence to support the conclusion
6  that although Glover's pain was real, a four-hour work schedule was feasible. First, Dr. Been
7  noted that Glover had no documented loss of functionality in the upper extremities with
8  regard to strength. See AR 56; see Jordan, 370 F.3d at 880 (noting that weakness might
9  indicate atrophy from pain-induced disuse). Second, Dr. Been recognized that there was not
10 consistent evidence demonstrating that Glover had radiculopathy, a disease of the spinal
11 nerve roots. See AR 56. Third, Dr. Been noted that even though there was no significant
12 change in her functional status, Glover had been able to withstand four-hour workdays for
13 the preceding five months. Id.

14 As Glover persuasively argues, the fact that Glover may have endured five months of
15 pain does not conclusively establish that she was capable of continuing to endure it. See
16 Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 918 (7th Cir. 2003)
17 ("The plan's bad argument is that because Hawkins worked between 1993 and 2000 despite
18 his fibromyalgia and there is no indication that his condition worsened over this period, he
19 cannot be disabled. This would be correct were there a logical incompatibility between
20 working full time and being disabled from working full time, but there is not. A desperate
21 person might force himself to work despite an illness that everyone agreed was totally
22 disabling. Yet even a desperate person might not be able to maintain the necessary level of
23 effort indefinitely.") (internal citations omitted). To be sure, standing alone, the fact that
24 Glover worked a four-hour shift for five months is not dispositive. But it is not unreasonable
25 to expect Glover's treating physician to provide some explanation for why she changed her
26 initial position that a four-hour shift was suitable. See AR 119. Dr. Harrell was certainly
27 permitted to change her mind, but the fact that she failed to respond to the administrator's
28 request for further information, see AR 241, undermines Dr. Harrell's ultimate conclusion

13

that Glover was "unable to return to her usual and customary job duties," AR 124.  See Jordan, 370 F.3d at 878.  Glover's work history, in conjunction with no objective evidence of significant muscle atrophy, provides at least a reasonable basis for the denial, even if such evidence would not be sufficient to withstand de novo review.

## CONCLUSION

Summary judgment is GRANTED to Defendant, and DENIED to Plaintiff. Reviewing the administrator's denial for an abuse of discretion, the decision must be upheld because there was a reasonable basis for the denial and the administrator did not rewrite the terms of the plan.

**IT IS SO ORDERED.**



Dated:  February 29, 2008

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE